# WHEELING.

## CRISLIP, GUARDIAN, &c., *v.* CAIN.

Submitted January 12, 1882. Decided April 22, 1882.

1. If in a chancery cause land has been sold, and a sale confirmed, and a rule issued against the purchaser to show why the land should not be resold, to which rule the purchaser answers, and the evidence to overrule and support his answer is all taken, and the plaintiff in the original cause then dies, and the court, the original cause not having been revived, enters a decree on the proceedings under the rule, HELD:

    The court had jurisdiction to render such decree. (p. 457.)

2. Exception to a commissioner's report has to be of the nature of a specia demurrer; and if the report is erroneous, the party complaining of the report or excepting thereto must in his exceptions point out the errors with reasonable certainty, so as to direct the mind of the court to them; and when he does so, the parts not excepted to arc admitted to be correct not only as regards the principles but as relates to the evidence, on which they are based. (p. 458.)

3. If lands be sold under direction of a court of chancery by certain metes and bounds by a widow as guardian of her infant children, who own the land subject to the widow's right of dower therein, and she conveys their interest as well as her own designating the boundaries of the land and warranting the title, and she having shown to the purchaser before the sale the tract offered to be sold, and he is put in possession and enjoys without controversy all the land so shown him, the title thereto being per-fect, but it turns out, that the boundaries set out in the deed include land not shown to the purchaser, and never held or claimed by the vendor, or those under whom she claims, the court by a rule in said cause may properly require the purchaser to pay the whole of the purchase-money without allowing him any abatement for the land, which was not shown him, but which is within the boundaries specified in his deed, and to which his title is worthless. (p. 459.)

| | |
|---|---|
| 19 | 438 |
| 54 | 502 |
| 19 | 438 |
| 56 | 53 |
| 56 | 58 |
| e57 | 102 |
| e57 | 108 |
| 57 | 109 |
| e57 | 110 |
| e57 | 111 |
| 57 | 112 |
| 57 | 117 |
| 57 | 118 |
| o57 | 126 |
| 57 | 127 |
| 57 | 129 |
| e57 | 130 |
| 57 | 131 |

| | |
|---|---|
| 19 | 438 |
| 59 | 39 |
| 59 | 45 |
| 59 | 208 |
| 59 | 632 |
| e 60 | 99 |
| e 60 | 100 |
| 60 | 103 |

4. A special commissioner is by consent of parties appointed by a chancery court to make report on certain matters in controversy in the cause. The report of such commissioner may be set aside by the court for causes, which would justify the court in setting aside the report of a general commissioner on the subject, who has without the consent of parties been directed to make the report; such special commissioner is not to be regarded as an arbitrator chosen by the parties, nor his report as an award. (p. 462.)

| | |
|---|---|
| 19 | 438 |
| f61 | 47 |
| 61 | 235 |
| 61 | 516 |

| | |
|---|---|
| 19 | 438 |
| 62 | 252 |
| 63 | 148 |
| f63 | 273 |

5. When a party has been guilty of a fraud in making a contract with another, a court of equity at the instance of the party defrauded may set aside the contract or may award to the party defrauded a compensation for the injury inflicted by way of abatement from what may be due to the other party, provided the amount of such abatement can be ascertained with certainty by fixed rules; but if the nature of the fraud is such, that the injury done to the party defrauded cannot be definitely ascertained by any fixed rule but is in the nature of unliquidated damages, the court of equity has no jurisdiction to make such abatement, but the party injured should be left to his action of deceit at law. (p. 464.)

| | |
|---|---|
| 19 | 438 |
| 64 | 658 |
| f65 | 89 |
| 19 | 438 |
| 66 | 187 |
| 66 | 213 |

6. Fraud is usually shown by either establishing a *suggestio falsi* or a *suppressio veri*. A *suggestio falsi* or misrepresentation, in order to amount to fraud, must not be about a trifling or immaterial thing, but must be material and not vague and inconclusive in its nature, and must not be a mere matter of opinion or about a fact equally open to the enquiry of either party, and in regard to which neither could be presumed to trust the other; and when the misrepresentation is material and not vague, in order to amount to fraud, it must have been actually relied upon by the other party, who must have been misled by it to his injury to do or agree to do that, which he would not otherwise have done or agreed to do. (p. 464.)

7. If a party to a contract makes a statement of a material fact not on his own knowledge but on information, and if either from the express declaration of the party or from the nature of the fact stated the other party understands, that the fact is stated on information and not on knowledge, the party cannot be guilty of fraud, if he had reason to believe and did believe his statement to be true, though it turned out to be untrue, and though the other party did rely on it, and was by it misled to his injury. (pp. 468, 471.)

8. But if a party to a contract makes a statement of a material fact, when he has no personal knowledge of the fact and no real information on the subject, or if he makes a statement of such a fact as made on his own personal knowledge, when he really has no such personal knowledge but has information on the subject, which he believes to be reliable, he is still responsible as for a fraud, if the other party relied upon his statement, and was thereby misled to his injury; and a statement will be regarded as thus made on the personal knowledge of the party, though he does not say so expressly, if the mode of making the statement and the nature of the fact declared is such, as would naturally lead the other party to the conclusion, that this statement was made on personal knowledge and not on mere information. In such a case, if he would not be held responsible for the statement as a fraud, the party making it is bound to warn the party, to whom it is made, that it is made on information only, so as fairly to put him on enquiry. (pp. 464–468).

9. If a mutual innocent mistake in reference to the substance of a contract is made by the parties, though neither party be guilty of fraud in the sense above explained, a court of equity has jurisdiction to rescind the contract and should do so or refrain from doing so according to circumstances. The jurisdiction of a court of equity in such a case is based on the fact, that the minds of the parties to the contract because of such mistake never in fact met; so there was really no mutual assent to the contract, and no contract is binding without such mutual assent. (pp. 468, 476, 482).

10. But no court of equity in such case of mutual innocent mistake, neither party being guilty of any fraud in the sense above explained, has a right to modify and alter the contract of the parties, so as to make it correspond with what, the court may think it probable, would have been the terms agreed upon by the parties, had they not by means of such innocent and mutual mistake been ignorant of the actual facts at the time, when the contract was entered into. All the court can do in such a case is to rescind the contract. It cannot modify the contract; for that would really be making a contract for the parties against their consent and then enforcing it, which would be usurpation of a very dangerous power. (pp. 468, 474).

11. But though there be no fraud in a contract of sale, yet the vendor may sometimes be responsible for a false affirmation of a fact, when such affirmation amounts to an implied warranty, as it may, when it appears, that it was so intended by the parties to the contract; but this must appear, and it is not alone sufficient without this appearing to show, that the vendee relied on the statement of the vendor and was thereby induced to purchase at a price, he would not otherwise have agreed to give. It is therefore often difficult to determine, whether an affirmation does or does not amount to implied warranty. (pp. 472, 480).

12. A court of equity may reform a written contract, where the suit is brought for the purpose, and it is alleged, that by fraud, accident or mistake of the scribe or by some other means the real agreement of the parties was not that, which is expressed in such written agreement; but except when such a suit as this is brought, no parol evidence can be introduced to explain, alter or modify in any manner a written agreement. (p. 483).

13. To this rule there is one exception, that is, when on the face of the written contract the meaning of the parties is ambiguous. In such case the situation of the parties, the circumstances surrounding them, when the contract was entered into, and their conduct subsequently in carrying into effect the written contract may be received as evidence; but this is the only character of parol evidence, which can be received to show the real intention of the parties in such ambiguous contract, and all other, such as the verbal declarations of parties, must be excluded. (p. 483).

14. Applying these principles to a written contract for a sale of land or to a deed conveying land, if it be a contract for a sale of land in gross, and the number of acres contained in the tract sold or conveyed is named, and on survey it turns out afterwards, that there is either a deficiency or excess in the number of acres in the tract, under some circumstances a court of equity might rescind the contract or annul the deed because of a considerable mistake of the parties as to the number of acres in the tract, though such mistake was mutual and innocent, and neither party was guilty of any fraud in the sense, in which fraud is above explained Such rescission could not be made, unless the mistake was so material as to show, that it affected the substance of the contract, and that the minds of the parties had not really come together on the terms stated in the contract or deed. But in such a case, if there was no fraud in either party in the sense above explained, a court of equity could allow no abatement on account of a deficiency in the land, nor could it require the vendee to pay any increased price because of a surplus, the mutual and innocent mistake of the parties not authorizing a court of equity to make for them, as this would be doing, a new contract, such as the court might think it probable, they would have made, had they known the true quantity of the land, when the contract was made by them. (pp. 485–557.)

15. But as the vendee of land has a right to rely on the statement of the vendor as to the number of acres in a tract of land, which he sells, and naturally does rely upon it; and as the quantity of land is generally a material matter in the purchase of a tract of land, it ought *prima facie* to be regarded, that the vendee was induced to pay or agree to pay the price named in the contract or deed because of the statement in it by the vendor of the number of acres, which statement, if positive, should be regarded as a statement made on the personal knowledge of the vendor; and therefore in the absence of all other proof the vendor must be regarded as guilty of a fraud on the vendee; and a court of equity should for this reason require the vendor to make a proportionate abatement from the purchase-money. (pp. 485–557).

16. This *prima facie* case of fraud can not be rebutted by the vendor by simply proving, that he believed, that the quantity of land named in the deed was the true quantity; for if he did not know the true quantity, he ought to have qualified his positive statement of the quantity by saying, that it was the estimated or supposed quantity, or in some other manner. But this *prima facie* case of fraud on the part of the vendor can be rebutted by parol proof showing, that the vendee did not in point of fact rely on the vendor's statement of the quantity and was not induced by that statement to buy at the price, which he paid. (pp. 485–557).

17. The law as above stated would not be varied by the statement of the vendor in the contract or deed, that the land contained a specified number of acres more or less, as this statement would be no less positive than the other ; for the words "more or less" are not construed to mean "as estimated," "as supposed," but are construed to mean *about* the specified number of acres and are considered or designed to cover only such small errors of surveying, as usually occur in surveys. (pp. 485-557).

18. If the vendor by his written contract agrees to convey, or by his deed does convey, for a specified price a tract of land described by metes and bounds or otherwise with the words added " containing a specified number of acres," this on the face of such contract or deed is a contract not by the acre but in gross and without any implied warranty of the quantity. But the specification of the quantity exactly without the addition of the words "more or less" or any other qualifying words renders the deed or contract ambiguous as to whether the parties did or did not intend, that the vendor by such positive affirmation of quantity should be regarded as making a warranty, that there was this quantity. And if in addition to the exact specification of the quantity of the land the contract or deed on its face shows, that the price to be paid for the land is a multiple of the number of acres specified, this would render the deed ambiguous, as to whether it was a contract in gross or by the acre (pp. 485-557).

19. If such deed or contract is rendered ambiguous on its face in the manner just spoken of, the court for aid in interpreting the same may con sider parol evidence of the circumstances, which surrounded the parties, and their situation, when the contract or deed was made, and also the conduct of the parties in carrying the contract into execution ; but the court can consider no other sort of parol evidence, such as the declaration of the parties before, at the time of or after the execution of the deed or contract ; nor can the court call in aid any kind of parol testimony to alter, explain, or modify the written contract or deed, if it is unambiguous on its face. (pp. 485-557).

20. A court of equity has clearly jurisdiction to abate from the purchase-money due from a vendee for the deficiency in such a sale of land, by which the vendee was injured through the fraud of the vendor in misstating the quantity of the land on the face of his contract or deed or orally. (pp. 485-557).

21. In such a suit the court can consider all sorts of parol evidence either to establish or rebut the alleged fraud of the vendor or to prove or disprove, that the statement of the vendor of the number of acres in the tract sold in gross was relied on by the vendee, or that it was not relied upon, or that by it he was or was not induced to purchase at the gross price, which he agreed to pay. The vendee in such a case would be permitted to prove by parol evidence, that the price named in the written contract or deed was arrived at by multiplying the number of acres specified by a certain price per acre, which, by such parol proof it may be shown, he was willing to pay, and the vendor to receive, this being direct and positive proof going strongly to establish (taken in connection with

the price named in the contract or deed) that the vendee did in point of fact rely on the statement of the vendor as to the number of acres in the tract and was thereby induced to pay the price, which he agreed to pay, for the tract.   This evidence, though it assumes the form of proving, that the land was sold by the acre, is admissible not to contradict the written contract or deed but to prove, that the vendor's statement of the quantity of the land did in point of fact deceive the vendee to his injury, and in this way to establish the fact at issue in a suit of this character, that is, the fraud of the vendor.   (pp. 485–557).

22.  In this case the vendor by a written contract agreed to sell for $2,000.00 a tract of land, the boundaries of which were set forth, containing one hundred and forty acres.   This was *clearly* a contract in gross; and *prima facie* there was no warranty by the vendor, that there were one hundred and forty acres in the tract; but this contract is on its face ambiguous as to whether by this representation of the quantity as one hundred and forty acres the vendor intended to warrant this quantity, and therefore parol evidence was admissible to show the circumstances surrounding the parties and their situation, when the contract was made, and also their conduct in carrying into execution the contract, excluding oral declarations of the parties.   The facts, which will be presently stated, showed clearly, that the vendor did not intend to warrant, that there were one hundred and forty acres in the tract; but the vendor was nevertheless responsible, if by her positive statement, that there were one hundred and forty acres in the tract, the vendee was induced to buy at the price of $2,000.00.   The *prima facie* presumption is, that he was so induced, and the vendor was guilty of a fraud; but this she might rebut by proving the circumstances, under which the contract was made, the situation of the parties, their conduct in carrying the contract into execution and the oral declaration of the parties at the time when the contract was made, and the oral declarations of the vendee subsequently.   The oral testimony proved, that the vendor was a widow, who had a dower interest in the land, the land itself subject to this dower belonging to her children; that by the leave of the court she as the guardian of her children and in her own right sold this land to the vendee; that her husband had bought it about two years before for $2,000.00, and she sold it at the same price; that the purchaser was about as well acquainted with the land as she was, both living near it; but at the time, when the price was agreed upon, neither of them probably knew the quantity of the land; that when they called together on the scrivener to reduce this contract to writing, they did not tell him to insert in the contract the number of acres, and he did not do so but took the balance of the description of the land from the deed to the vendor's husband, which had been furnished the scrivener as an aid in drawing the contract; that when he read this contract over to the parties, the vendee said, that he bought the land, that had been conveyed to the vendor's husband, and that the quantity of the land named in the deed, one hundred and forty acres, must be inserted; the vendor admitted, that the sale was of the land, which had been deeded to her husband, and that the price to be paid her was $2,000.00; that after some contention as to the propriety of inserting the quantity in the contract, it was inserted, and the contract was then signed; that the vendee took pos-

session of the land and held it a number of years, but when pressed in this suit for the payment of the purchase-money, he had the land surveyed and found, that there was a deficiency of six and three-quarters, acres.   Upon this state of facts it is held, that the vendee was not induced to pay $2,000.00 for the land by the representation of the vendor, that there was in the tract of one hundred and forty acres, on which representation he relied and acted, and therefore he is entitled to no abatement from the purchase-money.   (pp. 557–563).

23.  The opinion of Judge Baldwin in the case of *Blessing* v. *Beatty*, 1 Rob. R. p. ——, and the subsequent Virginia cases which have adopted his views, as also the first syllabus in *Nicholas* v. *Cooper*, 2 W. Va. p 347 disapproved.   (pp. 533–545).

Appeal from and *supersedeas* to a decree of the circuit court of the county of Roane rendered on the 20th day of March, 1880, in a cause in said court then pending, wherein Sarah A. Crislip, guardian, &c., was plaintiff, and Rezin Cain was defendant, allowed upon the petition of said Cain.

Hon. Joseph Smith, judge of the seventh judicial circuit, rendered the decree appealed from.

GREEN, JUDGE, furnishes the following statement of the case :

This cause was originally a suit brought under chapter 83 of our Code for the sale of lands of the infant children the heirs of Allen Crislip, deceased.   The suit was instituted in the circuit court of Roane county by Sarah A. Crislip, their guardian ; and the bill besides setting out the facts required to be set out in said chapter of the Code states, that beside the home farm, on which these infants and their guardian resided, their father had died seized and possessed of another tract of land in said county, containing one hundred and forty acres adjoining this home-farm, which descended to these infant children, and in which the plaintiff had a right of dower as widow; that this land was described in the deed from James Riddle and wife to Allen Crislip, filed with the bill dated March 7, 1870.   This deed conveyed " a certain tract of land containing one hundred and forty acres beginning at pointers on the east side of the left hand fork of Reedy creek corner to James E. Burdett, thence south 2° west, so far as will make a straight line from the original between said Riddle and James E. Burdett, the call to be north 89° west through

Thomas Wardman's town-field 185 poles to a small gum, corner to W. K. Board, thence north 2° east 118 poles to a small red oak, another corner to W. K. Board, thence south 89° east 180 poles to beginning corner." The bill states, that the buildings on this tract of land were rapidly going to ruin, the fences being destroyed, and the place growing up with weeds and underbrush. The bill also states, that "the plaintiff could sell this land to one Rezin Cain, for the sum of $2,000.00 payable on certain terms stated. The prayer of this bill is, that these infants may be made defendants, and that the court would decree said tract of one hundred and forty acres of land to be sold to said Rezin Cain upon the terms and conditions stated, and if not, that the same might be sold at public sale ; and the further prayer is for general relief. This bill was sworn to by the plaintiff.

On November 12, 1872, the court rendered the following decree in the cause:   "This day the defendants, Orlando Crislip, Daniel W. Crislip and Josiah Crislip, tendered their joint and several answer (the said defendants appearing to be over the age of fourteen years) which is ordered to be filed, to which answer the complainant replies generally, and the said defendants together with Victoria Crislip their co-defendant by their guardian *ad litem* Isaiah Baker, who was appointed such at the rules, also tendered their answer, which is also ordered to be filed, to which answer the complainant replies generally; and this cause coming on this 12th day of November, 1872, to be heard on the bill and exhibits filed therewith, the processes isued and proceedings had at rules, said answers and replications thereto, and upon the depositions of witnesses taken and filed in the cause, and was argued by counsel, the said guardian *ad litem* being present at the hearing. On mature consideration whereof the court is of opinion, that it is clearly shown by the bill and exhibits and evidence adduced, that the interest of said minors will be promoted by a sale of the tract of one hundred and forty acres of land in the bill and exhibits in this cause mentioned and described, and that the rights of no person will be violated thereby. It is therefore adjudged, ordered and decreed, that the said Sarah A. Crislip, guardian &c., do sell the.tract of one hundred and forty acres of land described in the bill and exhibit filed there-

with either at public or private sale and on such terms and conditions, as by her may be deemed most beneficial to said minors, taking from the purchaser bond with ample security, should the sale be made on a credit, and that she report her proceedings under this decree to this Court."

On the next day the following decree was rendered : "This day Sarah A. Crislip, guardian &c., tendered her report of sale of the tract of one hundred and forty acres of land mentioned and described in the bill and proceedings of this cause, which report is ordered to be filed ; and it appearing to the court from the said report, that said guardian sold the said tract of land for the sum of $2,000.00 (on certain terms named in the decree and which are the same as those stated in the bill as the terms, on which she could sell the land to Rezin Cain), it is therefore adjudged, ordered and decreed, that said report and sale be and the same is hereby approved and confirmed" * * * "that Sarah A. Crislip, widow and guardian, &c., do make and acknowledge for record a deed with covenants of general warranty conveying to said Rezin Cain the said tract of one hundred and forty acres of land retaining in said deed a lien for the payment of the deferred installments of the purchase-money."

The report of sale referred to in this decree has been lost ; but the decree and the deed executed in pursuance of it sufficiently set forth the contents of this report. The deed executed was dated the same day as this decree, November 13, 1872, and it recites : "WHEREAS, Sarah A. Crislip, guardian, &c., as aforesaid by virtue and in pursuance to the authority vested in her by a decree of the circuit court of Roane county, West Virginia, pronounced on the 12th day of November in a certain suit in chancery then depending in said court, wherein Sarah A. Crislip, guardian, is complainant, and the said Orlando Crislip and others are defendants, did sell the real estate herein mentioned and described according to the terms and conditions required by said decree, at which sale the said Rezin Cain became the purchaser for the sum of $2,000.00, of which said Cain paid the sum of $500.00 in hand and for the residue executed his three several bonds, each for the sum of $500.00 and payable respectively in one, two and three years from the 13th of November, 1872, and

bearing interest from the first day of November, 1872, and thesaid court having by a subsequent decree rendered in said cause, to wit, on the 13th day of November, 1872, duly confirmed the said sale and ordered, that the said Sarah A. Crislip, widow and guardian, &c. aforesaid, do make and acknowledge for record a deed with covenants of general warranty, conveying to the said Rezin Cain the tract of one hundred and forty acres of land herein mentioned and conveyed, reserving in said deed a lien for the payment of the deferred installments of the purchase-money therefor aforesaid." This deed then conveys "unto the said Rezin Cain the following tract or parcel of land situated on the left hand fork of Reedy creek in Roane county, and bounded and described as follows:" (giving the boundaries precisely as set out in the deed from James Riddle and wife to Allan Crislip) and after giving these boundaries concluding thus, " containing one hundred and forty acres and being the same land conveyed by James Riddle and wife to the late Allan Crislip by deed dated March 7, 1870, of record in the recorder's office of Roane county, to which said deed reference is hereby made." The conveyance is with general warranty, and the vendor's lien for the unpaid purchase-money is expressly reserved.

On September 3, 1877, the court reciting, that it appeared by affidavit, that Rezin Cain had not paid the second and third installments of said purchase-money then due, on the plaintiff's motion it was ordered, that he should appear on the third day of that term to show cause, if any he can, why said tract of land should not be resold for the payment of said unpaid purchase-money. To this rule Rezin Cain by his counsel filed an answer, in which he says : " He bought said tract of land as and for one hundred and forty acres, and the said land was represented to him to contain —— acres of valuable creek bottom land ; that he paid off the two first bonds for the deferred payments and also paid $50.00 on the last bond with all the interest on the first of said two bonds, so that the sum of $450.00 of the principal remains unpaid." He further says, that he never got the land he bought, that he has had the land surveyed by the courses and distances in the deed to him, and they include about twenty acres of valuable bottom land with other lands and improvements, of which he

has never had the possession, and which he cannot get, they being held adversely by the plaintiff and defendants in this suit and by John M. Grier and others; that these twenty acres is worth $1,000.00, and that they have thus been held adversely by these parties long before his purchase. This answer was sworn to by Cain.

This answer was replied to by Sarah A. Crislip, the replication being also sworn to. She denies, that she represented to Cain, that said tract of land contained any bottom or other land except what was enclosed with fences, which he could plainly see. She says, that the first bond has been paid and $200.00 on the second. That the two first bonds have only been claimed to have been paid off by an abatement of $300.00, which Cain claims for land, which he ought to have got, as he says, but had not in his possession. She says he got all the lands, which he supposed he was buying; that she showed him the boundary and especially the fence through the bottom, so that he could not have misunderstood what he was buying; and that he has possession of all the land, which was shown to him as the land he was buying, and none of it is in the possession of either the Crislips or John M. Grier and others. She says, she sold the farm, as it was, to Cain for $2,000.00; that she told him the papers called for one hundred and forty acres; but she says, she did not sell the land by the acre, nor did she sell any specified number of acres.

On the 7th of March, 1878, the court by a decree referred he cause to A. A. Smith thereby appointed a special commissioner to ascertain, establish and report the lines and boundaries of the James Riddle farm, conveyed by Sarah A. Crislip to Rezin Cain, and the amount of the deficiency in said tract of land, as sold to said Cain, and the number of acres sold to him, which he is unable to use and enjoy under his purchase and deed from the plaintiff, and the value of this deficiency, if any, and also to ascertain what said Cain had paid on his purchase and the balance due from him. And this special commissioner was authorized to do any surveying necessary or required by the parties and return his report and a plat of the land. He was required to take the proper oaths before acting as such special commissioner.

On March 5, 1879, an order was made for a rule against the parties to this suit to show cause, why R. Cain, the purchaser of said land, should not be put in possession of a portion of said land held by the parties to this suit. This rule was issued on the motion of Cain and was based on his own affidavit and that of one Armstrong. These affidavits state, that Armstrong and A. A. Smith had made a careful survey of the land according to the courses and distances named in the deed and found, that about seven acres of the land according to said courses and distances were held and enjoyed by the parties in this cause, and about five acres by J. M. Grier. A plat of this land is filed with these affidavits. Cain's affidavit states, that this land not in his possession is worth $50.00 per acre and its annual rent is worth $100.00. On March 10, 1879, the court recommitted to A. A. Smith, special commissioner, his report, which he had made according to a former decree of the court. On September 18, 1879, the court by an order reciting that A. A. Smith had failed to make an intelligible report and refused to act further, that he was removed as special commissioner, and by consent and agreement Jonathan Smith was appointed a special commissioner in his place.

On March 18, 1880, an order was made reciting that Sarah A. Crislip, the plaintiff in the rule against R. Cain, the purchaser, had died, on the motion of the defendants, who were entitled to the proceeds of the land, it was ordered, that A. Cain, who was appointed a special commissioner for that purpose, should collect the purchase-money bonds, and that the proceedings under said rule should proceed in his name. He was required to give bond with good security with condition to pay over or invest, as the court should direct, any moneys received by him.

Upon this rule a large number of depositions has been taken. They prove, that when this farm was owned by James Riddle, and for many years before he sold it to Allen Crislip, probably as far back as 1855, he built a fence along the southern side of this farm from what in the deed from Riddle to Crislip is called a small gum, corner to William K. Board, to the bank at the western end of the line, which fence has ever since remained in very nearly the same position, having

been reset several times but nearly in its old place. By the building of this fence together with the fencing on it before the farm was enclosed. The only dispute about the boundary of this James Riddle farm is as to the true location of this gum-corner and the true running of this line from this gum-corner to the bank-corner at the end of the lane. There never was any controversy about the location of this southern border of the farm, till it was raised by Rezin Cain, the purchaser of this James Riddle farm from Sarah A. Crislip. From the time when James Riddle built this fence, till Cain raised this controversy, this fence was recognized as on the boundary between James Riddle's farm and those who owned the land south of it. One of those who so owned land adjoining it on the south was Allen Crislip. When he bought this farm of Riddle in 1870, Mrs. Riddle, his wife, says, he told Allen Crislip, that this fence was not on the true line, but if the true line was run and established, it would take in some of the land of Allen Crislip and of Hardman, who held the land south of it. But Mrs. Riddle admits, that this fence was there, and she never heard of any difficulty about its being on the true line between her husband and Crislip or anything about any difficulty, till her husband was about to sell this land to Allen Crislip in 1870. When he told him about it, her husband said, he would have had the line run and established long before that, except he knew, it would make a trouble with him, Allen Crislip and Hardman. With this exception there is no evidence, that Riddle on the one side and Crislip and Hardman on the other ever raised any question or ever doubted, that this fence was on the true line. And a number of witnesses testify, that this gum-tree was either at or very near the corner of the fence as thus fixed around the James Riddle farm. No witnesses testified to its being located otherwise than near this fence except Board, whose testimony would put it about two poles outside of the fence. The gum-tree itself has been down for many years.

The two surveys made, one by M. B. Armstrong and the other by Jonathan Smith, the special commissioner, locate the southern lines from this gum-corner to this bank at the end of the lane southward of the old fence. These two surveyors however do not themselves agree in the running of

these lines.  Smith fixed the place, where this gum-tree-corner ought to be; at a point six poles south from the point, where the evidence seems to establish satisfactorily, that it was located ; and Armstrong's survey would fix this point still further south, about four and one-half poles.  According to Smith's location of this gum-corner and his running of these southern lines this Riddle farm contains one hundred and forty-three and one half acres, or three and one half acres more than the deed calls for.  According to Armstrong's running of this line and location of this gum-corner, this farm contains but one hundred and thirty-eight acres; and yet it is obvious, that by the Armstrong mode of running out this land, it would contain about nine acres more than the same farm as run out in Smith's mode ; and had the same lines run by Armstrong been measured so as to correspond with Smith's survey, this farm as measured by Armstrong would have been one hundred and fifty-two and one half-acres.  The difference between the one hundred and thirty-eight acres and one hundred and fifty-two and one half acres, no less than fourteen and one half acres, resulting from the errors of either Smith or Armstrong in the measurement of the same lines, or from errors in the calculation of one or the other of them.

According to Armstrong's survey, as he locates this gum-corner and runs these southern lines, there are nineteen acres of land in the farm, which was never enclosed in his fences, and of which R. Cain the purchaser never had possession.  Of these nineteen acres twelve acres were held by Adam Crislip as a part of his home place for years, before James Riddle sold him his farm; and the other seven acres is in the occupancy, and has been for years, of J. M. Grier, and on it is a store worth $300.00 and a church worth $400.00.  According to Smith's location of this gum-corner and his running there are ten acres of this Riddle farm, that never were in the possession of Riddle or under his fences.  How much of it was held by Allen Crislip and how much by J. M. Grier. does not appear.  The church according to Smith's survey is on this Riddle farm, and the store is built right on the division line and lies therefore partly on the Riddle farm and partly off it.  According to Smith's survey, which I regard, so far as the mere measurement of the length of the lines,

as probably the most correct, as this survey was made in the presence of the parties, while Armstrong's was an *ex parte* survey, there are one hundred and thirty-three and one fourth acres of land, which Riddle had under fence, and which is what the plaintiff claims as the Riddle farm, or six and three fourth acres less than his deed called for.

By the deed this gum-corner was south 2° west 118 poles from the small red oak corner, the location of which evidence shows was undisputed. The corner of the fence of Riddle, where the evidence proves this corner was, and where the owners of the land for twenty-five years have appeared to regard it, is south 2° west 115½ poles from the red oak according to Smith's survey. The point where Smith's survey located it was south 2° west 121½ poles from this red oak corner; and the point where Armstrong's survey located it was south 2° west 12 poles from this red oak. These surveys did not locate it either from the testimony of the witnesses or by measuring from this red oak corner, the most rational mode of finding its location; but it was attempted to be located from the bank at the western end of the lane, which was itself uncertain in its location; and its location was attempted to be fixed from another corner described as opposite the lane above the mouth of a small drain named in the deed. Their reason for so locating this corner is given by Smith in his report thus: " In locating this corner I was governed by the fact, that it was the only point in J. E. Burdett's line, from which I could run a straight line up the centre of the lane aforesaid, the deeds above recited making no mention of any corner between said point in Burdett's line and the bank at the west end of the lane." The wonder is not, that the gum corner located in such a manner should be so far from where it had been long considered to stand; but rather that it should be so near.

There was a large amount of testimony taken with reference to the credits, to which R. Cain was entitled as payments on his purchase-money. No receipts were produced. On this subject commissioner Smith in his report says: " I have endeavored to get a clear understanding of the evidence relating to the accounts between the parties; and it is impossible for me to do so. I have no more evidence before me than had

your former commissioner ; and I have reached substantially the same conclusion. The difficulties are : First, the evidence concerning the credits in the deposition of D. W. Crislip is so indistinct, that I can not say on what note they were to be applied, whether the first note (admitted to have been paid off), the second note, or whether they go into the $200.00 credit, which the plaintiff admits on second note, or whether they go on the balance of the second note. Secondly, the evidence concerning the $300.00, that the defendant Cain claims to have paid to David Denman is so contradictory, I can not decide upon it and therefore respectfully refer it to your Honor. From the papers and evidence the following is all that I can clearly make out." Then follows a statement of the purchase-money and of the credicts to be allowed as payments on them. He allows a credit of $500.00 in satisfaction of first note on plaintiff's admission, that it had been paid off, also a credit of $2,000.00 on plaintiff's admission that this much had been paid on the second note, and a third credit of June 25, 1876, of $49.51 ; and he finds the balance due from R. Cain as of date January 1, 1880, to be $1,107.14 ; and he adds: " I wish further to report, that I am not able to say, whether or not the evidence of N. B. Armstrong assessor and Thomas Dunn in regard to statements of plaintiff concerning the amount Cain owed her is legal evidence."

Commissioner Smith in this report also states and returns his survey of the tract of land showing, that about ten acres of it as located by him was not in the possession of R. Cain. The substance of his report on this subject as well as his mode of ascertaining the location of this tract of land has been stated above.

The cause was heard on this rule issued against R. Cain on March 20, 1880, and was heard on the papers formerly read, the depositions of witnesses, and other evidence filed in the cause, Rezin Cain's answer to this rule, commissioner Smith's said report, and on the defendant's motion to continue the cause with leave to take further testimony. On consideration whereof the court refused to continue the cause and decreed, that so much of the order of reference, as requires said commissioner to ascertain and establish the lines and boundaries of the " James Ridell farm," and the amount of deficiency in

the tract, and how much of it Cain never got possession of or used, and the value of the deficiency, if any, should be set aside, as unnecessary to enable the court to decide the matter arising on the rule, and because the said enquiries were improvidently ordered and made and the exceptions to said report endorsed thereon were for that reason overruled. And Rezin Cain still failing to show any cause, why he has not paid the residue of the purchase-money due from him, and the court finding, that there was due from Rezin Cain as of January 1, 1880, $1,107.14 with interest thereon from that date, the court confirmed the commissioner's report, so far as it found this balance due from R. Cain, and decreed, that Alfred Cain, the special commissioner to collect this purchase-money, do recover of Rezin Cain $1,107.14 with interest from January 1, 1880, and the costs in this rule expended; and unless he should pay the same within sixty days, a commissioner of sale named in the decree should sell the land, which had been so purchased by him, prescribing the terms of sale and mode of advertisement; and that the special commissioner should give a bond conditioned as the law requires in the penalty of $2,000.00 before receiving any money.

The exceptions of R. Cain referred to and overruled by this decree were, because the report did not show the value of the tract of land, nor its rental value, nor who was in the possession of and claimed to own the portion of this tract, which was not in his, Cain's, possession, and lastly : " because the evidence in this cause shows, that the defendant is entitled to more credits than were allowed him in said report." The exception of the plaintiff, A. Cain, special commissioner, also overruled, because this portion of the order of reference and report of commissioner was set aside as improvidently awarded and made, was, that the commissioner had found the boundaries of the land as stated in his report improperly and contrary to the evidence, and should have found the true boundary of this tract of land to be the one, by which it had been held by James Riddle.

The depositions referred to in the decree bearing on the question, whether the purchaser, R. Cain, was entitled to an abatement, because the land in his possession was less than one hundred and forty acres, the quantity named in the deed

to him, proved, that before the institution of this suit Mrs. Sarab A. Crislip and R. Cain made a contract for the sale and purchase of this land, and this suit was brought merely to get the sanction of the court to this sale, infants being interested in the land. W. B. Gibbs was called upon to reduce this verbal contract to writing. This contract probably left with R. Cain has been lost, and after diligent search cannot be found. Gibbs testifies, that he was called upon to draw this contract; that he drew a good portion of it and then read it to the parties; that the courses and distances were given, but the number of acres in the tract were not named, and that R. Cain objected to it on that account, and that he and Mrs. Crislip got into an argument; that Cain claimed, that had he contracted with her for the land to contain one hundred and forty acres agreeable to the deed from James Riddle to Allen Crislip; that after talking a little while she agreed he could have the land agreeable to the Riddle deed to Allen Crislip. When called upon to state the contents of the contract as executed by the parties, he says: " When Mr. Cain objected to the agreement I had commenced, Mrs. Crislip then and there agreed to contract him the piece of land agreeable to James Riddle's deed to Allen Crislip, as far as the article between them I cannot state positively in regard to its contents."

Mrs. Sarah A. Crislip testifies, that the verbal agreement for the sale and purchase of the land was made at her house, when Mr. Gibbs was not present. She sold him the boundary at "the price of $2,000.00. I wasn't positive about the number of acres, but proposed to have $2,000.00 for the boundary, and Cain agreed to it." When the writing was subsequently being drawn up by Mr. Gibbs, she requested, that they should name the boundary. Mr. Gibbs and Mr. Cain said there would have. to be a certain mumber of acres named. Then she requested, that they should name one hundred and forty acres according to the Riddle deed. She told Mr. Cain, that she must have $2,000.00. She told him, that she must have $2,000.00 for the bouudary; and if it did not hold out to one hundred and forty acres, she was still to have $2,000.00; and if it overrun, she would not ask more than the $2,000.00. She did not, she says, sell the farm to contain one hundred and forty acres.

She could not have sold the farm in that way, as she did not know the number of acres in it.

R. Cain in his deposition when asked the contents of this contract says: "My recollection about it is, that so far as the boundary and the number of acres is concerned, and the price to be paid, and the time it was to be paid, it was in exact accord to the deed to me. Mr. Gibbs was called on to draw the article of agreement; and he commenced and drew one part of the way through and read it in the presence of Mrs. Crislip and myself. I objected to the article. It was drawn for a boundary and set forth no number of acres. He then drew another, which I objected to because it set forth, that I was to have one hundred and forty acres more or less. I said I had made no such contract, that I was to have one hundred and forty acres just as described in the Riddle deed, and he changed it and made it just as the Riddle deed set forth and read it to us, and we both signed it." He says, he refused to take any article of agreement only just in accordance with the Riddle deed. He admits, that before he bought, he looked at the farm and walked through it two or three times. He went over it with one of Mrs. Crislip's sons. It was enclosed with a fence, but no boundary shown. There was no representation made, that there was any land belonging to the farm outside of the fence. When he bought the land, he says, he did not know, where the line of the Riddle deed ran.

The other evidence in the cause shows, that R. Cain must have been familiar with this James Riddle farm for many years prior to his purchase. He superintended the building of the Methodist church, which stands near to this farm as fenced in, and which R. Cain now claims is within the boundaries of the Riddle farm when properly run. This church has been there about ten years. Not only is the written contract between the parties of the sale of this land lost, but also the report of its sale as made by Sarah A. Crislip under the order of the court in this cause.

To the decree of the circuit court upon this rule against Rezin Cain, pronounced March 20, 1880, an appeal and *supersedeas* have been granted on the petition of Rezin Cain.

*Robert White* for appellant cited the following authorities: 14 Gratt. 118; 18 Gratt. 662; Code, ch. 132, § 8; 13 Gratt. 213; 8 Gratt. 505; 5 W. Va. 432.

*Henry C. Flesh* for appellee cited the following authorities: 2 Dan. Chy. Pr. (4th ed.) 1275, 1276; 19 Gratt. 720; 2 Gratt. 198; 5 Gratt. 60; 9 Gratt. 195 210, 212; 13 Gratt. 651; 8 Gratt. 496.

GREEN, JUDGE, announced the opinion of the Court:

The first question presented by the record is: Had the court below jurisdiction to render any decree on this rule against Rezin Cain, on March 20, 1880? The record shows, that Sarah A. Crislip, the plaintiff in this cause, had died prior to March 18, 1880, for on that day her death was suggested, as appears from an order made in the proceedings on this rule upon that day. This order says, that "on motion of the defendants, who are entitled to the proceeds of the sale of said tract of land, it is ordered, that A. Cain, who is appointed a special commissioner for that purpose, do collect said bonds for said purchase-money, and the proceedings under said rule against Rezin Cain shall proceed in the name of A. Cain, special commissioner." Two days afterwards the decree complained of was entered without first reviving the cause in the name of the representative of Sarah A. Crislip, deceased; and appellant's counsel insists, that the court had no jurisdiction to render any decree in the proceedings on this rule, until the original cause was revived, the sole plaintiff in it having died. Of course the court had no authority to render any decree in the original cause on its merits, until the cause was revived, such as a decree determining what portion of the fund was coming to each of the parties to the suit and distributing the same or ordering it to be invested. But is not such a decree distinguishable from a decree not in the original cause but upon the proceedings on this rule against Rezin Cain? The proceedings on this rule had been revived and were ordered to proceed in the name of A. Cain, special commissioner, as plaintiff, in lieu of Sarah A. Crislip, deceased. Did not this revival suffice to give the court jurisdiction to enter the decree in the proceeding on this rule,

which it did enter on March 25, 1880? It seems to me the court did have jurisdiction to so act.

There is a distinction between the action of the court in the cause, which the court has no right to take, unless all the parties are before it, and the action of the court *beyond* the cause. If any of the parties to the suit have died, the cause must be revived, before the court can take any action *in* the cause. By action of the court *beyond* the cause I mean those measures, which are necessary for the execution of · a decree, which has been pronounced, and which are properly to be regarded as adopted not *in* but *beyond* the cause as founded on the decree itself without respect to the relief, to which the party was primarily entitled upon the merits of the case. This kind of action *beyond* the cause may be had either before a final decree, as in this case, or after a final decree. This distinction is pointed out by Judge Baldwin in the case of *Cocke* v. *Gilpin,* 1 Rob. 28, and has been recognized as a correct distinction by this court heretofore. Whether this distinction was correctly applied in the case of *Cocke* v. *Gilpin* may be questioned; but the correctness of the distinction itself cannot, we think, be questioned. And when the court is proceeding to enforce the payment of the purchase-money by rule on a purchaser of land sold under its decree, a proceeding which is in this sense beyond the cause, such proceeding would not be suspended by the death of a party to the original cause, but a decree on this rule could be entered after such death. The party, to whom the purchaser had given his bond, might by the order of the court bring a suit on it at law or institute a suit in equity to enforce the vendor's lien, in which suits the parties to the original cause, in which the land was sold, would not be parties, nor are they properly parties to the proceedings on a rule against the purchaser; and therefore the death of any of them would not suspend the proceedings on this rule.

The next question, which we will consider, is, whether the circuit court did right in its decree of March 20, 1880, in confirming so much of the commissioner's report, as showed the amount due from the purchaser, Rezin Cain, without considering his exception to this report. This exception alleged in general terms, that he had not been allowed all the credits,

which the evidence showed he was entitled to.   This court has decided, that exceptions to commissioners reports partake of the nature of special demurrers; and if the report is erroneous, the party complaining of the report or excepting thereto must point out the error in his exception with reasonable certainty, so as to direct the mind of the court to it.   When he does so, the parts not excepted to are admitted to be correct, not only as regards the principles, but as relates to the evidence, on which they are based.   *McCarty et al.* v. *Chalfant et al.*, 14 W. Va. 531 ; *Chapman* v. *The Pittsburgh & Steubenville Railroad Co.*, 18 W. Va. 184.   The exception in this case amounted to nothing more than a personal allegation, that the commissioner's report was erroneous in the amount, which it found due from Rezin Cain on his purchase.   It did not pretend to point out any specific credits, to which the exceptant Rezin Cain was entitled, or which by the evidence ought to have been allowed him, but which was not allowed in this report.   Nor does it complain, that the commissioner erred in the principle he adopted of allowing the amounts or credits, which had been admitted by the opposite party instead of specifying each separate payment as a credit, which the evidence showed or tended to show had been paid.   The court therefore did not err in disregarding this exception and confirming the commissioner's report in this respect.

The next enquiry is:   Did the court err to the prejudice of the appellant in setting aside so much of its previous order, as directed the establishment by the commissioner of the lines of the Riddle farm and the ascertaining of the deficiency in said tract and the number of acres in the said tract, which the purchaser, Cain, had been entitled to get possession of, and the value of the same ?   And first it is unimportant if the evidence shows, that the purchaser was entitled to no abatement because of such deficiency or because of there being any land within the description in his deed, of which he never had possession.   In such case it is immaterial, whether the court set aside this portion of the order of reference, or whether it sustained the plaintiff's exceptions to the report and allowed the purchaser, R. Cain, no abatement either for deficiency, or because he had never got possession of and could not get possession of certain land claimed to be within the boundaries

set out in the deed. The same result would have followed either course. In considering therefore these questions I will take into consideration all the evidence which is in the record, whether it was introduced before or after the reference.

First. Is the purchaser, Cain, entitled to any abatement, because a portion of the land is in the possession of the heirs of Allan Crislip and John M. Grier according to the allegations of his answer to the rule? The replication to this answer by Mrs. Crislip alleges: "There was and is a fence around most of the outside lines, and she showed him the boundary included in the farm and especially the fence through the bottom, so that he could not have misunderstood the matter; and she denies, that the tract of land she sold him takes in a part of the land outside of this fence, and which he supposed he was buying." The evidence of more than half a dozen witnesses fully establishes, that this fence around the farm and especially this fence through the bottom has been built more than twenty-five years and stands now substantially, where it has ever stood; that Riddle never held or claimed any land outside of these fences and especially any land outside of this fence running through the bottom, which is the place, where the purchaser, Cain, claims, that the deed to and from Riddle extends beyond the fence; and Crislip and his heirs never claimed or held any land outside of this fencing as a part of this Riddle farm. It was found further, that before his purchase Cain went over this land with the son of Mrs. Crislip to see its boundaries and saw this fencing and knew, that no land was claimed by Mrs. Crislip or heirs as belonginging to the Riddle farm beyond this fence. Under these circumstances, though the evidence shows, that Mrs. Crislip by her contract agreed to convey by the boundaries set out in the deed from Riddle to her husband and to warrant this title, she was not bound to convey any land beyond that, which was held and claimed by her and by her wards, even though the title-papers might include other lands beyond this fence. This is decided in *Beverly* v. *Lawson's heirs, &c.* 3 Munf. 317.

But in this case the evidence satisfactorily establishes, that Cain was in possession not only of all the land, he bought, but all that was really contained in the boundaries set out in

his deed, when those boundaries were correctly located.   He, as he admits, had full possession of all the land so fenced and claimed by Riddle as belonging to his farm and by Crislip the purchaser from Riddle and by his heirs after his death. The mere fact, that this fence through the bottom had stood substantially in the same place, and that the owners on both sides had held their lands by it, for so long a time without the least controversy or dispute, is exceedingly strong evidence to establish, that it was put upon the correct line, especially as the gum-corner, from which this fence ran cannot now be found, the gum tree, which formerly stood there, having been long down.   But several witnesses testify, that this gum tree stood on or very near this fence.   And when its location is sought to be fixed from the red oak corner, it will fall within about two poles of this fence and much nearer it than the location of it attempted to be fixed by either of the surveyors, Armstrong or Smith.

Against this weight of evidence that this gum-corner stood at or very near this fence there is no evidence but the report of these two surveyors.   And in stating the case I pointed out their mode of locating this gum-corner and showed, that it was not the natural or proper mode of so doing but was an unsatisfactory mode likely to lead to an erroneous location of it.   They do not agree about its location.   One of them, Smith, fixes it six poles beyond this fence and the other ten and one half poles beyond this fence.   It seems to me, that the evidence satisfactorily shows, that it was located at this fence, and that Cain has in his possession all the land conveyed to him by his deed, when the boundaries of this land are truly located, as well as all the land, he supposed he bought. This is strongly corroborated by his declaration made to two witnesses, who testify, that he told them severally on different occasions, that the land as run by these surveyors took in land that had not been shown him, when he purchased, and which he knew, that Mrs. Crislip did not intend to sell; and he would not claim it.   It is true, he said, he expected to settle with her by a compromise and get an abatement in money for this land, but others were intermedling to prevent this compromise.

It is insisted however by the appellant's counsel, that the

report of Jonathan Smith thus set aside by the court in part was not a report of a special commissioner but was the award of an arbitrator mutually chosen by the parties; and his award ought not to have been set aside, simply because the court differed from the arbitrator as to the law or facts, which should have governed his decision. This claim, that he was an arbitrator, is based on the order directing him to make a report. This order recited, that A. A. Smith, the former special commissioner, had failed to make an intelligent report on this subject, and that he had declined to act further, and he was thereupon removed; and the order proceeds "and by consent and agreement of parties Jonathan Smith is hereby appointed a special commissioner in the room and stead of A. A. Smith to execute all that was required of him by said decree referring the cause to A. A. Smith." Now it seems obvious from this, that Jonathan Smith was not chosen by the parties as an arbitrator, but was simply by the consent of parties appointed a special commissioner and directed to report on this subject; and his report was liable to be excepted to, overruled or modified in the same manner as any other commissioner's report. I am therefore of the opinion, that the court did not prejudice the rights of R. Cain, the appellant, by the decree, which disregarded and set aside so much of said report as ascertained, that R. Cain was not in possession of ten acres of the land, which he bought, and which was deeded to him. The evidence did not sustain this conclusion of the commissioner. Of course the appellant cannot complain of the court for not acting directly on his rule to be put in possession of the land, as on the rule of the plaintiff the court in effect decided, that he was in possession of all the land, which he was under his purchase and deed entitled to.

The most difficult question in this cause remains to be disposed of. That is: Was the appellant entitled to an abatement, because by the survey and report of the special commissioner Jonathan Smith it appears, that there are in this Riddle farm only one hundred and thirty-three and one quarter acres instead of one hundred and forty as called for by the deed to R. Cain? The original contract in writing between Mrs. Sarah A. Crislip and R. Cain for the sale and purchase of this land has been lost, as has also Mrs. Crislip's report of

the sale to the court; but the original bill, the recitals of the terms of this report by the court in its decree confirming said report of sale, the depositions of Mrs. Crislip and of Cain and the deposition of Mr. Gibbs, who drew this lost contract, establish clearly, that the deed executed to R. Cain was drawn in exact accordance with the language of this written contract. We are by these means made acquainted with the contents of this lost contract with almost as much certainty, as if it had been produced.   By it Rezin Cain agreed to pay her $500.00 in cash and $500.00 on November 13, 1873, and $500.00 one year after this last date and $500.00 two years after that date, these deferred payments to bear interest from November 1, 1872; and in consideration she agreed to convey to him with general warranty of title a tract of land situated on the left hand fork of Reedy's creek in Roane county bounded and described as follows (then the boundaries are set out copied from the deed of James Riddle and wife to Allen Crislip.) The contract then proceeded: containing one hundred and forty acres, being the same land conveyed by James Riddle and wife to the late Allen Crislip by deed dated March 7, 1870, and duly recorded, to which reference was made.   This is the language also of the deed executed by Mrs. Crislip to R. Cain, the appellant; and its language is almost identical with the language of the deed from James Riddle and wife to Allen Crislip, the consideration named in the two deeds being also the same, each $2,000.00.

Before undertaking to determine, whether under this contract Rezin Cain is entitled to an abatement of the purchase-money due for the six and three fourths acres, which was shown by the survey in this cause to be the deficiency in the quantity of the land, it is necessary to have a distinct view of the legal effect of a written contract executed or executory, whereby the vendor agrees to convey or does convey to the vendee for a certain price named a specified tract of land, the boundaries of which are set forth, and which is stated on the face of the contract or deed to contain a specified number of acres. And before considering what are the legal rights of the parties by virtue of such a written contract or deed, as the jurisdiction of the court in many cases of this general character in furnishing relief to either party, where the quantity of land

turns out to be less or greater than that named in the contract or deed, depends upon fraud, accident or mistake, it is necessary to have a distinct idea of what is fraud, accident or mistake, on which a court of equity will grant relief.

Courts of equity have concurrent jurisdiction with courts of law in case of fraud cognizable in courts of law, and exclusive jurisdiction in cases of fraud beyond the reach of courts of law. Fraud includes all acts, omissions and concealments, which involve a breach of legal or equitable duty, trust or confidence justly reposed, and which are injurious to another; and courts of equity interfere in cases of fraud not only to set aside acts done or contracts executed or executory, but they will also, if acts have been prevented by fraud from being done, interfere and treat the case, as if the acts, which ought to have been done, had actually been done, or will require the party committing the fraud to compensate the party defrauded, which last is the usual form of the relief furnished by courts of law. One of the most usual modes of establishing fraud is by proving a *suggestio falsi* or misrepresentation. This furnishes a ground for relief, when the misrepresentation is a matter of substance, that is, important to the interests of the other party, and in addition thereto it is shown, that it *actually* did mislead him to his injury.

It is said in Story's Eq. Jur. vol. 1 § 193a: " If the misrepresentation was of a trifling or immaterial thing ; or if the other party did not trust to it, or was not misled by it ; or if it was vague and inconclusive in its own nature; or if it was a matter of opinion or fact equally open to the enquiries of both parties, and in regard to which neither could be presumed to trust the other, there is no reason to interfere to grant relief upon the ground of fraud." And in section 193 it is further said : " Whether a party thus misrepresenting a material fact, knows it to be false, or made the assertion without knowing whether it was true or false is wholly immaterial ; for the affirmation of what one does not know or believe to be true is equally in morals and law as unjustifiable as the affirmation of what is known to be positively false. And even if a party innocently misrepresents a material fact by mistake, it is equally conclusive, for it operates a surprise and imposition upon the other party."

The last part of this section : " If a party innocently mis-represents a material fact it is equally conclusive," while true in a certain sense is when thus broadly stated calculated to mislead. The authorities cited to sustain it are *Pearson* v. *Morgan*, 2 Bro. C. C. 389 ; *Burrowes* v. *Lock*, 10 Ves. 475 ; *DeManville* v. *Compton*, 1 Ves. & B. 355 ; *ex parte Carr*, 3 Ves. & B. 111 ; *Carpenter* v. *American Insurance Co.*, 1 Story 57. In the first of these cases A. was interested in an estate in fee, which was charged with £8,000 in favor of B. B. pro-posed to borrow money of C. on the faith of this charge in his favor ; and C., before he lent the money, enquired of A., if this charge on his land in favor of B. was still subsist-ing and unsatisfied, and was informed, that it was ; and upon the faith of this representation C. lent his money to B. Held : That as A. stated as a fact to C., that this charge was unsatis-fied, and thereby C. was induced to lend his money, and it turned out, that the charge was satisfied, it was in law a fraud practiced on C. by A., for which A. was responsible, though he did not intend to defraud C. and was laboring under a mistake, when he made the statement, that this charge on his land was unsatisfied. He knew the true state of facts, which in law amounted to a satisfaction of the charge in favor of B.; but he did not suppose, that in law these facts would be held as a satisfaction of the charge. In his declaration to C. he did not state these facts known to him ; nor did he simply express an opinion, that the charge was unsatisfied ; but he stated as a fact, which C. had a right to suppose was within his knowledge, that the charge was unsatisfied. What this case then really decides is, that where one represents as known to him as a fact, what is a matter of opinion only, he is in law guilty of a fraud, though he did not intend to mislead ; and this position is sustained by the authorities. See *Cabot* v. *Christie*, 42 Vt. 121 ; *Fisher* v. *Mellen*, 103 Mass. 503.

In the case of *Burrows* v. *Locke*, 10 Ves. 475, a *cestui que trust* assigned his claim to a third person, who, before he took it, called on the trustee to know, whether the whole claim £288 was still coming to the *cestui que trust*. The trustee told him, it was. He made this statement supposing it to be true, as he claims, though he had known, that a part of this claim had been previously assigned by the *cestui que trust* ; but he

claimed, that he had forgotten this fact. The master of the rolls said, page 476 : " At least it was gross negligence to take upon him to aver positively and distinctly, that the *cestui que trust* was entitled to the whole fund without giving himself the trouble to recollect, whether the fact was so or not, without thinking upon the subject." He was accordingly held responsible for the loss the assignee sustained ; and it should be noted, that though it was ·claimed, that a court of law only should have jurisdiction in such a case, yet the court held, that in such a case a court of equity had concurrent jurisdiction. This was not a case of simple mistake, but a case of culpable negligence by the trustee, and because of this culpable negligence, whereby another suffered, he was properly held responsible.

The case of *De Manville* v. *Compton*, 1 Ves. & B. 355, does not bear on the point under discussion. It was simply held, that in that case the alleged misrepresentation " was vague and inconclusive," and therefore the party making it was not held responsible.

In the case of *ex parte Carr*, 3 Ves. & B. 111, it was held, that " if a person is induced to advance his money by the representation of another, that he had no demand on a particular individual, and the person so advancing is thereby misled, a court of equity holds the mouth of the person making such misrepresentation shut." This, therefore was not a case of mutual innocent mistake.

In the case of *Carpenter* v. *American Insurance Co.* 1 Story 62, an agent made a positive misrepresentation of a most material fact, whereby a policy of insurance was issued to the principal; and it was held, that the policy was thereby avoided, though the principal was ignorant of the misrepresentation. Story, Judge, does say: "It now turns out, that this representation is utterly untrue (whether by design or mistake is not material)." But the misrepresentation is in a letter, and the facts are therein asserted positively, as though they were within the knowledge of the writer, and of course in such a case, if he were ignorant of them and thus asserted them to be facts, he would or his principal would be responsible, on the principle that he, who represents as known to him personally, what he does not so know but simply believes, is in law guilty of a fraud.

The last case referred to in 1 Story's Eq. Jurisprudence, § 193a, is *Taymon* v. *Mitchel*, 1 Md. Chy. Dec. p. 496. This was a suit in equity to rescind a contract for the sale of negroes alleged to be fraudulent. The vendor represented them to have been appraised in the inventory of the decedent's estate at $1,200.00, when in fact they were appraised at only $750.00, and they were also represented as sound, when in point of fact they were unsound. The court deemed it unnecessary to consider, whether these false representations, whereby the vendee was induced to purchase, were made with the intent to deceive or defraud, or were made by mistake of the vendor. In either case the vendee was entitled to have the contract rescinded, his application having been made in a reasonable time after the sale.

While the case does not distinctly point out the distinction, it was, as I conceive, based on a broad distinction, which, we will presently see, runs through the decided cases, between the right of a vendee, who has purchased under a mistake, which affects the substance of his contract, to have it rescinded by a court and a right of such vendee either in law or equity to require of the vendor an abatement in the purchase-money because of such deficiency, or his right to recover back a portion of the purchase-money because of such mistake. Though in this particular case he might on the authorities, which we have cited, recover back the difference between the value of sound slaves and of unsound ones, because the misrepresentations of fact if not known to the purchaser were in their very nature such, as he ought to have known, before he made the positive affirmation of their existence, which he did, and it was not therefore really a case of mutual mistake, in which both parties were equally innocent, but was a case, which in law amounted to a fraud, a false statement having been made of a matter of fact, which the vendor ought to have known to be true, before he made such statement, and which the vendee had a right to believe and did believe was a fact within the knowledge of the vendor. When this is the case, we have seen, that the vendor is responsible, just as he would be, had he intended to defraud and deceive. He has done that, which, he ought as a reasonable man to know, would affect the purchaser, just as if he, the vendor, had de-

liberately deceived him; and having thoughtlessly or care-lessly made false statements, which, the vendee had a right to believe, were made on his own knowledge, and which did mis-lead the vendee, is both in law and morals as responsible, as though he had designed to defraud.

But there is a marked distinction between this and like cases, where there is moral impropriety on the part of the vendor, and cases, where the vendor has reason to believe and does believe, what he asserts, and does not make the asser-tion in such a way, as to induce the belief in the vendee, that he has personal knowledge of what he asserts to be the fact. In such case the vendor is not bound to refund a portion of the price because of his mistake either by an action of deceit at law or in a suit in equity. See *Weed* v. *Case*, 55 Barb. 534; *Wheeler* v. *Randal*, 48 Ill. 182; *Marsh* v. *Falker*, 40 N. Y. 562; *Hartford Insurance Co.* v. *Matthews*, 102 Mass. 221; *Mar-shall* v. *Gray*, 39 How. Pr. (N. Y.) 172. Though in some such cases of mutual mistake both parties, vendor and ven-dee, being equally innocent, a court of equity may under some circumstances at the instance of the injured party rescind the contract.

The distinction between rescinding the contract in such a case and allowing an abatement from the purchase-money or requiring the vendee to pay a further sum, as the case may be, is not drawn with the requisite distinctness in Story's Equity Jurisprudence, though in some portions of it this distinction is approvingly referred to. Thus in sections 138$h$, 138$i$ and 138$k$ of the first volume the law is thus stated: "We wish only to add here, what will occur to the careful student, that this en-tire subject of equitable relief on the ground of mistake, either in law or facts, is altogether exceptional, and quite out side of anything contemplated in the law of contracts. In the inception of contracts it must always be assumed, in re-gard to both these classes of mistakes, that the parties im-pliedly stipulate, that they will, each for himself, run his own risk. This is confessedly the implied condition of all con-tracts. And the parties cannot properly ask to be relieved from any merely incidental hardship resulting from being under mistake, either as to the true state of facts or as to the law. But when the mistake is of so fundamental a character,

that *the minds of the parties have never in fact met ;* or where an unconscionable advantage has been taken by mere mistake or misapprehension ; and there was no gross negligence on the part of the plaintiff, either in falling into error, or in not sooner claiming redress; and no intervening rights have accrued ; and the parties may still be placed *in statu quo,* equity will interfere in its discretion to prevent intolerable evil.   This we believe to be the clearly defined and well established rule upon the subject both in England and America."

The question of reforming deeds and other instruments on the ground of mistake or fraud is carefully examined and judiciously presented by Mr. Justice Kellogg in the Vermont Supreme Court in a recent case, *Brown* v. *Lamphear*, 35 Vt. 252.   Here the plaintiff conveyed to the defendant a piece of land, from which the plaintiff's aqueduct supplied his own and other premises with water.   The aqueduct was of greater value to the plaintiff than the price received for the land; and he did not intend to part with the right to use the water in the spring ; but by mistake no reservation was made in the deed.   The defendant at the time of the purchase had no knowledge of the existence of the spring.   It was held, that the plaintiff was entitled either to such a conveyance from the defendant, as would entitle him to use the water of the spring, or else to a reconveyance of the land upon the repayment of the price, and the defendant might elect which form of remedy he preferred the plaintiff should have.

These views seem to me to be entirely sound.   Where there is simply a mutual mistake, and neither party has gained any unconscionable advantage of the other, but where nevertheless the mistake is of such a fundamental character, that the minds of the parties have never in fact met, as in the above case put, where the vendor had no idea of depriving himself of the use of the spring, while the vendee intended to purchase the whole land without any reservation being made in favor of the vendor, but did not even know of the existence of the spring.   Though of course there was no mistake made in the vendee's understanding of the contract as reduced to writing, and though he had taken no sort of unfair advantage of the vendor, yet as by a mutual mistake the vendor sold, what the vendee did not even know had an existence, this

spring, and thus the minds of the parties had in a most material matter never in fact met, the court furnished the vendor relief. But note the character of the relief furnished. The court did not require the vendee to pay an additional price for this valuable spring, which, it turned out, was included in his purchase, though he did not even know, that it had an existence; for if the court had done this, it would have been making a new contract for the parties, into which they had never entered, which power the court could not possess. But it did what it had a right to do; it held, that in point of fact the minds of the parties had never come together in making this contract, and therefore it was not a binding contract upon them, and the court would therefore rescind it, unless the defendant would consent to reconvey the use of the spring to the plaintiff. If he gave this consent, then the mind of the defendant would meet with that of the plaintiff, as he understood the contract, and it could then be executed; but if the defendant was not willing thus to surrender of his own accord this spring, then the plaintiff could have this contract rescinded, as there was really wanting in the making of it, what is an essential to every contract, the mutual consent of both parties.

Upon these principles, as I understand, the courts have often proceeded and in proper cases have rescinded contracts upon the sole ground, that there was a mutual mistake in the very substance of the contract, so that in point of fact there had been no mutual consent to the contract in writing, which the court was asked to rescind; and for exactly the same reason the courts have refused to specifically execute contracts in cases, where there was a mutual mistake of the parties, for which neither party was at all to blame, when such mistake affected the substance of the contract. But no cases except a recent Virginia decision, which will be commented upon, can be found, where the courts have because of such a mutual mistake (in the absence of fraud) substituted for the written contract of the parties such a contract, as the court might think it probable, they would have entered into, had they not been mutually laboring under a mistake of fact, and having thus made a contract for the parties enforce it by requiring a vendee to pay an additional price, beyond what he had agreed

to pay, for what he bought, or by compelling the vendor to abate something from the price he had agreed to take, because the court supposed, he would have been willing to take a smaller price at the time, when he made his contract, had he known the real facts.

It is true, as we shall find, that some judges have thrown out the idea, that a court of equity might so act, when there was a pure mutual mistake; but I know of no instance, except the one, which I have referred to above, in which they have in point of fact so acted; and it seems to me to be clearly beyond the power of any court. It is clearly inconsistent with the principle, which, as we have shown, the courts constantly act upon, that a party is not liable, if he actually believes, what he asserts, and has not so asserted it, as to induce the other party to believe, that the facts, which he has asserted, are within his own personal knowledge, that is, when there has been a mutual mistake, in which both parties are equally innocent; for in such case there is always a mutual mistake. See *Ward* v. *Case*, 55 Barb. N. Y. 434; *Wheeler* v. *Randall*, 48 Ill. 182; *Marshall* v. *Gray*, 39 How. Pr. (N. Y.) 172; *Marsh* v. *Falker*, 40 N. Y. 562; *Hartford Ins. Co.* v. *Matthews*, 102 Mass. 221.

In England there is authority, that this rule is not even subject to the qualification, that the party is liable, if he affirms, that in making the representation he speaks of his own knowledge. Thus in *Haycraft* v. *Creasey*, 2 East 92, it was held, that an action would not lie for a false representation, though the party affirmed he spoke of his own knowledge, if the representations were made *bona fide* with a belief in their truth. But this decision has not, so far as I know, been followed in England; and it has, I think properly, been repudiated in this country. But after a long controversy in the English courts it seems to be now well settled there, that in order to make a vendor responsible in damages for a false affirmation made by him, it is essential not only, that the representation should be false, but it must be made *mala fide* and not in the *bona fide* belief that it be true. All these English authorities are elaborately reviewed in Benjamin on Sales, second English edition. See second American edition of 1877 by Perkins from sections 454 to 461 inclusive, from pages 417 to 426.

These English cases thus reviewed are *Evans* v. *Collins,* 5 Q. B. 820 ; *Ormrod* v. *Huth,* 14 M. & W. 650 ; *Foster* v. *Charles,* 6 Bing. 396 ; 7 Bing. 105 ; *Polhill* v. *Walter,* 3 B. & Ad. 114 ; *Cornfoot* v. *Fowke,* 6 M. & W. 358 ; *Fuller* v. *Wilson,* 3 Q. B. 58, reversed 3 Q. B. 1009 ; *Moens* v. *Heyworth,* 10 M. & W. 147 ; *Taylor* v. *Ashton,* 11 M. & W. 401 ; *Humphreys* v. *Pratt,* 5 Bligh (N. S.) 154 ; *Bailey* v. *Walford,* 9 Q. B. 197 ; *Childers* v. *Wooler,* 2 El. & El. 287 ; 29 L. J. Q. B. 129 ; *Western Bank of Scotland* v. *Addie,* L. R. 1 Sc. App. 148 ; *Reesse Riv. Silver Min. Co.* v. *Smith,* L. R. 4 Eng. App. 64.

These authorities as well as the American authorities, to which we have referred, as well as numerous other American cases referred to in the foot notes on above pages in Benjamin on Sales, 2 Am. ed. pages 419 to 426, seem to me to establish clearly and satisfactorily, that no vendor can ever be held answerable in damages for an injury, which the vendee has sustained by the fact, that the property, which he has purchased, is not what both parties expected it would be, where such expectation was the result of a mutual mistake made by each party, and where both of the parties are equally innocent, and no blame can be attached to the vendor in any way as misleading the vendee. Whatever we may think of this controversy so vigorously carried on in England for so many years as to its merits in some respects, we cannot fail to agree, that the proposition above laid down is fully sustained by the English and American cases.

It does not however follow, that because the vendor is not responsible in damages to the vendee for losses, he has sustained as the result of such innocent mutual mistake, he is therefore entirely remediless. Benjamin on Sales, § 420, p. 376, thus states the law on this subject : " An innocent misrepresentation of fact or law may give rise to a contract and thus involve the question, whether the party deceived by such innocent misrepresentation is entitled on that ground to avoid the contract." The law as to misrepresentation of fact was thus stated by Blackburn, Judge, delivering the judgment of the court in *Kennedy* v. *The Panama Roy. Mail Co.,* 2 Q. B. 580–587. He says : " There is a very important difference between cases, where a contract can be rescinded on account of frauds, and those, in which it may be rescinded, on the

ground that there is a difference in substance between the thing bargained for and that obtained. It is enough to show, that there was a fraudulent representation as to *any part* of that, which induced the party to enter into the contract, which he seeks to rescind. But where there has been an innocent misrepresentation or misapprehension, it does not authorize a rescission, unless it is such as to show, *that there is a complete difference in substance* between what was supposed to be and what was taken, *so as to constitute a failure of consideration.* For example as where a horse is bought, if the purchaser was induced to buy by a fraudulent representation as to the horse's soundness, the contract may be rescinded. If he was induced by an *honest misrepresentation* as to its soundness, *though it may be clear, that both vendor and purchaser thought, that they were dealing about a sound horse and were in error,* yet the purchaser *must pay the whole price,* unless there was a warranty." *Street* v. *Bray,* 2 B. & Ad. 456. The learned judge then quotes authorities from the civil law to the same effect and concludes this passage by saying : " And we apprehend the principle of our law is the same as that of the civil law ; and the difficulty in every case is to determine, whether the mistake or misapprehension is *as to the substance of the whole consideration,* going, as it were, to the root of the matter, or only to some point, even though a material point, an error as to which does not affect the substance of the whole consideration, &c."

In *Torrance* v. *Bolton,* 14 L. R. Eng. Eq. 124, it was held, that when a bidder at an auction was misled by the particulars advertised as to the property exposed to sale, and being deaf did not hear the conditions read out at the sale, in which the property was stated to be subject to a mortgage, he was not bound by the contract made by mistake under such misleading particulars, which had induced him to believe he was buying the absolute reversion of the freehold and not an equity of redemption."

Many of the principles which we have stated, were held in common law courts ; and they equally prevail in courts of equity. Where there would be a right on the part of the vendee to recover damages in a common law court, if the case be in equity, the court will allow to the vendee an abatement

from the purchase-money; and if the vendee in a common law court would have a right to repudiate and treat as a nullity the contract because of innocent mutual mistake, it would be rescinded in a court of equity, though no abatement from the purchase-money would be allowed any more in a court of equity than at law. There are numerous cases, in which courts of equity have set aside contracts for the sale of lands both because of mutual innocent mistakes made by the parties in making the contract of sale and because of fraud practiced by the vendor; and most of these cases were cases of the sale of real property. The principles applied in granting this relief of setting aside the sale because of a mutual innocent mistake, which affected the substance of the contract, are substantially the same as govern in the courts of law in regarding as void a sale of personal property, the only difference being the application of these principles to the sale of a different species of property. The same sort of difficulty occurs in the sale of personal property in determining what is of the substance of the contract, and what mere innocent mistakes ought to be considered as affecting the substance. What are regarded as such substantial mistakes, as prove, that the minds of the contracting parties never in fact met, and thus justify a court of equity in regarding the contract as null for want of the assent of the parties and for that reason setting it aside, may be ascertained with reasonable certainty by an examination of the decided cases. The following are some of the cases, in which courts of equity have set aside contracts for the sale of real property for such reasons, most of them when the contracts were based on innocent mutual mistakes of the contracting parties touching the substance of the contract, but some of them for fraud on the part of the vendor, which, it will appear as in the case of the sale of personal property, need not affect the very substance of the contract. See *Daniel* v. *Mitchell*, 1 Story 172; *Dogget* v. *Emerson*, 3 Story 700; *Warren* v. *Daniels*, 1 Wood & M. 90; *Mason* v. *Crosby*, 1 Wood & M. 342; *Smith* v. *Babcock*, 2 Wood & M. 246; *Tuthill* v. *Babcock*, 2 Wood & M. 299; *Smith* v. *Richards*, 13 Pet. 26; *Roosevelt* v. *Dale*, 2 Cowen 134; *Champlin* v. *Laytin*, 6 Paige 189; *Lewis* v. *McLemore*, 10 Yerg. 206; *Sherwood* v. *Salmon*, 5 Day 439; *Spurr* v. *Benedict*, 99 Mass. 463.

The case of *Kyle* v. *Kavanagh*, 103 Mass. 356, was an action for the price of land in a common law court. Evidence was offered tending to show an innocent mutual mistake as to the location of the land, and the court instructed the jury: "If the defendant was negotiating for one thing, and the plaintiff was selling another thing, if their minds did not agree as to the subject-matter of the sale, they could not be said to have agreed or to have made a contract; and therefore if the plaintiff or defendant were in fact mistaken as to the location of the land, it was a good defence, although there was no fraud or misrepresentation on the part of the plaintiff; such mistake alone, if proved, was a good defence." Under this instruction the jury found for the defendant and the Supreme Court of Massachusetts approved the judgment and instruction.

So in a like case in Virginia on the application of the vendee a court of equity rescinded a contract because of a mutual and innocent mistake of the parties as to the location of the land sold. See *Glassell* v. *Thomas*, 3 Leigh 113. In this case the whole contract was rescinded for exactly the same reason, for which the Massachusetts court instructed the jury to regard it as a nullity; and the court decided that it could not be rescinded in part, for to do so would be for the court to make a contract for the parties, where they had themselves failed to make one. This Court disclaimed all power to modify the contract because of such mutual mistake. All they could do was to rescind it. And doubtless the Massachusetts court would for a like reason have refused to instruct the jury, that they could abate from the purchase-money due according to the terms of the contract the difference in the value of the land the defendant got and what he supposed he was purchasing. For this would in effect have been compelling the plaintiff to sell land, which he had never agreed to sell, and to take for it a price fixed by the jury.

In *Brooks & Morris* v. *Stolley*, 3 McLean, 523, the same principles were acted upon by a court of equity when the relief sought was in effect the nullifying of a contract for the use of a patent. The court held, that a party claiming under a contract must take it as agreed by the parties or not at all.

So in *Glass* v. *Hulbert*, 102 Mass 24, 3 American Reports

118. The defendant had made a conveyance of land to the plaintiff not actually including a certain lot of seventeen acres, which, the defendant had represented, and the plaintiff had been led to believe, was included in the deed. But the court held, that the plaintiff did not offer to rescind the whole contract, he was without remedy in equity, which could not require the defendant to convey the seventeen acres of land omitted in the deed. This case, it is true, was based on the ground, that under the statute of frauds the plaintiff could not prove an oral agreement to include this seventeen acres in the sale; but if in point of fact it were not included in the contract by a simple mutual and innocent mistake of the parties, on the principles laid down by the court it could not have ordered its conveyance; for to have done so would have been to make a contract for the parties; but it could put aside the contract, if asked, because of such mutual innocent mistake.

The principles therefore, which govern courts of law in regarding contracts based on an innocent and mutual mistake of the parties in reference to the substance of a contract as null and void, and those which govern courts of equity in rescinding such contracts, whether applied to real or personal property, are essentially the same. To show this more clearly we will refer to what is said in Story's Equity Jurisprudence as to when courts of equity will rescind a contract on account of mutual and innocent mistakes. See Story's Equity Jurisprudence, vol. 1 sec. 141. " The rule as to ignorance or mistake of facts entitling the party to relief has this important qualification, that the fact must be material to the act or contract, that is it must be essential to its character and an efficient cause of its concoction (see *Chapman* v. *Coats*, 26 Ia. 288) for though there may be an accidental ignorance or mistake of a fact, if the act or contract is not materially affected by it, the party claiming relief will be denied it. The distinction may be easily illustrated by a familiar case. A. buys an estate of B., to which the latter is supposed to have an unquestionable title. It turns out on due investigation of the facts, unknown at the time to both parties, that B. has no title (as if there be a nearer heir than B., who was supposed to be dead but is in fact living) in such case equity will relieve the purchaser and rescind the contract. See *Bingham* v. *Bingham,* 1 Ves. Sr. 126;

*Burley* v. *Jones*, 11 Gratt. 468; *Calverly* v. *Williams*, 1 Ves. jr. 210, 211.  But suppose A. was to sell an estate to B., the location of which was well known, and they mutually believed it to contain twenty acres, when in point of fact it contained only nineteen and three fourths acres, and the difference would not have varied the purchase in the view of either party.  In such case the mistake would not be a ground to rescind the contract. *Smith* v. *Evans*, 6 Binn. 102; *Voorhees* v. *De Meyer*, 2 Barb. 37; *Mann* v. *Pearson*, 2 Johns. 37; *O'Kill* v. *Whitaker*, 1 De G. & Sm. 83.  On the other hand if the vendor represented the land as situated in one county, when it was in fact in another, this is a sufficient mistake to justify a court in refusing specific performance, though the vendor was innocent of fraud. *Best* v. *Stow*, 2 Sandf. Chy. 298.  So if the mistake be in the quantity of land sold as four acres instead of eight, this is sufficient to justify a court in rescinding a contract; it being proved, that the deficiency was material in the object of the purchase.  And this would be so, though the land was described as being eight acres more or less those words being confined to a reasonable allowance for small errors of survey and for variations of instruments. *Belnap* v. *Sealy*, 2 Duer. 579; *Quesnel* v. *Woodlief*, 2 H. & M. 173 Note; *Day* v. *Fynn*, Owen 133."

It is true, in one part of this citation mistake of facts is spoken of as in certain cases entitling the party to relief; but the whole citation shows, that the author clearly by relief meant by rescission of the contract, the only sort of relief spoken of in the citation.  So in a number of the cases, which I have referred to, the judges have sometimes spoken of a mutual innocent error entitling the injured party in certain cases to relief in equity.  The relief obviously meant was relief by a rescission of the contract, the only relief sought or granted in any of the cases I have cited.  That this is the true meaning of this citation from Story Eq. Jur. is rendered still more clear by what is said in section 115.  Speaking in that section of a mistake in law and the relief, which a court of equity in such case may grant, after stating the case of *Hunt* v. *Rousmanier*, 8 Wheat. 174, the author says:  "It is manifest the whole controversy in this case turned upon the point, whether a court of equity could grant relief, when a

securety became ineffectual, because the parties in executing it innocently mistook the law. It was the very security the parties had innocently selected. It would have been most extraordinary and unprecedented for a court of equity under such circumstances to grant relief; for it would be equivalent to decreeing a new agreement not contemplated by the parties instead of executing that actually made by them. If the party, who was to execute the power of attorney (according to the contract in that case) had refused that and offered a mortgage (which is what in this suit the plaintiff sought in lieu of the power of attorney, which by the death of the grantor was revoked) could he have insisted on such substitute? If a mortgage had been agreed on, could he have compelled the other side to have accepted a letter of attorney? Certainly not. Equity may compel parties to execute their agreements; but it has no authority to make agreements for them or to substitute one for another. See the able opinion of Mr. Justice Washington in *Hunt* v. *Rousmanirer* 1 Pet. 13 to 17."

These views are expressed with reference to a mistake of law, but they are obviously equally applicable to a mistake of fact. If the parties have either by a mistake of law or of fact entered into an agreement, which they would not have entered into but for their ignorance of the law or fact, as the case may be, it may be and doubtless is true under some circumstances, that the court may properly rescind the contract, as it may be one, to which really the parties never in point of fact assented; but in no such case would the court substitute for such contract another, which in the judgment of the court the parties would probably have made, had they not been ignorant of the law or facts, as the case may be. The reasoning of Justice Washington is unanswerable. A court of equity has no authority for making agreements for parties; and this it would do, if because of such mutual innocent mistake either of law or fact instead of rescinding the contract it should compel one party to keep the property, if it were a contract of sale, and pay for it more than he had contracted to pay, or should compel the other to part with his property for a less sum, than he agreed to take. If the vendor had been guilty of a fraud, then indeed the court would compel

him to receive less than he had agreed to take for his prop-
erty; for in so doing it would be making no new contract but
would simply be enforcing from the vendor, by way of abate-
ment of his demand, a just compensation due to the vendee
for the injury, which he had sustained by the vendor's wrong.
But if the vendor has done no wrong he cannot be enforced
to sell his property for less, than he chooses or has agreed to
sell it for, simply because a mistake, for which he was not to
blame, has occurred.   The court may, as we have seen, under
some circumstances rescind a contract because of such mutual
mistake; but this is the extent of its power.

But though a representation be made with reference to the
property sold by the vendor under circumstances, that would
not make him responsible because of any fraud, yet he may
make himself responsible for what he has thus said or reduced
to writing either by an express or implied warranty.  If the
warranty be express, and the vendee suffer from its breach, he
has of course a right to recover the amount of damage, which
he has sustained; or if sued for the purchase-money in law or
equity, he would have a right to abate from the purchase-
money the loss, which he may have sustained by such breach
of warranty.   And he possesses primarily the same rights, if
the warranty be an implied instead of an express warranty.
An affirmation made by a vendor of real or personal property
may or may not amount to an implied warranty; and it is
often very difficult to determine in a particular case, whether
an affirmation made by the vendor is or is not an implied war-
ranty.

No special form of words is necessary to create a warranty.
A representation made by a vendor either at the time, when
the bargain is concluded, or, if it be a verbal sale, during the
course of dealings, which led to the bargain, will or will not
be held to be a warranty according to the intention of the
parties, to be gathered, with an exception presently stated in
case of ambiguity, from the written contract, if the terms of
sale be reduced to writing, and if not in writing, from the
conversation of the parties at the time of or preceding the con-
tract and during the negotiation and from all the surrounding
circumstances.   To make such representation a warranty it is
not sufficient, that it appears to have been an inducement to

the buyer, but it must appear, that it entered into the contract of sale, when it was concluded, and was intended by the vendor as a warranty and so understood by the vendee. If this does not appear, it will not be held to be a warranty, and the vendor may or may not be responsible for such representation, if it turn out to be false. If there be a warranty either express or implied, the vendor is always responsible on his contract, if the warranty be broken. But if the untrue representation be not an implied warranty, the responsibility therefor of the vendor will depend on a variety of circumstances, as we have seen. As for instance, if the vendor has stated as a fact that, which he knew to be false, or that which he did not believe to be true, or has stated as within his own personal knowledge that, which was not, though he believed it to be, true, and this statement was made to induce the purchaser to buy at the price, which he agreed to give, and the buyer was in fact induced by such misrepresentation to make the purchase on the terms he did, the seller would be responsible to him for whatever loss he might thereby sustain, though there was no warranty express or implied ; but he would not be responsible, if any of these essential requisites to his responsibility did not exist.

These principles are sustained by the authorities of both England and America, the only controversy about them being, whether the vendor would not be excused from responsibility, if he stated as known to him personally what he verily believed to be the truth ; and it may be regarded as settled, that he could not, be held responsible, if the statement was not made as of his own knowledge unless it was made recklessly, when he had no knowledge on the subject and no real information. But there is a great diversity among the decisions, as to what circumstances and language would convert a representation into an implied warranty. These differences are commented on in the case of *Mason* v. *Chappell*, 15 Gratt. 572, and what seems to me to be very correct views so far as they are expressed, are stated by the court. They are thus expressed in the syllabus of the case: " To constitute fraud in a sale it is not sufficient, that there should be false representation by the vendor; but he must know, at the time he makes them, that they are false, or at least he must make them as statements of fact within his

own knowledge, when he has no knowledge on the subject. Any affirmation of the quality of the article at the time of the sale intended as an assurance to the purchaser of the truth of the fact affirmed and acted upon by the purchaser is an express warranty. But no affirmation however strong will constitute a warranty unless so intended." These principles are equally applicable to the sale of real as of personal property and would apply as well to the affirmation by the vendor of real estate as to the number of acres in the tract of land sold as to the affirmation by a vendor as to the quality or quantity of personal property sold. If the contract is in writing, there could be no warranty, unless it was contained expressly or by implication in the writing; and the court must construe it aided, as we will presently see, in some cases of apparent ambiguity by a certain character of parol evidence. See *Brown* v. *Bigelow*, 10 Allen 242, 244; *Wason* v. *Rowe*, 16 Vt. 525. But if the contract is verbal, whether the parties intended an affirmation of facts as a warranty or not, is a question of fact to be determined by the jury. See *Duffee* v. *Mason*, 8 Cowen 25; *Morrill* v. *Wallace*, 9 N. H. 111.

As illustrating the great difficulty of determining, whethe a representation is or is not an implied warranty, a few cases may be cited. The vendor of a horse, when asked, said, the horse was " sound to the best of his knowledge," but presently said : " I never warrant. I would not even warrant myself." The court held, that this was a qualified warranty, " that the horse was sound to the best of his knowledge" and assumpsit would lie, &c. *Wood* v. *Smith*, 5 M. & R. 124. So an affirmation by a vendor, that a horse was not lame, and he would not be afraid to warrant, that the horse was sound every way, so far as he knew, was held to amount to a warranty. *Cook* v. *Moseley*, 13 Wend. 277. So a statement, that flour sold in barrels was extra superfine and worth a shilling a barrel more than common coupled with an assurance to the purchaser, that he could rely on such statement, was held to be a warranty of the quality of the flour. See *Carley* v. *Wilkins*, 6 Barb. 557. But in *Richardson* v. *Brown* 1 Bing. 344, in a sale of a " horse five years old, has constantly driven in the plough, warranted," the warranty was held to refer to soundness only. So where the sale was worded: " Received £100

for a bay gelding got by Cheshire Cheese, warranted sound." It was held, that there was no warranty, that the horse was of the breed named. *Dickinson* v. *Grepp*, quoted at page 50 in *Budd* v. *Fairmaner*, 8 Bing. 48. A bill of sale of a horse, in which it was stated, that he was "considered sound" is not a warranty. *Mason* v. *Rowe*, 16 Vt. 525. These cases will suffice to show the uncertainty, which exists in determining, whether particular words do or do not amount to a warranty. So great is this uncertainty, that probably it would have been wise, had the courts held, that to make a warranty language should be used, whereby the vendor expressly warranted. But implied warranties have been upheld by the courts for so long a time, that it would be unwise and indeed impossible to hold, that they could not exist. No more definite rule can be laid down to determine when they exist, than that laid down in *Mason* v. *Chappell*, 15 Gratt. 572.

We have thus far been disscussing principles of law applicable in courts of law and equity generally whether written or verbal. But there are certain other principles applicable only to written contracts, and most generally applied in courts of equity, which we must briefly consider, before we discuss further the points directly involved in this cause. The question of reforming deeds and other written contracts on the ground of mistake or fraud is governed by a number of well recognized rules, which control a court of equity in the exercise of such jurisdiction. In the first place a written contract can neither be set aside nor reformed by the proof of oral declaration of parties, unless there be a distinct allegation in the pleadings of fraud or mistake. If there be no fraud or bad faith in the case but simply a mutual and innocent mistake of the parties, for which neither of the parties is at all to blame, and there is nothing in the transaction to affect the conscience of either party, but all that appears is, that there was a mutual mistake of such a fundamental character, as proves, that the minds of the parties have never in fact met, the only relief, which the court can afford, is to set aside the contract *in toto* as originally void, the mutual consent of the parties to such contract never having been given ; and even this cannot be done in many cases, where it has become impossible to put the parties *statu quo* ; but without the consent of

parties this contract really void cannot be reinstated in another form under the pretence of reforming it and making it correspond with such a contract, as it is supposed, the parties would have entered into, had they, when the contract was made, been correctly informed of the facts, on which the contract was based. The authorities, we have cited, show what, it seems to me, would have been obvious, even had there been no decisions on the subject, that while a court of equity may ascertain the real agreement of parties and compel them to perform it, as it was really entered into, when by fraud or mistake it has not been corectly reduced to writing, yet clearly a court of equity can have no authority to make agreement for parties or to substitute one agreement for another, because the court may think, that the proposed substituted agreement is a fair and reasonable one and such a one, as the parties would probably have agreed to, had they been correctly informed of the facts.

When an agreement in writing is expressed, precisely as the parties intended, that it should be expressed, it cannot be varied or altered by the court on parol proof, that the parties were laboring under a mistake as to the legal consequences of such an agreement. But where the agreement as reduced to writing does not express the real contract of the parties because of a want of skill in the draftsman or for any other reason, it may be reformed by a court of equity. *Lackings* v. *Riddle*, 21 Ala. 252; *Huss* v. *Morris*, 13 P. F. Smith (Pa.) 367. When the language of a written agreement is susceptible of more than one interpretation, that is to say, is on its face ambiguous, it has been held, that the courts will look at the surrounding circumstances existing, when the contract was made, at the situation of the parties and the subject-matter of the contract, and will sometimes even call in aid the acts done by the parties under it as affording a clue to the intention of the parties; but the court never resorts in such a case to the verbal declaration of the parties either before, at the time or after the execution of the contract to aid it in giving a construction to its language. See *Hurst* v. *Hurst*, 7 W. Va. 299; *French* v. *Carhart*, 1 Com. N. Y. 109; *Keyton* v. *Brawford*, 5 Leigh 39; *Bierne* v. *Erskine*, 2 Leigh 59; *Tucker* v. *Cocke*, 2 Rand. 51; *Wilson* v. *Troup*, 2 Cowen 195–228; *Fowle*

v. *Bigelow,* 70 Mass. 384–392; *Parkhurst* v. *Smith,* Willis's R. 332; *Bradley* v. *The Washington, Alexandria & Georgetown S. P. Co.,* 13 Peters 89; *Summers adm'r* v. *Williams,* 8 Mass. 214; *Whallon* v. *Kauffman,* 19 Johns. 104; *Gibson* v. *Tyson,* 5 Watts 34; *Crawford* v *Garville,* 2 Leigh 630–637 *Livingstone* v. *Ten Broeck,* 16 Johns. 22; *Attorney General* v. *Parker,* 3 Atk. 576; *Attorney General* v. *Foster,* 10 Ves. Jr. 338; *Weld* v. *Hornby,* 7 East 199; *Rex* v. *Osbourne,* 4 East 327.

Having reviewed the general principles, which, it seems to me, should operate and control the court in determining, whether in a particular case it can grant relief to the parties, where there has been a sale of an entire tract of land for a specified sum, and the written contract specifies the number of acres in the tract, but it afterwards turns out, that there is in the tract a larger or smaller number of acres than the number specified in the contract, I propose now to review the cases, which have been decided directly involving this question and ascertain, whether these general principles have been followed, or whether they have been modified, or new and different principles have been applied to this class of cases. As the cases have been numerous, this is a great labor I have imposed on myself; but I cannot in justice to the subject omit to perform it, because the opinions of many of our judges pronounced in this class of cases have been often far from clear, and in modern times especially in Virginia since the formation of this State there has been an obvious tendency to abandon almost all of the fundamental principles, which I have laid down, when they are to be applied to this class of cases. This tendency is in my judgment much to be deprecated, and if not checked, it is well calculated to do mischief in this State and to throw our law on this subject into the uncertainty and confusion, which prevail in Virginia; and this onerous duty I cannot escape, because upon a correct settlement of the principles, which should govern in such cases, must depend the question, whether the case before us should be affirmed or reversed.

The older decisions in Virginia are nearly all of them, perhaps all of them, correctly decided; and while the principles, on which they were decided, were often not stated with

certainty or precision, yet a careful examination of them will show, that they were really based on the fundamental principles, which I have announced.  Occasionally some one judge in delivering his opinion has announced views, which are not in accordance with these fundamental principles; but it will be found, that the cases, in which such false views were stated, were really decided not on these false views but in strict accordance with these principles, which I have announced, and which have a universal application.

The oldest case of this character was the case of *Quesnel* v. *Woodlief* reported in a note in 2 H. & M. 173 and afterwards in 6 Call 218.  It was decided November 19, 1795, during the period of the Washington Reports but was for some reason omitted in his collection.  It seems to have in no manner tended to settle the law on this subject; but the principles, on which it was decided, at once became the subject of dispute and controversy, and when Henning and Munford were the reporters of the court in 1808, with the praiseworthy object of putting an end to this dispute, in a note to *Nelson* v. *Mathews et al.*, 2 H. & M. 173, they reported the facts of the case and the decree rendered by the court in it.  They preface this report by the statement, that this case " has been so often inaccurately quoted *out of court* and *even in court* and has been cited under such different appellations, that it is believed a correct statement of the case *from the record* will be acceptable to the profession."  They then report the case as follows:

" QUESNEL v. WOODLIEF, RUFFIN & HARRISON,
" November 19, 1796.
" [Order-Book No. 3 p. 152 MS.]

" Woodlief, one of the appellees, advertised for sale the tract of land, whereon he resided, called *Sion Hill* and described it as containing about eight hundred acres.  Quesnel became the purchaser at private sale and agreed to give the price of *four pounds per acre* estimating the tract at eight hundred acres, which amounted to the sum of £3,200, for which he executed his bonds payable at several different periods.  The parties had been for some time in treaty for the land, Woodlief representing it as held by old title-papers, and reputed, by himself, as well as former proprietors, to contain at least

eight hundred acres, and Quesnel believing that it would hold out that quantity. The land was not re-surveyed by Woodlief, either before he advertised it or sold it to Quesnel. After the sale Woodlief still expressed his belief, that the tract contained eight hundred acres and Quesnel accepted a deed for that quantity 'more or less.' But in fact upon an actual survey, it was found to contain only six hundred and eight acres one rood and eighteen poles. Before any survey was made Quesnel gave a deed of trust upon the same land as containing eight hundred acres (without any qualification) to Harrison as trustee for the purpose of securing the balance of the purchase-money, part to Woodlief and part to Ruffin, to whom some of the bonds of Quesnel had been assigned. A bill was exhibited by Quesnel in the High Court of Chancery for an injunction to judgments obtained on some of the said bonds on the ground of the deficiency in the quantity of the land. The Chancellor on a final hearing dismissed the bill; and Quesnel appealed to the Supreme Court of Appeals, where the following decree was pronounced:

"That the appellee Woodlief not having surveyed the tract of land in the bill mentioned called *Sion Hill* before he advertized the same for sale, or sold it to the appellant, but that supposing there had been an old survey, which he has not produced or referred to, and which does not appear in the proceedings in this cause, under which the land had been long held, as he suggested by the former proprietors of the said land, and estimated by them and him as containing eight hundred acres, he advertised it as containing about that quantity, and the appellant was thereby induced to purchase it, expecting it would contain that full quantity, and the appellee, Woodlief, having afterward asserted his belief thereof, occasioned the appellant to accept of a deed for the same as containing eight hundred acres, *more or less;* and it appearing from the survey made by Robt. Turnbull, and returned to the High Court of Chancery, pursuant to an order of the said court in this cause made for ascertaining the exact quantity of land in the said tract called *Sion Hill*, that the same contains only six hundred and eight acres one rood and thirteen perches, so that both parties were mistaken in the quantity and number of acres contracted for, the said mistake ought to be rectified in a court of equity, and

the appellant allowed a deduction *from the price agreed by him to be given for the said land* for the deficiency in quantity, that deficiency being too great for the purchaser to lose under an agreement for a reputed quantity, notwithstanding the words ' more or less' inserted in the deed *which should be restricted to a reasonable or usual allowance* for small errors in surveys, and for variations in instruments. The value of the deficiency, when ascertained under the direction and to the satisfaction of the said High Court of Chancery, to be deducted from his bonds for the purchase-money in the hands of the appellees Woodlief and Ruffin or either of them, if sufficient to satisfy the same, and if more than sufficient, the injunction to be dissolved for the residue, but if not sufficient the appellee Woodlief to be decreed to refund it with interest, &c.   Decree of the High Court of Chancery reversed and cause remanded to the said court for a final decree according to the principles of this decree."

In 1833 this case was reported at length in 6 Call 218. The facts are stated at great length; but so far as they were stated in the report in 2 H. & M. 173, they appear to have been correctly stated, except perhaps the reporter might not have been justified by the evidence in saying: " That Quesnel became the purchaser at £4 per acre estimating the tract at eight hundred acres, which amounted to the sum of £3,200, though there is considerable evidence to sustain this statement, and ample evidence to show, that the price he agreed to give was £3,200, and that the tract was estimated in fixing this price at eight hundred acres.   The only additional proof, which is very material, not included in the decree or in this statement of the facts was, that Quesnel was a foreigner and very little acquainted with the English language.   Lyons, Judge, delivered the opinion of the court, composed then of Peter Lyons, Paul Cavington, William Fleming and Spencer Roane.   Judge Lyons says:

" The bill charges, that fraud was practiced upon the plaintiff in the sale of a tract of land called Sion Hill, which, it asserts, the defendant fraudulently misrepresented as containing eight hundred acres, although he knew, that to be more than was actually comprehended in the tract at the time, as several parcels of land had been previously conveyed to

other persons without that fact being disclosed to Quesnel, who purchased under the belief that there were actually eight, hundred acres; but upon a survey since there appeared to be much less. The fraud and misrepresentations are denied in the answer, and the evidence does not support the allegations of the bill in respect thereto but proves clearly, that the parcels conveyed were not part of the original ' *Sion Hill* ' tract, which was the estate *Woodlief* contracted to sell, and which there is every reason to believe, he actually thought contained at least eight hundred acres; for the land had been the family-seat for ages, and Woodlief supposing it to be held under an old survey, which he and his predecessors had always estimated to comprehend eight hundred acres, advertised as containing about that quantity; and Quesnel relying upon these circumstances purchased it under a belief, that there was that number of acres in the tract. Both parties appear to have acted innocently; and there is consequently no cause for relief upon the ground either of fraud or misrepresentation; but as both vendor and vendee proceeded under a *mistake* each believing the tract certainly contained eight hundred acres and perhaps more, that constitutes a proper ground for relief in equity, which adjusts and equalizes contracts according to the exigencies of the case. The mistake, therefore ought to be rectified, and a deduction made from the purchase proportionate to the deficiency of the land."

The following points were clearly decided in this case:

1. A contract to convey or a deed conveying a specified tract of land for a fixed price, even where that price is a multiple of the number of acres, which the contract or deed states as the number of acres more or less in the tract, is a contract in gross to sell the entire tract at the specified price and not a contract to sell by the acre. This is obvious; for had this contract been regarded as a contract by the acre, the vendee as a matter of course would have been bound to pay only for the number of acres he actually got; and the court would at once have thus disposed of the case, had they regarded this as a contract for a sale by the acre.

2. The statement in the contract or deed, that the land contains a number of acres "more or less," means, that it contains about that number of acres, allowance being made for

the reasonable and usual errors of surveys produced by the ordinary and usual errors in taking the courses and measuring the length of lines in making surveys.

3. The assertion in a written contract or deed, that a tract of land sold contains a specified number of acres more or less, does not amount to an implied warranty by the vendor, that there is about that number of acres in the tract. This was obviously the view of the court; for if these words had been construed as such a warranty, the court would have based its decision on so obvious a point, which would have saved all necessity of enquiring into the circumstances of the case, as under any circumstances, if there had been such an implied warranty, the vendor would have been bound to make an abatement of the purchase-money proportioned to the deficiency.

So far there can be no controversy about what was included in this decision; and these views were for many years fully sustained and upheld, as we shall see by the Virginia decisions; but in modern times and especially since the separation of this State the Virginia decisions may be regarded as having in that State thrown serious doubt on the first and third of these propositions, though they are still firmly upheld in West Virginia. What other propositions were decided by this case, has, ever since it was rendered, been a subject of dispute. Some insist that this case as its last proposition decided :

4. That when in such a deed or contract the tract is stated to contain either more or less than the actual quantity of land, and this misstatement of the quantity was the result of an innocent mistake made by the parties, for which the vendor is in no manner more responsible than the vendee, the court because of such mutual innocent mistake would require the vendor to make an abatement, if there was a deficiency in the quantity of the land, or would require the vendee to pay an additional sum for any surplus in the quantity of the land.

But instead of this proposition others insist, that the court in this case only decided :

4. That where a vendor in his deed states, that the tract of land, which he has sold at a certain price, contains a specified number of acres more or less, this is an affirmation by the ven-

dor as within his own knowledge, and if the vendee relying on this assertion is in point of fact induced to purchase the land at a certain price, and it turns out, that there is a less quantity of land in the tract, this would be a legal fraud on the vendee, though the vendor really believed, that there was this number of acres in the tract. Such an affirmation ought not to be made by him, unless he knows it to be true; and the vendee being in the view of a court of equity injured and deceived by such false representation is entitled to an abatement from his purchase of an amount in proportion to the deficiency in the land.

Those, who take this view, regard this case to have been decided, as it was, because the vendor made this assertion, and as he resided upon the farm and had done so for years, the vendee, who was a foreigner unacquainted with our language, would most naturally, as he had a right to do, rely upon the truth of the statement of the vendor as to the quantity of the land, and being thereby deceived he was entitled to an abatement of the purchase-money, even though the vendor by his inadvertance or carelessness thought, that there was the quantity he stated in the land. That this was the true basis of this decision, these persons say, appears from the recitals in the decree as well as from the opinion of Judge Lyons. We will presently see, what the judges, who decided this case, say, that they based their decision upon; but before so doing we propose to consider, which of these conflicting bases for this decision would according to the decisions elsewhere than in Virginia be regarded as a basis, on which it could rest as a sound legal principle.

From the principles, we have laid down, the conclusion is inevitable, that if the only ground for this decision is, that both the vendor and vendee, when this contract for the sale and purchase of this land was made, were laboring under an innocent mistake as to the number of acres in the tract, and neither of them was more responsible for such mistake than the other, then this decision would be erroneous. For a court of equity, while perhaps it might have rescinded the deed and contract of sale because of such mutual mistake, could not either allow an abatement of the purchase-money for a deficiency or require the payment of an additional price because

of any surplus. In either case the court would in so doing be substituting for the contract made by the parties one, which the court thought equal and just, and which it assumes they would have made, if they had really known the number of acres in the tract, an assumption, which in very many cases would probably be unfounded. But if the decision was based on the ground, that the vendor asserted in his deed as a fact within his knowledge, that there was in the tract about the specified number of acres, and the vendee was actually thereby induced to give the price asked, then it is sustained by the principle we have laid down. For, as we have seen, where one represents as personally known to him what is not true, though he may believe it, yet he is guilty of legal fraud and would be responsible for any injury resulting from this false representation. This proposition is laid down in *Cabot* v. *Christie*, 42 Vt. 121:

"If the vendor of land, in order to induce a sale, represents, that he has personal knowledge as to the quantity of land, being at the same time aware, that he had not such knowledge, his representation would be fraudulent, though he did not state the quantity of land to be larger than he believed. It was an imposition and fraud for him to pass off his belief as knowledge. And so too, if the incorrect representation was absolute and intended to be understood and was actually understood as a statement upon knowledge, it is fraudulent, if the party, who made it, was aware, that his statement was in fact merely an opinion or belief."

This was an action at law brought to recover on a fraudulent misrepresentation of the number of acres in a tract of land, whereby the plaintiff was induced to give a certain price for it; and the court held as above stated. The court say on page 126:

" A representation of a fact *as of the party's own knowledge* is, if it prove false, unless explained, inferred to be *wilfully* false and made with intent to deceive at least as to the knowledge, which is professed. A sufficient explanation however sometimes arises from the nature of the subject itself or from the situation of parties being such, that the statement of knowledge would only be understood as an expression of strong belief or opinion. But the quantity of land in a farm is a matter,

upon which accurate or approximately accurate knowledge is not at all impossible or unusual. If the defendant had only a belief or opinion as to the quantity of land, it was an imposition upon the plaintiff to pass such belief as knowledge. So too, if he made an absolute representation as to the quantity, which was understood or intended to be understood to be a statement upon knowledge, it is precisely the same as if he had distinctly said and in terms professed to have knowledge as to the fact. It is often said a representation is not fraudulent, if the party, who makes it, believes it to be true. But a party who is aware, that he has only an opinion, how a fact is, and *represents that opinion as knowledge*, does not believe his representation to be true. As is well said in a note to a report of the case of *Taylor* v. *Ashton*, 11 M. & W. 418 (Phil. ed.), the belief of a party to be an excuse for a false representation "must be a belief in the representation *as made*. The *scienter* will therefore be sufficiently established by showing, that the assertion was made as of the defendant's own knowledge, and not as a mere matter of opinion with regard to facts, of which he was aware he had no knowledge."

The same principle of law has been repeatedly recognized. *Hammett* v. *Emmerson*, 27 Maine 308-326; *Bennett* v. *Judson*, 21 N. Y. 238 ; *Stone* v. *Denny*, 4 Metc. 151; *Howard* v. *Erwin*, 18 Pick. 95.

So in the case of *Hammatt* v. *Emmerson*, 27 Maine 308, which was a common law suit on a note for the purchase-money of land the defence was a partial failure of consideration arising from a representation by the vendor of the timber on the land, which turned out to be untrue. On page 326 the court say : " When one has made a representation positively professing to speak of his own knowledge without having any knowledge on the subject, the intentional falsehood is disclosed and the intention to deceive is also inferred." As I understand the language of the court, the belief of the vendor in the truth of what he said would not in such a case render his representation of having personal knowledge, when he had not, less false.

In the case of *Fisher* v. *Mellen*, 103 Mass 506, the suit was an action at law for a deceit in the sale of an interest in land, the declaration declaring, that the defendant made certain

specified representations as to the land, whereby the plaintiff was induced to purchase his interest at $1,000.00; that the representations were false, and the interest in the land bought was of no value. The court say on page 500 : " The ground, upon which the plaintiff sought to recover was, that the representations of the defendant with regard to the lands were false in fact and made as of his own knowledge. * * * * Evidence of information from others, upon the strength of which he made these representations, even if they were such as led him to believe in the truth of the facts, which he stated, would not be a defence against such charges as the plaintiff relied on. If to induce the plaintiff to make the purchase, the defendant stated as of his own knowledge material facts susceptible of knowledge, which were false, and the plaintiff relying upon his statements so made was thereby induced to purchase, the defendant is liable notwithstanding proof, that he himself was misinformed as to the facts ; see *Hazard* v. *Erwin*, 18 Pick. 95 ; *Page* v. *Bent*, 2 Metc. 371. Such evidence would not disprove the fraud, which consists of representing the statements to be true of his own knowledge."

These authorities establish, that on the facts stated in the opinion and decree of the court in *Quesnel* v. *Woodlief*, 6 Call 218 and 2 H. & M. 173 note, Quesnel could have maintained an action of deceit against Woodlief; for Woodlief advertised the land as containing about eight hundred acres and conveyed it as containing eight hundred acres more or less, which meant the same thing as the advertisement. He was living on the land, and these statements must be regarded precisely, as if he had said, that he knew the land contained about eight hundred acres of his own knowledge. Quesnel must have so understood these statements ; and as Woodlief really had no such knowledge, as he asserted he had, and this assertion induced Quesnel to purchase at the price, which he agreed to give, Woodlief could have been sued for his false representation ; and any proof, that he had been misinformed as to the number of acres in the tract and believed, that there were eight hundred acres, would have been no defence, as his affirmation in effect, that he had personal knowledge of the fact, that there were about eight hundred acres of land in the tract, would have still remained

false, and he must necessarily have known it to be false.    If he had said in his advertisement, that he had information, that there were eight hundred acres in the tract but had no personal knowledge of the quantity, it is almost certain, that Quesnel would have had it surveyed, before he purchased; but his allegation made positively about a matter, which he might well be supposed to know personally, deceived Quesnel and induced him to purchase.    Having then a right to sue Woodlief for this false representation, Quesnel had for this reason a clear right to abate the amount of his damages from the purchase-money due from him; and this was the decree of the court.    But if there had been no other ground for the rendition of this decree other than, that each of the parties had fallen into an innocent and mutual mistake, for which one was no more responsible than the other, as some have supposed, then there is no sound principle, on which such a decision could be rendered.    But in determining what is to be regarded as fraud, it should be always borne in mind, that it is not based on a criminal intent to deceive and defraud.    If he suppresses the truth or suggests what is false, he is legally guilty of fraud, though he may not have intended to deceive and may have believed, that he did not.    This view is well expressed by Lord Romilly in *Peek* v. *Garney*, 13 Law Reports, Equity Cases 1871, p. 113.    He says:

"A more dangerous doctrine could scarcely be laid down, than that, unless a fraud is of so deep a dye of moral turpitude, that it amounts to a crime and is punishable in a court of criminal jurisprudence, the court of equity has no power to entertain the consideration of it, or to compel the author of it to rectify the calamities he has thereby produced.    The distinction between the cases of equitable and criminal jurisdiction in matters of fraud is laid down in many cases, but I think, is well put in *Burnes* v. *Pennel*, 2 H. L. C. 497.    It is the *suppressio veri* or *suggestio falsi*, which is the foundation of the reilef in equity; and this exists, whether it were fraudulently or mistakenly done.    It is the superadded guilty intention, which gives the the criminal jurisdiction.    A man may not have intended to deceive and may believe, that he did not, when he was really suppressing the truth or suggesting what was false.    If so, he is not liable to an indictment in a

criminal court, but he is equally responsible in equity, as if he had, while committing these acts, done so with a view to injure others or benefit himself."

In the case of *Wilcox* v. *The Iowa Wesleyan University*, 32 Ia. 374, this view was not confined to the case, where the vendor represented, what was not in point of fact true, as within his own knowledge, though he believed it to be true; but it was extended to the case, where the vendor told the vendee, that he had never seen the property, but when the court said, that he did, what was substantially the same thing, "by stating what the donors said in relation to the situation or value of the lands, and that he knew one of the donors, who he represented to be a smart business-man, and a leading member of the church, whose statements could be relied upon."

The decisions are numerous, in which the courts have held, where the vendor was guilty of fraud or misrepresentation in its legal sense as above explained, and there is a deficiency in the number of acres, that an abatement will be made from the purchase-money, but no abatement will be made, where the sale is in gross, and there is a deficiency in the number of acres named, when such deficiency was the result of mutual innocent mistake, and the vendor was not guilty of fraud in its legal sense, or the purchaser was not induced to purchase by the statement of the quantity of land made by the vendor. See *Morris Canal Co.* v. *Emmett*, 9 Paige 170, in which the Chancellor says: " The cases, in which equitable relief has been granted, are generally those, in which the sale of the land has been made by the acre or foot, or where there has been fraud or wilful misrepresentation on the part of the vendor to induce the purchaser to suppose, that the quantity of land was greater, than it actually was. In the case under consideration however there is no allegation or proof, that the premises were sold by the foot, or that the price to be paid had any reference to the actual depth of the lots, or that the purchaser was deceived by any misrepresentation as to the number of feet the lots extended back from Water street. Both parties were actually ignorant of the actual depth of the lots conveyed." In this case there was obviously a mutual mistake as to the quantity of land in the lots sold; but the vendor being guilty of no fraud, the court refused to

make any abatement in the price, the sale being in gross.

So in *Stebbins* v. *Eddy*, 4 Mason 414, the court decided, that the sale of the land being in gross, it would allow no abatement for a deficiency, as the vendor was not guilty of any fraudulent misrepresentation. Yet it is obvious, there was an innocent mutual mistake in that case in the quantity of the land conveyed.

In *Marvin* v. *Bennett*, 8 Paige 312, where the sale of the land was in gross, it was held, that in the absence of fraud or intentional misrepresentation by the vendor as to the quantity, though there was a mutual innocent mistake by both parties, no relief would be granted for a deficiency in the quantity named in the contract. The deficiency in that case was nearly one third. The same was held in *Noble et als.* v. *Googins*, 99 Mass. 231; and the distinction was drawn between seeking a rescission of the contract in such case. This distinction is rendered striking, when it appears, as it does, that where there is a mutual mistake in the quantity of the land affecting the substance of the contract, courts of equity have constantly on application rescinded the contract. This is shown by the numerous cases, which we have cited; and it is freely done in States, where they have refused to make an abatement of the purchase-money because of such mutual mistake, as in New York. See *Belknap* v. *Sealy*, 2 Duer 571.

So in *Ketchum* v. *Stout*, 20 Ohio 453, it was held, that where there was a sale of a tract of land in gross, there would be no abatement allowed because of mutual mistake in the quantity, where there is no misrepresentation or fraud in the vendor.

In the case of *O'Connell* v. *Duke*, 29 Tex. 299, the vendor brought a suit to rescind a contract, which he had made for the sale of a tract of land in gross, because the quantity of land named in the contract, which by a mutual and innocent mistake was supposed to be the correct quantity, was in point of fact nearly thirty-three and one third per cent. less than the real quantity. The court did not on this state of facts, as asked, rescind the contract but instead ordered to be laid off to the defendant, the vendee, a quantity of land equivalent to the number of acres named in the contract, quantity, quality and value of the land being considered. On the principles we have

stated the court in such a case could properly have rescinded the contract *in toto;* but on no recognized principle could it without the consent of the vendee have entered such a decree, as was entered, and the consent of the vendee does not appear on the face of the report. Such a partial rescission or modification of the contract violated the principles laid down in Leigh, that in such a case the contract could only be rescinded *in toto.* The principles laid down in this Texas case, it seems to me, are unsound. They were taken from decisions rendered in Kentucky and especially in *Harrison* v. *Talbott,* 2 Dana 258, which was a case brought by a vendee for a specific execution of a contract for the sale of a tract of land in gross described by boundaries and stated to contain four hundred acres for $6,000.00. It turned out, that there were four hundred and ninety acres in the tract. The quantity received being so named as four hundred acres by mistake. The court refused to specifically enforce the contract, unless the plaintiff would elect to receive a conveyance for four hundred acres, he electing on which side of the tract he would have it laid off. The court very properly refused to specifically enforce this contract; but it violated all correct principle, when it undertook without the consent of the vendor on the consent of the vendee only to enforce a contract for a different boundary of land, than that agreed upon by the parties. If that could not be enforced as agreed upon, all that the court could do was to rescind the contract *in toto,* unless both parties agreed to its modification. The consent of one to this new contract did not make it binding on the other; and though the court may have thought it just for the vendor to convey four hundred acres, yet it could not make a contract for him ; and he had only agreed to convey the entire tract.

These are the only cases, which I have been able to find, in which the principle seems to be recognized, that in case of a mutual mistake in the quantity of a tract of land sold the court can furnish any other relief than an entire rescission of the contract. And even these do not indicate, that in such case the court would, if there had been a deficiency, have allowed an abatement from the purchase-money agreed upon. This would have been even a greater change of the contract made by the parties, than that countenanced by these Kentucky and

Texas case; but it does appear to me on the authorities as well as on reason, that the court cannot in case of mutual innocent mistake modify in any manner the contract of the parties and then enforce it.

There are some cases, which perhaps on a cursory examination might look like a decision by the court in favor of making such abatement, when there was no fraud but a simple mutual mistake and some *obiter dicta* of this character. *Conse* v. *Boyles et al.*, 3 Green. (4 N. J. Eq.) 217, is one of them. But an examination of the facts stated by the Chancellor on page 215 shows, I think, satisfactorily, that the vendor was clearly guilty in that case of actual fraud; but even if we disregard this evidence of intentional fraud by the vendor, the decree in this case would have been right in allowing the abatement on account of the large deficiency, though the sale was a sale in gross, because there was legal fraud in the case, as we have defined it. The agreement was for $5,500.00, to convey to the vendee a farm, on which the vendor resided, said to contain one hundred and thirty-five acres more or less. And the deed conveyed the land by boundaries containing one hundred and thirty-five acres more or less. It actually contained only about one hundred and five acres. The Chancellor on page 217 says: "Under this agreement and deed I deem the defendant equitably entitled to an abatement for the deficiency in the number of acres upon the supposition, that it was a mistake only and without knowledge to the contrary by either party at the time of the contract. It can not be supposed, that it was believed by either party, that the deficiency as shown by either surveyor was so large, or it would have affected the terms of the contract. The defendant by his answer declares he never would have paid the price he did, had he known the true quantity of the land. The variance is too large to be passed by; taking a medium quantity between the two estimates and it will leave a deficiency of nearly thirty acres on the purchase of one hundred and thirty-five acres. The fact, that Mr. Boyles, the vendee, lived a neighbor and saw the land daily, can have no bearing on the question, nor can the doctrine *caveat emptor* have any application. A purchaser relies and has a right to rely upon the vendor for the number of acres, and may and usually does place implicit confidence in his statements."

It is true, this is said upon the "supposition, that it was a mistake only ; " but by this is obviously meant on the supposition, that the vendor in his contract and deed did not intentionally misstate the quantity.   So understanding the Chancellor, his views above expressed are in strict accordance with our views. For though the vendor in that case did not intentionally misstate the quantity in the deed, yet as he owned the land and resided on it, the vendee, as the Chancellor said, had a right to rely upon him for the number of acres.   The statement therefore, that there were in the tract about one hundred and thirty-five acres, must be regarded, as doubtless it was understood by the purchaser, that the vendor personally knew, that there was this number of acres in the tract; and therefore though he believed, that there was this number of acres, it would not have saved him from responsibility for his allegation, that within his own knowledge there was this quantity of land.   The deed must be interpreted, as though he made this allegation expressly on his own knowledge.   In this case the evidence shows, that a surveyor, who had surveyed this land, reported to the vendor, that it contained much less than one hundred and thirty-five acres.   The vendor, it is true, told the surveyor, that he must be mistaken, still he told him, the surveyor, to say nothing about it.   Certainly after this warning it was a fraud to insert in the deed and allege, that the land cantained about one hundred and thirty-five acres.

In *Kent et al.* v. *Carcand*, 17 Md. 292, it was decided, that the exhibition by the vendor of a plat at the time of sale is equivalent to the averment of the number of acres ; and if the number of acres stated on the plat is larger than the number of acres in the tract, though it was sold in gross, and though this representation was made innocently, yet the vendee would be entitled to an abatement.   This case like the New Jersey case may be properly based on the ground, that such an exhibition of a plat, by which the land was sold, is the equivalent of an affirmation by the vendor, that the number of acres specified in the plat is within his knowledge the number of acres in the tract; and his belief, that this was so, would not relieve him from responsibility for a deficiency, because in law the exhibition of the plat was a fraud, unless

it was accompanied by a statement, that the vendor did not know, whether it represented the correct quantity of the land or not. Without such statement it was the equivalent of a declaration, that the vendor knew this to be a true plat of the land.

It seems to me, that an exhibition of a plat ought to be regarded as a positive declaration by the vendor, that within his knowledge this plat is correct. But it has not always been so held. In *Weart* v. *Ross*, 16 N. J. Eq. (1 C. E. Green) 298, an exhibition of a plat by a vendor was not so regarded but was regarded as a simple declaration, that he believed this plat to represent the true quantity of the land ; and if he did so believe it, he was not responsible for a deficiency of about five per cent., the contract describing the land as containing so many acres more or less.

So too in *Marbury* v. *Stonestreet*, 1 Md. 147, it was decided, that when land is sold in gross upon a statement by the vendor, that it contains so many acres, specifying them, and there is a deficiency, the vendee is entitled to an abatement, though the vendor believed, that there was in the tract the number of acres named. This decision seems to me to be correct, not because a court of equity will allow an abatement because of a mutual mistake of the quantity, but because such statement is the equivalent of a declaration by the purchaser, that there is that number of acres in the tract of his own knowledge, and the vendee is imposed upon, if such be not the case. But if the declaration made by the vendor be, that there was in the tract so many acres more or less, or that there was estimated to be so many acres in the tract, then the vendee would not be entitled to any abatement, if the vendor believed, that his statement was correct, that is, in the absence of fraud or misrepresentation. See *Jones* v. *Plater*, 2 Gill 125 ; *Stull* v. *Hurtt et al.*, 9 Gill 446 ; *Hall et al.* v. *Mayhew*, 15 Md. 568.

But it should be borne in mind, that by the Maryland decisions and by those in some other States the words " more or less " have quite a different meaning from what they have according to the decisions in Virginia beginning with *Quesnel* v. *Woodlief*, 6 Call. In Maryland the meaning of these words is much the same as " supposed to contain " or " estimated to contain so many acres," and it being therefore no

affirmation on the part of the vendor as of his own knowledge, he can not be responsible, if he really believed, that this supposition or estimate was correct. But in Virginia and this State as well as some others these words " more or less " mean " about so many acres " and would therefore be regarded as an affirmation by the vendor as of his own knowledge, that there was about the specified number of acres ; and he would be responsible for a material deficiency in quantity, though he believed, that the number of acres specified was about the quantity of land in the tract, provided the vendee was by this statement or affirmation induced to purchase at the price he gave, which would be presumed in the absence of proof.

So in *Hill* v. *Buckley,* 17 Ves. 395, where the representation was, that the land contained a specified number of acres, it was held, that the vendee was entitled to an abatement because of a deficiency in the quantity, though the vendor believed his statement of the quantity to be true. In this case Sir William Grant said : " No deception was intended. The defendant's agent fell into a mistake ; but I do not think, I am warranted by the evidence in the cause to infer, that the plaintiff knew the real quantity. A very intimate acquaintance with the premises did not necessarily imply knowledge of their exact contents ; while the particularity of the statement descending to perches would naturally convey the notion of exact measurement. When a misrepresentation is made as to quantity, though innocently, I apprehend, that it is the right of the purchaser to have, what the vendor can give, with an abatement out of the purchase-money for so much, as the quantity falls short of the representation. That is the rule generally ; as, though the land is neither bought nor sold professedly by the acre, the presumption is, that in fixing the price regard was had on both sides to the quantity, which both supposed the estate to consist of. The demand of the vendor and the offer of the purchaser are supposed to be influenced in an equal degree by the quantity, which both believed to be the subject of the bargain, therefore a ratable abatement of the price will probably leave both parties in nearly the same situation, in which they would have stood, if the true quantity had originally been known."

The concluding portion of this citation looks, as if the court

thought an abatement could be made, when there was a mutual and innocent mistake. But, as I conceive, the true ground of this decision is rather to be found in what Sir William Grant had said just previously, that the statement of the quantity of the land by the vendor would naturally convey to the purchaser the idea, that the vendor *knew of his own knowledge* the quantity of land he offered for sale, and though he made this statement innocently, that is, as I understand him, *without any intent to defraud* and with belief, that there was this quantity of land in the tract, yet as he has in point of fact made a misrepresentation of the quantity by stating it, so as to induce the vendee to believe, that the vendor *knew* the quantity, in law this would be a fraud and would entitle the vendee to an abatement of his purchase-money for a deficiency. If this be the ground, of course the vendor would not be entitled to require of the vendee to pay for such surplus, and while the decisions sustain generally, as we have seen, the right of the vendee to an abatement under such circumstances for a deficiency, they do not sustain any claim of the vendor under such circumstances to additional pay for any surplus. This, it seems to me, shows satisfactorily, that the true basis, on which this and all other similar cases have been decided, is not, that a court of equity can make an abatement for a deficiency or cause the vendee to pay for a surplus because of a mutual and innocent mistake of both parties, but that a court of equity can make an abatement of the purchase-money because of the legal fraud in the vendor in representing the quantity as of his own knowledge, when he really had not such knowledge, and that he cannot relieve himself of this liability by proving, that he believed, what he said, and did not intend to deceive. In point of fact he has deceived the purchaser to his injury, and therefore, he, the purchaser, is entitled to this redress. This, I think, is the fair conclusion to be drawn from all the authorities other than some recent cases in Virginia, which I propose to examine in detail.

In my judgment the first Virginia case, *Quesnel* v. *Woodlief,* 6 Call 218, 2 H. & M. 173 note, when rightly understood is really based on this principle. We will now see, how it was understood by the judge of the court, which rendered the decision. About two years after this decision the case of *Jolliffe*

v. *Hite*, 1 Call 207, top page 262, was decided. Its syllabus is: "If the vendor sells and the vendee buys a *tract of land* for so many acres *more or less*, and it turns out upon a survey, that there is less than the estimated quantity, the buyer shall not be relieved in equity." The deed conveyed a tract of land particularly described as containing five hundred and seventy-eight acres. On survey it was found to contain only about five hundred and twelve acres. Judge Roane was of opinion, that there was no warranty of the number of acres in the tract and announced the following as the principles, which ahould govern in deciding the case :

"1. In a contract every serious and deliberate communication, which has taken place between the parties relative thereto, so far as a former one has not been revoked by a latter, must be considered as forming the basis of the contract with this exception, that the treaty must not at any intermediate time have been at an end.

"2. That a communication or representation in a public advertisement relative to property offered for public sale must be considered as one of these communications with reference to any person, who may become the purchaser.

"3. That a representation of a fact by one to another contracting party should be fair and true ; and if the former asserts to the latter a fact, the truth of which he has it in his power to ascertain but does not, and it turns out to be untrue, he shall be responsible himself for the consequences of that event, and the party, to whom the representation is made, shall not be injured thereby. This doctrine is explicitly laid down in the Court of King's Bench in England in the case of *Macdowall* v. *Fraser*, Dougl. 260, relative to representations in case of a insurance; but the principle of the doctrine being founded in naturnal justice, it must equally apply to all contracts.

"4. A misrepresentation may at any time before the conclusion of the bargain be removed by a just representation of the fact ; but it must be clearly and explicitly removed ; for if it be equivocal only, the rule concerning misrepresentation, which I have before mentioned, will take place.

"5. That in contracts it may be said to be a general rule, that the purchaser takes upon himself usual and ordinary

risks, as those arising from variation of the compass but is not, unless it be so stipulated or understood between the parties, insured against those great defalcations, which can only arise from the fraud of some antecedent holder of the lands or the gross mistakes of unqualified surveyors; and whenever the latter risks are involved in the contract, it should clearly appear, that such was contemplated by the parties."

Judge Roane in his opinion also says: "With regard to the case of an excess above the quantity it may not follow of course, that where there is an abatement for deficiency, there should be payment for the excess." And again he says: "The particulars of the decree to be made by this court should be, if my opinion were to prevail, similar or nearly so to those in the case of *Quesnel* v. *Woodlief* in this court; and as the ground of the decision in that case seems not to be well understood, I will take the liberty for myself to say, that the principles and reasons, which governed me in that case, were substantially the same, as I have endeavored to state as governing in this; and the decision in that in its principles appears to be an authority in the present case." He thought, that on the facts proven in the case the vendor was entitled to an abatement for the deficiency in the land. Judge Fleming was of the opinion, that on the facts proved the vendor of the land, who was an executor and sold as such, stated on the day of sale, that his testator held the land for two hundred and seventy-eight acres, but that he set up as *more or less*, and that it was understood by the vendee, that he was buying the land risking the quantity himself, and his acceptance of the deed a year after, when he knew of the deficiency, showed, that he so understood. He concludes his opinion thus: "But then the case of *Quesnel* v. *Woodlief* in this court is cited as an authority, which decides the present cause. That case however differed widely from this. For in the first place Woodlief sold his own land, and that was an old family estate, the true quantity of which was probably known to him; but here Hite was only executor and not supposed to be cognizant of the exact number of acres. In the second place Quesnel was a foreigner not acquainted with our language or measure; whereas here the vendee was a

native and perfectly acquainted with both. Thirdly, that was a private sale and therefore more liable to imposition; but this was a public auction, and the terms were *more or less* expressly declared. Fourthly, in that case Woodlief had actually sold his brother Peter a part of the estate; but nothing of that sort existed here. Lastly the deficiency there amounted to almost one fourth; whereas here it was scarcely a tenth. I think relief was properly granted in that case but I can not agree, that it ought to form a precedent for the decision in this."

Judge Fleming was one of the judges, who sat in the case of *Quesnel* v. *Woodlief.* Judge Carrington from the evidence concluded, that the executor, the vendor, gave notice, that those, who wished to purchase, might inspect the title-papers; but he only sold as much, as they contained; and that he would not warrant either the title or the quantity; and that nobody was deceived. He concludes thus: " This is not like the case of *Quesnel* v. *Woodlief.* There Woodlief acting for himself sold an estate, which had long been held in the family, and the quantity whereof he might therefore reasonably be presumed to know; whereas Quesnel was a foreigner and did business by an interpreter. He had before the deeds often declared, he was willing to take it at eight hundred acres; and when they were executed he enquired into the meaning of the words *" more or less."* Upon being informed he asked whether he would be allowed for a deficiency, to which Woodlief answered, he should, if Quesnel would pay the excess. Here indeed the conversation stopped, and no reply was made; but as soon as the deficiency was known, instead of acquiescing, as was done in the present case, he gave an early notice, that he should demand a deduction. All of which circumstances vary the case so much from this, that it ought not to be considered as forming a precedent for the judgment we are now to give."

Judge Carrington sat in the case of *Quesnel* v. *Woodlief.* President Pendleton, who did not sit in it, seems from an examination of the case to have thought, that in that case the real contract, which was not produced in the case was, that Quesnel should give four pounds per acre for the eight hundred acres supposed to be in the land; and this, it would seem

from the report of Henning and Munford in 2 H. & M. 173, they, the reporters, also thought was proven in the case; and Judge Pendleton supposed, that that had its influence in deciding the case. He says in this: " I consider this was a sale in bulk, where a mistake in the estimated quantity has no influence, unless there was fraud in the vendor." He thought the proof showed, that there was none, and therefore there should be no abatement for the deficiency. In this conclusion Judge Lyons concurred, except that he thought, that there should be an abatement for the loss of ten acres held adversely by the Quaker church. He was the judge, who delivered the opinion in *Quesnel* v. *Woodlief.* He says:

"The general rule as laid down by civilians is, that if there be not a full knowledge of all the circumstances, it is ground for avoiding the contract (*Gee* v. *Spencer*, 1 Vern. 32; *Mildmay* v. *Hungerford*, 2 Vern. 243). And the reason is, because the buyer proceeds upon the supposition of a quality, which the thing does not contain. The contract should not oblige the party, who contracts under a misapprehension. For in this case the party is not conceived to have agreed absolutely but upon the supposed presence of a thing or quality, on which as on a necessary condition his consent was founded; and therefore the thing or quality not appearing, the consent is understood to be null and ineffectual. (*Grotius* Lib. 2 c. 12, §§ 8, 9; *Gwynne* v. *Heaton et al.*, 1 Bro. C. C. 9; *Heathcote* v. *Paignon*, 2 Bro. C. C. 175; Puffendorf Bk. 1 c. 3, § 12). This is equally true, whether the seller knew of the defect or not; for he ought not to reap the advantage of an apparent value, which the thing sold seemed to have, and yet had it not. Dom. Lib. 1, Tit. 2, § 11.

"It was on these grounds according to my recollection, that *Quesnel* v. *Woodlief* was decided. For in that case the court declared, there was no fraud in the defendants, but that both parties had acted under mistake, and therefore they relieved the plaintiff. Consequently if there be any real difference between that case and this, it should be clearly shown or else the decision there ought to govern."

He then proceeds to point out the differences between the two cases: "1. Woodlief was the owner of the land and lived upon it. 2. The executor in this case openly declared

he would sell according to the deed.  3. As soon as the pur-
chaser discovered the error in that case, he sought relief." On
account of these differences he thought no relief should be
granted for the deficiency in quantity but only for the ten-
acres lost.  If the real ground of the decision in *Quesnel*
v. *Woodlief* was, that there was a mutual mistake as to the
quantity, then the first two points of difference are entirely
immaterial.  In fact, as it was admitted, there was in both
parties a mistake in this case as to the quantity of land sold,
and if such mutual mistake in the quantity of land sold is,
as Judge Lyons supposes, itself sufficient ground for granting
relief by abatement of the purchase-money for the deficiency,
then this relief ought to have been granted in this case; for
there was no dispute about the fact, that both parties were
mistaken in the quantity of the land.  This case was accord-
ingly decided on the ground, that such a mutual mistake in
itself furnished no ground for such an abatement; and in
this case there was no fraud; and three out of the four judges,
who sat in *Quesnel* v. *Woodlief* expressed the opinion, that
that case was decided on the ground, that the vendor was
guilty of fraud, that is, of what the law regards as fraud.

The reasons assigned by Judge Lyons for holding, that a
mutual mistake is a sufficient ground for making an abatement
from the purchase-money strikes us as very inconclusive, his
authorities, he says, show, that mutual mistake may be a good
ground for rescinding a contract.  This no one disputes; but it
does not follow, that such mutual mistake authorizes a court of
equity to make an abatement in or addition to the purchase-
money; for that would be making a contract for the parties
and enforcing it, instead of, as his authorities show may be
done, rescinding the contract *in toto*.  His authorities and
his reasoning seem to me to lead to the exactly opposite
conclusion to that, which he reaches.

The questions necessarily involved in that case and really
decided by the court were:  1. A bill in chancery may be
filed to have an abatement in the purchase-money of a tract
of land, which was conveyed by the vendor to the vendee by
certain boundaries containing a specified number of acres
more or less, on the ground that the vendor asserted, that
there was in the tract the specified number of acres, and that

relying on this statement of the vendor as a fact known to him the vendee was induced to purchase at a certain price the entire tract, which statement of the vendor was in fact not true and was therefore a fraud, as the tract turned out really to contain much less than the specified quantity. In such a suit as a matter of course parol evidence of every description may be freely introduced to prove or disprove the alleged fraud or to show, that the vendee was or was not induced to purchase by the representation of the quantity made by the vendor. This was the character of this suit and also of the evidence admitted without objection. The same may be said of the case of *Quesnel* v. *Woodlief*, &c., 6 Call. 218. There can be no question of the jurisdiction of the court or of the propriety in such case of admitting such testimony. Fraud is one of the oldest and most usual grounds of equity-jurisdiction. The parol evidence is not received to vary or modify the written contract or deed but to establish something *dehors* the deed, that is, fraud in its procurement. While it is true, that in the deed the vendor does assert, that the tract contains about so many acres, yet this does not constitute an essential part of the deed, but is properly only the recital of a fact in it, and whether the statement of this fact did or did not operate to deceive and defraud the vendee, can only be be shown by parol proof generally.

2. Such a statement of the quantity of the land more or less in a deed is not a warranty of the quantity but is an affirmation by the vendor of the fact, that there is about this number of acres in the tract, and must be regarded as made on his own knowledge, as a vendor would reasonably be presumed to know the size of the tract of land, which he offers to sell.

3. In such case the mere belief, by the vendor, that this was a correct statement of the number of acres in the tract, would not of itself relieve him of the responsibility, which he incurred by in substance alleging, that he knew the number of acres in the tract, when he did not know.

4. But if he can show by evidence, that the vendee did not rely on his statement and was not by it induced to pay the price, which he agreed to pay for the tract, he would relieve himself from such responsibility ; and this would be satisfac-

torily proven by showing, that at the time of the sale the
vendor stated, that he was acting only as executor, and that
he would sell the tract according to the deeds of his testator
conveying only so much, as such deeds really included, and
that he would not warrant the quantity of land in the tract
nor the title. This would fairly put the vendee on his guard,
and if the vendor really believed, that the tract contained the
number of acres, which he had mentioned, he would not be
responsible for a deficiency.

5. The mere fact, that there was a mutual innocent mistake
as to the quantity of the land sold, for which mistake the
vendor was no more responsible than the vendee, would be
no ground for a court of equity to make any abatement from
the purchase-money for a deficiency in quantity, if the writ-
ten contract or deed on its face showed, that the sale was in
gross of the entire tract for a certain price, and three out of
four judges, who sat in the case of *Quesnel* v. *Woodlief, &c.,*
6 Call 218, declare, that in the decision in that case they did
not intend to announce a contrary doctrine ; and the only
judge, who sat in this case, who did not sit in that, concurs in
their view of the law and of the grounds of the decision in
that case.

6. The acceptance of a deed describing the boundaries of
the land and specifying, that it contained a certain number of
acres more or less, by the vendee, after he had ascertained,
that there was not that number of acres, shows, that he was
not misled to make the purchase at the price he paid by any
misrepresentation of the quantity by the vendor.

In the case of *Tucker* v. *Cocke,* 2 Rand. 51, the agreement
was for the sale of "a tract of land lying on Pig and Staun-
ton rivers in the counties of Bedford and Pittsylvania con-
taining by estimation ten or twelve thousand acres for the
price of $27,500.00." Three days after a deed was executed,
which conveyed the tract without specifying its boundaries or
the number of acres in it. A survey of the land made after-
wards showed, that there were less than eight thousand acres
in the tract. The purchaser filed a bill asking for an abate-
ment in the purchase-money. He admitted in the bill, that
the purchase was in gross and not by the acre ; but he insisted,
that both the vendor and vendee confidently believed at the

time of the sale, that there were at least ten thousand acres in the tract, and that this mistaken belief operated on both parties in making the bargain, and asked an injunction to stay the enforcement of the lien for the purchase-money, till the court had ascertained the amount of this abatement, the vendor having refused to allow any abatement. The Chancellor refused to grant an injunction; but it was granted by a judge of the Court of Appeals. An answer was filed and parol proof taken, which showed, that the vendor had no accurate knowledge of the quantity of the land and *sold it in gross* not doing anything to mislead the vendee, who knew as much about the land and title-papers as the vendor, both being in great ignorance. The question whether parol proof was admissible in the case was discussed at the bar. Judge Green, who delivered the opinion of the Court, says: "Whether the circumstances of this case would or would not admit of parol proof to explain the written agreement, it is unnecessary to decide. If the written contract be mistaken or equivocal in its terms, the parties may explain it according to their real and original intention either by a new instrument of writing or by admissions of record. The contract in this case was upon its face equivocal and of doubtful construction."

By explaining it "by admissions of record" he meant clearly by the pleadings of the parties in the suit; for he at once proceeds to show, that the plaintiff on the face of his bill admits, that the sale was of the entire tract in gross at a certain price, but upon the belief of the parties that it would turn out ten or twelve thousand acres. A sale by the quantity he says "would have been in effect a warranty by the vendor of the quantity sold. This accords with contemporaneous construction given by the parties in executing and accepting a deed of the entire tract of land without specifications of boundaries or quantities."

He says afterwards, that "the estimation of the quantity" was made by both parties on the same facts equally known to both. And again "the error in respect to the quantity of land was mutual and not in relation to the substance of the thing contracted for but in relation to the very hazard contemplated by the parties. The question is, whether the disappointed party is entitled to relief; and this was the

question, which the vendee with perfect frankness intended to submit to the judgment of the court. These are cases in which the mutual error of parties without default in either may be a just ground for rescinding a contract. As if the error be in a matter, which is the cause of the contract, that is, in the *substance* of the thing contracted for, so that the purchaser cannot get the thing he contracted for."

He then gives examples where contracts will be rescinded for mutual mistake referring to *Chamberlaine* v. *Marsh,* 6 Munf. 283 and *Armstrong* v. *Hickman,* 6 Munf. 287 ; and concludes thus :

" If relief could be given in such a case as the case at bar, *a fortiori* it should be given, if the vendor knew of the deficiency and concealed it. So that in both cases, when the vendor knew, and when he was ignorant of the deficiency, relief being given, there could no longer be a contract, in which the purchaser could take the risk of quantity effectually upon himself. The Court of Appeals have uniformily recognized the validity and obligation of such a contract, and in all cases, in which they have given relief, it has been founded on *circumstances of fraud, misrepresentation or concealment,* or mistake in part or whole in relation to the substance of the thing contracted for."

By *mistake in relation to the substance of the thing contracted for* the judge obviously referred to such cases, as he had just before spoken of, where land lying in a certain locality was sold, and it turned out, that the vendor had no land in that locality but had in some other, in which cases the court would rescind the contract on account of mutual mistake affecting its substance. The judge concludes: " It is possible the case of *Quesnel* v. *Woodlief,* 2 H. & M. 173 note, does not fall within this observation ; but the grounds of the judgment in that case are so uncertain, some of the judges who decided it the reporter and the counsel on both sides, who argued the cause, differing so materially in their statements of the reasons, on which the judgment was founded, that it cannot be considered as an obligatory authority to the point now under consideration ; and if it were so considered it has been repeatedly overruled."

In these views all the judges concurred ; and, as I

understand the case, there was an express and unanimous decision, that a court of equity can give no relief by an abatement from the purchase-money, where there has been a sale of a tract of land in gross, for a deficiency in quantity, simply because there has been a mutual innocent mistake by both parties as to the quantity of land in the tract. To justify such relief there must be fraud, concealment or misrepresentation by the vendor. If *Quesnel* v. *Woodlief, &c.*, can bear another interpretation, it was expressly overruled and indeed was regarded as having been repeatedly overruled before. In examining the previous cases we shall find, that the court was right in saying, that if this was to be regarded as the ground of the decision, it had been often overruled. We have seen it was, if so interpreted, overruled in *Hite* v. *Jolliffe*, 1 Call 301.

The reason, why there was a controversy in this case about the admission of parol testimony, and why the court waived the consideration of it, while in the other cases, which we have reviewed, parol evidence was freely received and considered, is obvious. In those cases the controversy was, whether the vendor had committed a fraud on the vendee ; but in this case the controversy was as to the meaning of the written contract, and whether an admitted mutual innocent mistake furnished any ground for the relief sought. The court appears to have regarded the contract as sufficiently ambiguous to consider in aid of its construction the admissions of parties in their pleadings and their *contemporaneous conduct* in *carrying into execution the contract*, but not to consider any other parol testimony.

The case of *Anthony* v. *Oldacre*, 4 Call 489, decided according to the syllabus : "Although the vendor sells *the tract of land, whereon he formerly lived, supposed to contain three hundred acres more or less, as he bought it*, if he omits to disclose to the vendee, that he had previously surveyed it, and found it to contain less, than he bought it for, the purchaser will be entitled to a deduction from the purchase-money equal to the deficiency, notwithstanding he paid part after the deficiency was discovered and gave a new bond for the balance with only an oral declaration, that he would seek compensation for the loss." No opinion was pronounced by the

court; and the case was obviously decided in favor of the vendee because of the fraud practiced on him by *suppressio veri.*

In the case of *Pendleton* v. *Stewart*, 5 Call 1 the syllabus is : "If a tract of land be sold for one thousand one hundred acres more or less at a fixed price, and it turns out, it is less, the purchaser will not be relieved in equity." The bill was brought by the vendee to enforce the specific performance of the contract after a proper abatement was made for the deficiency. The answer shows, that when the deficiency was discovered, the vendor offered to cancel the contract, which the vendee refused to do. The deficiency was one hundred and sixty acres. The price to be paid was £330, which would be £30 per one hundred acres for one thousand one hundred acres, which the bill alleged was the contract. Judge Tucker on page 6 says: "In this case the contract was drawn by the purchaser, and was founded on a proposal moving from him to the seller, who lived remote from the land and possibly knew no more of it than was expressed in the patent; while the purchaser, whom it joined, might be presumed to have such a knowledge of it, as to enable him to form a competent judgment of its gross value without regard to the specific quantity, which the tract might contain. The evidence, which seems to have been relied on by both parties, was the patent, which being nearly fifty years old might, as is not unusual, be supposed to comprehend a larger quantity within the lines, than was expressed in the patent. The buyer was probably induced from this circumstance to take the tract in gross, and the seller made no reserve or condition of further compensation in case of excess."

Judge Roane says: " If the decision of the case had turned solely upon the written agreement of the 30th of September, 1783, I should probably have been of opinion under the principle laid down by this court in the decree in the case of *Jolliffe* v. *Hite*, that the appellant was entitled to the abatement for the suggested deficiency, if proved beyond what might reasonably be imputed to small errors from variations of instruments or otherwise, and this rather because the agreement does not profess to relate to a 'tract of eleven hundred acres more or less' but to 'eleven hundred acres of land more or

less.' " But on the evidence in the case he took the general views of Judge Tucker and concurred with him in the opinion, that no abatement should be allowed.

Judge Fleming was of opinion, that on its face it was a contract in gross; and as there was no fraud or concealment on the part of the vendor, it was clear, that no abatement should be allowed. Judge Carrington took the same view and both of these judges reiterate their former statement, that *Quesnel* v. *Woodlief* was decided, as it was, because of the fraud of Woodlief.

Judge Lyons adhered to his views expressed in *Jolliffe* v. *Hite*, that a mere mutual mistake without any fraud on the part of the vendor was a good ground for granting an abatement of the purchase-money in case of a deficiency, and for this reason thought, that there should be an abatement allowed in this case.

This case was obviously a repudiation of the idea, that a court of equity could grant relief by an abatement of the purchase-money, simply because there had been an innocent mutual mistake. It was doubtless one of the cases intended to be referred to in *Tucker* v. *Cocke*, 2 Rand. 67, as overruling *Quesnel* v. *Woodlief*, if that was interpreted as deciding, that such relief could be granted merely because of such mutual mistake; and Judge Lyons, who wrote that opinion and was the only judge, who sat in that case, who so construed it, regarded, as he says, this case of *Pendlton's ex'r* v. *Stewart* as overruling that case expressly, as it certainly did, if he was right about what the case of *Quesnel* v. *Woodlief* decided. It should be observed, that all the court regarded this contract "to convey one thousand one hundred acres of land more or less" as a contract in gross. Judge Roane's view, as I understand it, was that in a contract, in which the vendor asserted, that the quantity of land was one thousand one hundred acres or thereabout, if it turned out otherwise, the vendee could have an abatement for this deficiency because of the vendor's fraud to be presumed from the face of the contract and the deficiency, which would show, that he had asserted as a fact within his own knowledge, what was not true, and without reference to whether he believed it or not, he would be responsible. And I do not understand the other judges as differing from him

in this respect; for he and all the others base their opinion on the ground, that despite this *prima facie* presumption against him the vendor proved, that the vendee was not in this case induced to purchase by reason of his statement, that there were about one thousand one hundred acres in the tract, as the evidence showed, that the vendee did not rely on this statement but on the patent and upon his own knowledge of the tract of land, which knowledge was much more thorough in this case than that of the vendor. Parol-evidence was properly received in this case, as the real question or issue was, whether the vendor had defrauded the vendee.

In the case of *Nelson* v. *Mathews*, 2 H. & M. 164, the syllabus is: "A vendor, who conveys a tract of land with general warranty as containing by estimation a specified quantity more or less, when in fact his own title-papers call for less than such specified quantity, is bound to make good the deficiency to the purchaser. A deficiency of eight acres in a tract of five hundred and fifty-two acres is no more than a purchaser, who buys *more or less*, may reasonably expect." These were the only two points determined in this case bearing on the subject, which we are discussing. The principal question of controversy in the case was as to the proper *measure* of compensation, when the vendee was entitled to an abatement of the purchase-money. It seems hardly to have been seriously contended, that the vendor was not entitled to compensation. The court evidently proceeded on the ground, that there was actual and intentional fraud in the vendor in the suppression of the fact, that his own title-papers showed, that there was in the tract a much less quantity of land than he represented. The court all treat this contract as a contract in gross.

In the case of *Hull* v. *Cunningham's ex'r*, 1 Munf. 330, the syllabus is calculated to mislead. The case, as the report shows, was as follows: The agreement on the part of the vendor was to make to the vendee "a good and sufficient deed for a certain tract of land known as *Crab Bottom* lying in *Pendleton* county said to contain three hundred and seventy acres, be it more or less, clear of all incumbrance, to wit, *all that tract left him by his father John Cunningham.*" The deed was for the same tract of land, setting out its boundaries from

a previous deed. The vendee was in the occupation of the land as a tenant. There were on the land, as was supposed, a dwelling-house and improvements, but it turned out, that the actual lines of the vendor's tract did not include this dwelling-house and ninety acres of land; but the purchaser was put in possession of it and was never evicted but took up this ninety acres as vacant land and obtained a patent therefor. On a bill filed to obtain an abatement from the purchase-money because of this deficiency the court allowed the vendee an abatement only of the expenditures made by him in procuring the patent with a reasonable allowance for his trouble.

There was a controversy, as to whether the vendee in such a case ought not to have sued at law. The Chancellor below was of opinion, that " the vendee's relief was purely *equitable*, as it is believed, he could neither support an action on the agreement or deed; but that the parties were *mistaken* as to an important fact cannot be doubted. Had the vendee brought his bill to be relieved from his contract, and could the court place the parties in the same situation, in which they were before the contract took place, the mistake appears to be of sufficient magnitude to justify such measure; but inasmuch as the vendee (the plaintiff) has not prayed to be relieved from his contract, nor could the parties be placed in the situation, in which they stood prior thereto : part of the defendant's (the vendor's) lands and improvements, which had been held for many years, and which he might have continued to hold uninterruptedly (more especially, as from the report of the surveyor the boundaries of the land said to be vacant appear to be *marked* as boundaries of the said defendant's claim and, *as it may appear*, originally *were so*) are now held by the plaintiff (the vendee) under a different title, the court must endeavor to place the parties in the situation they must have stood, had no mistake taken place, which, it is presumed, is equally consonant with the principles of equity." The plaintiff (the vendee) was therefore directed to exhibit an account of his expenditures in procuring a title to the vacant lands, and also an account of his trouble therein to be allowed him (when reported to the court) *so far as reasonable* together with his *actual costs* in prosecuting his suits. The

defendant (the vendor) appealed from this decree; but the decree was affirmed by the court of appeals.

Judge Tucker in his opinion says:  "This case in many of its circumstances so nearly resembles *Pendleton* v. *Stewart*, that the same reasons, which governed in that case, appear to apply to this in part.  *In both* the purchaser had a much better opportunity of knowing the land than the seller.  Here the words of the agreement do not amount to a warranty of the quantity inasmuch in speaking thereof there is this caution used 'said to contain three hundred and seventy acres be it more or less, to wit, *all* that tract left him by his father, John Cunningham, deceased.'  These circumstances indicate a contract in *gross* and not by the specific *number of acres*.  Neither the seller nor the buyer seems to have access to any title-deeds. The old marked line and corners noticed by the surveyor may have misled them both, or may in fact be the true lines of the original survey or patent lost or mislaid among the records of the general court; and if so, Cunningham, the vendor, was entitled perhaps to a patent for the surplus under the forty-sixth section of the land-law.  Be that as it may, here there was no *actual eviction* or expulsion of Hall (the vendee) from the lands not comprehended within the lines of Cunningham's (the vendor's) deed.  What then is the damage he has sustained?  Exactly what the chancellor has supposed."

Judge Roane says:  "The grounds of the decision of this court in the case of *Pendleton* v. *Stewart*, 5 Call 1, are decisive of the present case and even go beyond it."  After stating that case he says:  "These principles are decisive of the present case, unless we say, that a party is not competent to take upon himself a risk with respect to the manner, in which the lines of a tract may run, as with respect to the actual number of acres contained in the tract.  In the case before us it is fully proved, that that risk was taken upon himself by the vendee, and there was no concealment, fraud, misrepresentation or deception on the part of the vendor.  It is also evident, that the vendor was as ignorant of the actual lines of his tract as the vendee (and probably more so) but sold the land *by the gross*, and was particularly careful not to lay himself responsible for any particular boundaries or num-

ber of acres.   Unless therefore we are prepared to say, it is immoral and inequitable for a man to pay and another to receive money for more land than one parts with under all possible circumstances whatsoever, the vendor was entitled to recover the stipulated price in the case before us.   My opinion is the decree should be affirmed."

Judge Fleming simply says:   "This is a very plain case. The decree is right; and I am not for disturbing it."

The court obviously affirm the principles of *Pendleton* v. *Stewart*, 5 Call 1, which distinctly decided, that when there is no fraud in the vendor but simply an innocent and mutual mistake, in which neither party is more to blame than the other, as to the quantity of the land, and the sale is a sale in gross, there can be no abatement of the purchase-money because of a deficiency in the quantity.   It further decides, that if the title to any part of the land is defective, and the vendee being in possession of it is put to expense in fortifying the defective title, he is entitled to be compensated for his actual cost and trouble in thus fortifying the defective title of the vendor.   Surely there is nothing in the case, which gives any countenance to the idea, that an abatement for a deficiency in the number of acres, when the land is sold in gross, can be made in favor of the vendee, simply because there has been a mutual innocent mistake by the parties as to the number of acres in the tract.   The very reverse of this, as I understand the case, was decided.   And I presume, that this was one of the cases intended to be referred to in *Tucker* v. *Cocke*, 2 Rand. 67, where the court said, if *Quesnel* v. *Woodlief* was to be construed as deciding, that such an abatement for a deficiency was to be made on a sale in gross because of such a mutual mistake, then it had been repeatedly overruled.

In *Grantland* v. *Wight*, 2 Munf. 179.   The syllabus states the case so far as it relates to the subject before us sufficiently. It is:   "A piece of ground being sold at public auction expressly according to certain metes and bounds (then and there shown the purchaser before he became the highest bidder) be the same more or less, he is not entitled to any compensation for a deficiency, although the previous advertisement described the tenement as containing more than the actual quantity; neither is the case varied by subsequent articles of agreement

under seal (written by the purchaser and signed by the vendor for the purpose of binding the vendor to make a title), in which the terms of the sale are referred to, but the quantity of ground mentioned in the advertisement is specified omitting the words more or less.   The vendor is not precluded by such article from proving the terms of sales by parol testimony." There being no fraud in the case on the part of the vendor, it was held, that the vendee was not entitled to an abatement for the deficiency.   But in this case there could not be said to have been a mistake in the quantity on the day of sale.

In 5 Call page 236 is reported the case of *Bedford* v. *Hickman*.   Its syllabus is:  "If the contract be for nine hundred acres more or less, and the tract be found to contain only seven hundred and sixty-five acres, the purchaser will be relieved, if it appear, that the seller knew of the deficiency at the time of the sale and did not disclose it."   The case shows, that the only question was, whether the vendor had been guilty of a fraud; and it seems by the agreement of counsel, it was not even claimed, that a mere mistake in the quantity without fraud by the vendor would entitle the purchaser at such a sale of land in gross to an abatement.   The fraud was established; and the court affirmed the judgment of the court below allowing the abatement without delivering any opinion.

With reference to the jurisdiction of the court the numerous cases, which we have reviewed, show, that a court of equity has clearly jurisdiction to stay the collection of the purchase-money, when by reason of the fraud of the vendor in misrepresenting the quantity of the land the vendee is entitled to an abatement from the purchase-money.   Courts of equity have generally concurrent jurisdiction with common law courts in those cases, where common law courts have jurisdiction because of fraud ; and though, where the vendor has fraudulently misrepresented the quantity of land and thus induced the vendee to purchase, a common law suit for deceit would lie, yet this is concurrent with the right of the vendee to stay the collection in a court of equity, till an abatement has been made.   It is true, if the misrepresentation was in a matter, about which there was no certain measure of damages as for instance if the vendor had fraudulently represented

that a spring on the land was a constant one, which never went dry, a court of equity would not stay the collection of the money and ascertain and allow an abatement because of such a fraudulent misrepresentation; for this would be allowing as an offset unliquidated damages. See Tucker's opinion in *Robertson* v. *Hogsheads,* 3 Leigh 679. But if the fraud consists in a misrepresentation as to the number of acres, this objection to a court of equity exercising jurisdiction to make a proper abatement does not exist, as the measure of damages in that case is fixed and certain and can be ascertained with greater ease and certainty in a court of equity than in a court of law. Accordingly it has always been admitted, that a court of equity has jurisdiction, where the claim is for an abatement or for compensation for a deficiency in land. The cases, which we have cited, show this. See also *Castleman* v. *Veitch,* 3 Rand. 598, and *Koger* v. *Kane's adm'r,* 5 Leigh 606.

In *Keyton* v. *Brawford,* 5 Leigh 39, the syllabus is: " A vendee of land in a *sale by the acre* is entitled to an abatement from the purchase-money in case of a deficiency of quantity; but in a sale of land in gross, a contract of hazard on both sides, the vendee is not entitled to relief in case of deficiency; and whether the sale be a sale *by the acre* or a *sale in gross* is a question of intention of the parties, to be collected from all the circumstances of the transaction." There was in this case no written contract of sale. The sale was of an undivided moiety of two tracts of land for the consideration of $1,000.00 to be paid. The deed for the consideration of $1,000.00 to be paid conveyed an undivided moiety of two tracts of land by very erroneous boundaries copied from a preceding deed and described it as two parcels of land, one conveyed to said Steel and Branford by John Trimble's executors containing three hundred and twenty-five acres and the other conveyed to them by McKnight containing eighteen acres, in all three hundred and forty-three acres. On survey of the land, as it had been held by the parties, when this sale was made, the first tract was found to contain two hundred and ninety one and one half acres, and the second nineteen and one fourth acres. The vendees' representatives in their bill claimed, that when the boundaries admitted to be erroneously set out in the bill were corrected, they would include some land held by

one McKnight, and asked an abatement from the purchase-money due from the vendee to the vendor's representatives for the land, which the vendee claimed was really intended to be included in the sale, and which was held by McKnight, but did not expressly claim an abatement for the deficiency in the quantity of land. The court held, that the vendee was entitled to no relief because of the land held by McKnight. On the other question Judge Tucker says :

" The next ground, on which relief is asked, is the alleged deficiency in the quantity of land sold. This depends upon the question, whether the sale was in gross or by the acre. * *. * * * Before going into an examination of the probable intention of the parties in this case I shall premise a few remarks on the subject. Contracts of hazard, such as those we are now considering, never have been discountenanced by our law. Where they are clearly established, they are valid and will be respected and enforced, if fair and reasonable. But though such a contract of hazard is valid, it is not readily to be presumed, that the parties designed to enter into such a contract, unless it is clearly sustained by the facts. The courts will not favor such a construction ; but they will rather take it, that a contract is by the acre, whenever it does not clearly appear, that the land was sold by the tract and not by the acre. *Hundley* v. *Lyons*, 5 Munf. 342. Nor will they presume, that an executor, who ought not to sell in gross, has done so, unless the fact is clearly established. *Jolliffe* v. *Hite*, 1 Call. 301. Nor do I think it should readily be presumed, that a vendee, who is ignorant of the lines and of the quantity of the land, would enter into such a contract of hazard with the vendor, who may fairly be presumed to know every thing about it ; since in such a contract the hazard is only on one side.

" In the present case the deed itself and the circumstances afford the only evidence of the character of this purchase. The deed is for a moiety of two tracts of land, the first containing three hundred and twenty-five acres and the second containing eighteen acres. Whether the specification of the number of acres here should be regarded merely as matter of description or in the stronger light of a warranty of quantity, may well perhaps admit of a difference of opinion. I

have looked upon such mention of quantity as in general matter of description only and not of itself as giving the character of a contract by the acre. I am satisfied such a thing is rarely dreamed of by those who execute deeds usually filled up according to a *formula* without the slightest reference to the real contract of the parties.

" In the present case the circumstances are very strong to show a purchase in gross instead of by the acre. The presumption against a vendee's being willing to make such purchase is rebutted by the fact, that Keyton himself was interested in the estate and probably knew as much or more of it than Branford. The tract was in woods and unsettled; its lines were unascertained and but little known to the contracting parties. The value by the acre was small; no previous attempt was made to ascertain the lines or quantity, and no provision for a survey prior to the final adjustment of the purchase-money, though the parties were very uninformed about the lands. The conveyance was for three hundred and twenty-five acres instead of three hundred, as set forth in the grant, under which the land was claimed, whence I infer, that an estimate of quantity was made between the parties in the deed from Trimble's executors and adopted by Keyton and Branford; the price by the acre is not stated but a round sum $1,000.00 given for this body of unsettled land. These facts all go to satisfy me, that Keyton took the risk of the purchase on himself. In *Jolliffe* v. *Hite,* 1 Call 325, President Pendleton speaking of *Quesnel* v. *Woodlief* says : ' The original contract there was not in proof; but it is evident to me, that it was a specific quantity, since the purchase-money amounts to eight hundred acres at four pounds per acre. The converse of this proposition may not be equally conclusive, but it is pursuasive evidence, that a contract was not by the acre, when the purchase-money is not an equi-multiple as in this case of the number of acres.' "

Upon this case I would remark, that Judge Tucker confounds and treats as the same thing a warranty by the vendor of the number of acres named in the deed and a sale by the acre, while it is obvious, that they are widely different. If it be a sale by the acre, the vendee would have to pay for any surplus, as well as the vendor abate for any deficiency; but

if it were a warranty by the vendor, while he would have to abate for any deficiency, he could not require pay for any surplus.   In this particular case it would in effect make no difference, as there was a deficiency.   Still this confusion of language is unfortunate.   The surrounding circumstances were in this case considered in aid of the court in construing the deed.   This, as we have seen, is only admissible, when the written contract is ambiguous.   Judge Tucker says: " Whether the specification of the number of acres should be regarded merely as descriptive or in the stronger light of a warranty of the quantity may well perhaps admit of differences of opinion ;" and therefore being ambiguous on its face the solution of the question, whether this contract amounted to a warranty of the specified number of acres might be aided by the circumstances surrounding its execution.   As we have seen, this question, whether an affirmation by a vendor does or does not amount to a warranty, is frequently very difficult to determine.   But it seems to me, it is much less difficult to determine from the face of a contract, whether the parties intended a sale in gross or by the acre.   If there be no ambiguity on this point, none ef the surrounding circumstances could be considered in determining the meaning of the contract.   It may well be ambiguous, as to whether a warranty of the quantity was on the face of the deed intended by the parties, and yet entirely clear, that a sale in gross was intended ; and this, it seems to me, was the case in this deed. There may of course be a sale in gross accompanied by a warranty of the number of acres in the tract.   In this case it seems to me on all the authorities it was clear, that on the face of this deed there was a sale in gross and not by the acre ; but that it was to some extent ambiguous, as to whether the grantor did or did not intend to warrant the exact number of acres named in the deed.   To solve this doubt the court properly looked into the surrounding circumstances.   This is what was really done by the court, though unfortunately Judge Tucker confounds this question of warranty with an entirely different question, whether it was a sale by the acre.

In *Bierne* v. *Erskine,* 5 Leigh 59, the vendor by articles of agreement contracted to sell and convey a tract of land particularly described as containing one hundred acres for

$2,000.00 payable in instalments, both vendor and vendee being well acquainted with the tract and believing it to contain one hundred acres and no more.  Upon a survey afterwards made at the vendee's instance it turns out to be one hundred and thirteen acres.  There is parol evidence, that the intent of the parties was a sale by the acre at $20.00 per acre; and that when the vendor offered to convey the land to the vendee as contaning one hundred acres, the vendee insisted on a survey to ascertain the quantity, before he would complete the purchase, in which the vendor acquiesced.  It was decided, first, that though parol evidence of the intent of the parties is inadmissible to explain or vary the written contract, yet the parol evidence *touching the conduct of the parties as to the execution of the contract* is admissible, as the contract was ambiguous on its face; and when this is taken into consideration, this written contract, which was apparently a sale in gross, should be interpreted as a *sale by the acre*; and this interpretation was reached, because the vendee insisted on a survey before completing the purchase, and the vendor acquiesced showing that both parties understood the written contract to be a *sale by the acre*; and therefore it was decided that the vendee should pay for the thirteen acres of excess at $20.00 per acre.

Judge Carr with whom Judges Cabell and Brooke concurred said:  "It would be wrong to let in parol evidence to explain or alter the written agreement for the sale of the land.  We must take the agreement uninfluenced by that evidence, since there is no allegation in the pleadings of fraud, surprise or mistake.  Yet we may resort to contemporary and subsequent acts of the parties (as the court has said in several cases) to show, how they understood the contract.  The contract itself impresses me with the idea, that both buyer and seller thought, that the one was selling and the other buying *a hundred acres* of land at $20.00 *per acre* making $2,000.00 for the *one hundred acres*.  This seems to me not a description but a representation of quantity, which would bind him to make good the quantity of a hundred acres for $2,000.00.  If so, the obligation ought generally to be reciprocal binding the vendee to pay for any excess.  The whole conduct of the vendee shows, that he understood the

sale to be by the acre.   He refused a deed without a previous survey; and it was only after the survey showed an excess, that he took opposite ground."

These views are perfectly sound and were concurred in by all the Court except Judge Tucker, who reached the same conclusion by different and, it seems to me, very unsound reasoning.   He says:   "I think the decree clearly right.   I consider the original contract between the parties as having been en-entered into by an innocent mistake of both as to the quantity of land contained in the tract conveyed."   He then shows, that the evidence proves such mutual innocent mistake, and adds: "Against this innocent mistake on both sides either was entitled to relief according to well received principles and on the authority of *Quesnel* v. *Woodlief* now well reported in 6 Call 218."   We have seen, that it had been repeatedly decided and was well settled, that this sort of relief by an abatement of the purchase-money for a deficiency or requiring additional pay for a surplus, could not be granted because of a mutual innocent mistake of both parties in the absence of fraud; and that if this was the real ground of the decision of *Quesnel* v. *Woodlief*, which there is very strong ground to believe it was not, then this case had been frequently and expressly overruled, if so understood; and Judge Tucker, as if he was conscious, that it would not do to rest his decision on this point, then proceeds to assign for it substantially the reasons assigned by Judge Carr and concurred in by the other judges. But not content with this sound and safe ground, on which to rest his decision, he says speaking of the conduct of the parties in agreeing, that a survey should be made before the transaction was closed:   "Whether we consider the transaction as a new agreement, by which compensation was to be made for surplus or deficiency, the vendee was clearly bound; or if we look upon it only in the light of the vendee's insisting on that as the true interpretation of the old agreement and the vendor acquiescing, the vendee cannot be permitted to recede from the ground he has taken, when the fact has turned out differently from what he has expected."

The second of these positions is perfectly sound, the contract being ambiguous, and was the ground taken by Judge Carr; but the first of them is untenable, as the supposed new

agreement was altogether parol and being for the sale of land was void by the statute of frauds.

It is desirable that we should have clear views of the points really decided in these two cases in 5th Leigh. And in considering them it should be borne in mind, that the decisions in Virginia and elsewhere have uniformly held, that where a vendor sold by written contract a tract of land for a certain sum of money describing it and adding to the description of the land containing so many acres, specifying them, *more or less,* or *estimated* to contain a specified number of acres, or *said* or *supposed* to contain a specified number of acres, or containing about a specified number of acres, or containing a specified number or some other number, as twelve or fourteen hundred acres, or any other mode of specifying the quantity, which shows, that its exact quantity was not intended to be given, such a contract has been almost invariably construed to be a contract in gross and has not been construed to be a contract by the acre, nor has such an indefinite specification of the quantity of land ever been construed, as a warranty of the number of acres by the vendor and as a contract, thus binding him to make it good, though the vendor has sometimes been held to make it good because of a fraud committed by him on the vendee by his false representation of the quantity. This construction of such a contract, that it is *a sale in gross,* and that there is no warranty in such a contract of the quantity by the vendor, has in most cases been assumed and acted upon by the court as clear and indisputable, and no comment has generally been made on the subject. Such contracts are not regarded in these respects as in any degree ambiguous. See *Stebbins* v. *Eddy,* 4 Mason 414; *Smith* v. *Evans,* 6 Binn. 109; *Glen* v. *Glen,* 4 Serg. & R. 488; *Weart* v. *Rose,* 16 C. E. Green 290; *Marvin* v. *Bennett,* 8 Paige 312; 26 Wend. 169; *Jackson* v. *Mc-Connell,* 19 Wend. 175; *Jackson* v. *Moore,* 6 Cowen 706; *Lush* v. *Druse,* 4 Wend. 313; *Brown* v. *Parish,* 2 Dana 9; *Hampton* v. *Eubank,* 4 J. J. Marsh. 634; *Eubank* v. *Hampton,* 1 Dana 343, 344; *Peden* v. *Owens,* Rice Eq. 55; *Whicker* v. *Crews,* 1 Ired Eq. 351; *Galbreath* v. *Galbreath,* 5 Watts 146; *Williford* v. *Bentley,* 5 J. J. Marsh. 181; *Perkins* v. *Webster,* 2 N. H. 287; *Howe* v. *Bass,* 2 Mass. 382; *Hall*

v. *Mahew*, 15 Md. 551 ; *Innis* v. *McCrummin*, 12 Martin (La.) 425 ; *Leassier* v. *Dashiel*, 13 La. 151; *People* v. *Wilson*, 16 La. 185 ; *Morris Canal Co.* v. *Emmett*, 9 Paige 168 ; *Slothower* v. *Gordon*, 23 Md. 1 ; *Tyson* v. *Hardesty*, 29 Md. 305 ; 8 Cal. 76 ; *Johnson* v. *Taber*, 10 N. Y. 319 ; *Clarke* v. *Carpenter*, 4 C. E. Green (N. J.) 328 ; *Zeringue* v. *Williams*, 15 La. An. 76 ; *Wear* v. *Parish*, 26 Ill. 240 ; *Winch* v. *Winchester*, 1 Ves. & Beam. 385, and also these Virginia cases : *Jolliffe* v. *Hite*, 1 Call 301 ; *Anthony* v. *Oldacre*, 4 Call 489 ; *Nelson* v. *Mathews*, 2 H. & M. 164 ; *Hull* v. *Cunningham's ex'r*, 1 Munf. 330 ; *Grantlines* v. *Wight*, 2 Munf. 179 ; *Bedford* v. *Hickman*, 5 Call 236.

The only case, we have thus far found in Virginia, in which such a contract seems to have been regarded as in the least degree ambiguous on its face and as such admitting of any sort of parol evidence to interpret it, was the case of *Tucker* v. *Cooper*, 2 Rand. 63. Judge Green does say in that case speaking of a contract of this character : "The contract in this case was upon its face equivocal and of doubtful construction." But even in this case it should be observed, that the evidence outside of the contract itself, which was admitted, was nothing but the admission against himself made by the vendee on the face of his bill and the deed executed in carrying out the contract ; and both of them went to prove, that the contract was a sale in gross without any warranty of quantity. I should think it very questionable, whether any outside evidence would have been received, had it tended to show, that a contract in gross and without warranty of quantity so clear on its face was a contract by the acre or with warranty of quantity. As it was, no other parol evidence except this bill and deed was considered by the court, though there was other parol evidence in the case. These two cases in 5th Leigh were the first arising in Virginia, where the exact number of acres was specified in the contract, the sale being in form a sale of a tract of land in *gross* for a certain sum.

In the case of *Bierne* v. *Erskine*, 5 Leigh 59 ; the price to be paid named in the written contract was an exact multiple of the number of acres sold and named in the contract, that is, one hundred acres sold for $2,000.00, which would be just $20.00 per acre. This circumstance, the court considered, rendered the contract, which

would otherwise have been clearly a sale in gross and not by the acre, ambiguous, as it appeared to make it probable, that the real intention of the parties to be gathered from the contract was, that $20.00 per acre was to be paid for the land. As an original question it might be regarded as perhaps doubtful, whether this circumstance ought to have been regarded as rendering a contract worded as a contract in *gross* ambiguous in its meaning; but there were certainly no Virginia decisions, which held, that such contract could not be regarded as ambiguous on its face. And as the rule in construing it like any other contract was, that the intention of the parties, if it in any manner appeared, was to control, though the wording of it may have been such as was inappropriate to express such intention. The fact, that the price was an exact multiple of the number of acres certainly had some tendency to show, that the parties by this contract contemplated a sale by the acre, though they had expressed such purpose in very inappropriate language. Standing by itself it it could not have controlled the language of the contract so as to convert that, which was apparently a sale in gross, into a sale by the acre; but it rendered it ambiguous in meaning, and therefore on the principles, which we have heretofore explained, and which are supported by the authorities, if the contract was ambiguous on its face, the circumstances, under which it was executed, and the conduct of the parties in carrying it into execution could be considered as showing their understanding of the meaning of the contract. Their conduct in this case clearly proved, that the parties regarded and treated this as a contract of sale by the acre. For this reason and this only it was so interpreted.

It should be specially noticed, that the court properly rejected all the other parol evidence offered by the parties to show, that this was a contract by the acre, excepting their conduct in carrying it into execution; and that none of the judges except Judge Tucker in any degree relied on or even referred to the fact, that there was a mutual mistake by the parties as to the quantity of the land sold. It is obvious, that had not the price been an exact multiple of the number of acres, the court would have held, that there was no ambiguity in the written contract, and excluding all other evidence would have re-

garded the contract on its face as clearly a contract in gross and not by the acre. On this question, whether on its face such a contract is ambiguous so as to admit in aid of its interpretation parol evidence of the circumstances, under which it was executed, and the conduct of the parties in carrying it into execution, it is obvious, there is a marked difference between such supposed ambiguity as to whether it be a sale in gross or by the acre, and such ambiguity as to whether the exact number of acres specified was intended by the parties as a warranty by the vendor, that there was in the tract the specified number of acres, or whether it is to be regarded merely as an affirmation by the vendor, that there was such number of acres, but which did not enter into the contract and bind him as by a contract to make good the number of acres. In determining whether the specifying of the exact number of acres does or does not make the contract ambiguous, as to whether it was a warranty of this number of acres it is obvious, that it is in no degree affected by the price being an exact multiple of the number of acres specified. It would be just as probable, that a warranty was intended, when the price is not such multiple of the number of acres, as when it is. But not so, when we are enquiring, whether or no it is a sale by the acre or in gross, as is shown by the case of *Bierne* v. *Erskine*, 5 Leigh 63.

When the question is whether any representation made by a vendor at the time of sale in a verbal contract, or put on the face of the contract, if in writing, is a warranty of what is stated, or is only a representation, it is one, we have seen, which is alway difficult to determine. It depends simply upon whether the parties intended it to be a part of the contract, and as such a warranty. If they did not, it is a representation only, though it was relied on by the vendee and induced him to purchase. There being inherently so much difficulty in determining what language in a written contract amounts to an implied warranty, it is but reasonable to hold, that where the number of acres is exactly specified in the contract, but there is no express warranty of the quantity, the court would *prima facie* treat this, as it appears on the face of the contract, as a mere representation ; still it is by no means clear, that when the vendor named the exact number of acres, he did not intend

68

by inserting it in his contract to warrant, that there was this number of acres in the tract. It renders the contract ambiguous and justifies therefore the introduction of proof of the circumstances, under which it was executed, the situation of the parties and their conduct in carrying the contract into execution but no other sort of parol evidence.

Judge Tucker in *Keyton* v. *Brawford*, 5 Leigh 48, says: "Whether the specification of the number of acres here (it was of the exact number of acres) should be regarded as merely a matter of description, or in the stronger light of a warranty of the quantity may well, perhaps, admit of a difference of opinion. I have looked upon such a mention of quantity, as in general matter of description only, not of itself as giving the character of a contract by the acre to the transaction." I presume he meant " as not of itself being a warranty of the quantity," for of this doubt he was speaking, and the case being one, in which the vendee wanted an abatement for the deficiency, the real question was, whether the vendor had warranted the quantity named in the contract. But throughout his opinion Judge Tucker confounds the question, whether there was a warranty of the quantity and the question whether there was a sale by the acre ; two very different questions, as we have seen. In this case the agreement was for the sale of a moiety of three hundred and forty-three acres of land for $1,000, the price being no multiple of the number of acres. As Judge Tucker says, the price divided by the number of acres would give $5.83$\frac{81}{343}$ per acre. Yet the court regarded this contract properly as ambiguous, as to whether there was a warranty by the vendor of the number of acres specified. And though Judge Tucker confounds this question, which was the real one in that case before the court, as there was a deficiency in the land, with the distinct question, whether there was a sale by the acre, I assume the other members of the court had a clearer view of the matter. For in the case of *Bierne* v. *Erskine*, decided by this Court at the same term and probably in a few days thereafter, if not at the same time, Judge Carr, who expressed the opinion of the other judges, in his opinion shows, that the court would not have regarded this contract as ambiguous, as to whether it was a contract in gross or by the acre, because the price was not a

multiple of the number of acres, yet he and they all concurred in the opinion, that the contract in *Keyton* v. *Brawford*, 5 Leigh 39, was ambiguous, that is on the question of warranty, the real question of controversy in that case. The court accordingly in that case considered the circumstances and situation of the parties but no testimony of conversations or any other sort of parol testimony to aid in the interpretation of the contract, and concluded that it was a contract in gross without warranty of the quantity named in the contract by the vendor.

I regard the remarks of Judge Tucker in this case, which I have quoted, to the effect that courts do not favor a construction, which will render a sale of land as a sale in gross or contract of hazard, but will rather take it, that a contract is by the acre, whenever it does not clearly appear, that the land was sold by the tract and not by the acre, as having no application to a case, where the contract is in writing, and the intention of the party to sell either by the acre or in gross is clearly expressed, as it was in the case before him, and as it is in almost every case, as the phrases used in deeds or contracts for the sale of land are usually set phrases, which have been over and over construed by the courts, so that there is no room for favoring any construction, and indeed no room left for construction.

These ideas were adopted by Judge Tucker from an opinion of Judge Lyons in the case of *Hundley* v. *Lyons*, 5 Munf. 345. In that case the language was very properly used, and, I do not doubt, lays down the law correctly in such a case. There the contract was to be ascertained only by construing some four or five letters, in which letters a variety of different language was used, the whole correspondence rendering it doubtful whether the parties intended a sale by the acre or in gross. In such a case as this, or where the contract is verbal, and the vendee has possession of the land, and a suit is brought by either party for specific performance, I have no doubt, that the court would in case of a doubt, as to what were the exact terms of the contract, lean in favor of construing it as a contract by the acre.

In *Russell* v. *Keeran*, 8 Leigh 18, Judge Cabell says : " I am of opinion, that the decree of the chancellor is wholly

erroneous. It declares, that though a sale of land was a sale in gross, yet it was not a sale of hazard as to quantity. This is contrary to first principles ; for every sale of land in gross, or by the tract is *ex vi termini* a sale of hazard as to quantity ; the vendor being debarred from claiming any addition to the purchase-money in case the real quantity of the land shall be found to exceed the estimated quantity, and the vendee being debarred from claiming any dimunition of the purchase-money, in case the real quantity shall fall short of the estimated quantity. I am also clearly of opinion, that the sale in this case was a *sale in gross* ; and consequently, although the land has turned out on actual survey to be about one hundred acres short of the estimated quantity, yet the vendee is entitled to no abatement of the purchase-money, but is bound to pay the whole thereof with interest."

. The written contract was to make "a good and sufficient deed to a certain plantation in Shenandoah county, situated on Thorn's Brook, containing four hundred and five and one half acres more or less." Judge Cabell seems to have regarded, as he must have done under the decisions, that this contract on its face was plainly a contract in gross, and of course a contract of hazard as to quantity, and therefore no abatement would be made of the purchase-money for a deficiency in the absence of fraud.

Judge Brockenbrough also delivered an opinion, but it is confused ; and it is difficult to deduce any principles from it. He says in one place : "Where the contract does not specify the number of acres sold or contracted for otherwise than by the general words 'containing so many acres,' this can hardly be looked upon as a warranty of quantity." But in another part of his opinion, he says : "The plaintiff's have failed to show, that the sale was by the acre ; and the defendants have proved by *Wendell,* that it was actually a sale in gross, and that the vendee took the hazard of quantity on himself. This testimony is admissible, if there was ambiguity in the terms of the title-bond." He refers to no authority for this singular position ; and it is in direct conflict with the case of *Bierne* v. *Erskine,* 5 Leigh 62, where such testimony in a case of ambiguity was expressly rejected as inadmissible. This testimony, to which Judge Brockenbrough refers, was proof of .

the oral declarations of the vendee, which could in no case have been admitted, even if the contract had been ambiguous, which it clearly was not, and which, Judge Brockenbrough does not say was ambiguous.   But after taking this loose view of the case he reached the same conclusion as Judge Cabell ; but his opinion is far more satisfactory.

The case of *Weaver* v. *Carter*, 10 Leigh 37, is in principle very similar to that of *Bierne* v. *Erskine*, 5 Leigh 59.   By the written contract the vendor agreed to sell and the vendee to purchase a tract of land bounded as expressed in the survey of a surveyor named and by him estimated at one thousand twenty-two and three fourths acres, for which the vendee agreed to pay $25,568.75.   This sum is the precise amount of the specified number of acres at $25.00 per acre.   In carrying out this contract the survey referred to in it was followed in making the deed, and some four years afterwards the vendee had another survey made *ex parte*, which showed a deficiency of twenty-seven and one half acres.   It was held, that though the price was an exact multiple of the number of acres named in the contract, yet it was still a sale in gross, and evidence of the conduct of the parties in the execution of the contract, as the accepting of a deed by this survey, was received in evidence, I presume, on the ground of an ambiguity appearing on the face of the contract, but this evidence only tended to establish, what the contract apparently showed, that it was a contract for a sale in gross.

The case of *Blessing's adm'r* v. *Beatty*, 1 Rob. 287, was decided by a divided court.   Judge Brooks was absent, and Judges Baldwin, Allen and Cabell concurred in the decision, while Judge Stanard dissented.   The contract was, that the vendor sold to the vendee for $2,000.00 a certain tract or parcel of land containing two hundred and eighty acres called Staley creek place, lying in Washington county, Virginia, adjoining lands of certain specified parties.   The deed made sixteen months afterwards followed this contract and stated the consideration to be $2,000.00 and the land after describing it by its boundaries to contain two hundred and eighty acres. These boundaries did not contain two hundred and eighty acres but only two hundred and fifty-three acres.   A mistake was also made in copying the boundaries in the deed, so that

it contained twenty-three and one fourth acres not owned by the vendor and omitted by mistake eight acres owned by him. The bill states these errors and this deficiency in quantity and asks relief. The court properly corrected the boundaries arising from the accidental mistake in copying them into the deed, and with reference to the abatement claimed for the deficiency, some twenty-seven acres, Judge Baldwin says on page 298 : " The principle, upon which equity gives relief in cases of deficiency or excess in the estimated quantity upon the sale of lands, I understand to be of mistake, whether the mutual mistake of the parties or the mistake of one of them, occasioned by the fraud or culpable negligence of the other. I do not perceive any other principle, upon which the jurisdiction can be founded; for if there had been no mistake either in the contract itself or the execution of the contract, the parties must stand upon their legal rights, to be adjudicated and enforced in a legal forum, unless the question should arise incidentally in a court of chancery in the exercise of some other branch of its jurisdiction. The principle was recognized in *Hill* v. *Buckley*, 17 Ves. 394-401; *Glover* v. *Smith*, 1 Dessaus. 433; and *Duva* v. *Ross*, 2 Munf. 290. It was the expressed and sole ground of decision in *Quesnel* v. *Woodlief*. The case, though commented on and approved in *Jolliffe* v. *Hite*, 1 Call 301, was for some time misunderstood and questioned (5 Call 9; 2 Rand. 67) from want of correct report of it (see an imperfect one in 2 H. & M. 173 note), but is now well and accurately reported in 6 Call 218; and its authority no longer disputed but recognized. *Beirne* v. *Erskine*, 5 Leigh 64. The cases of *Nelson* v. *Mathews*, 2 H. & M. 164 and *Hull* v. *Cunningham*, 1 Munf. 330, must have been founded on the same principle. The idea is sometimes adverted to of a tacit warranty annexed to every contract, that the thing bought or sold shall correspond with the representation made of it at the time, (5 Call 5,) but this is only another mode of suggesting the same principle and imparts nothing more than the duty of one party to correct a mistake, to which he has been instrumental, committed to the prejudice of another. In the application of the principle it is wholly immaterial, whether a deficiency arises from a miscalculation as in *Duval* v. *Ross* or the exclusion by the pre-

scribed boundaries of part of a tract sold as in *Hull* v. *Cunningham* or the exclusion of a part belonging to a third person as in one aspect of *Nelson* v. *Mathews*."

In this citation Judge Baldwin says, that the sole ground for equity jurisdiction in cases of deficiency or excess in the estimated quantity in the sale of land is *mistake;* but he immediately adds: " whether the mutual mistake of the parties, or the mistake of one of them occasioned by the fraud or culpable negligence of the other." If by this he means, that this equity jurisdiction of allowing an abatement for a deficiency or additional payment for a surplus is based either on *mistake* or *fraud,* no one ever disputed it.  When the sale is in gross the only controversy, that ever arose, is, whether the court of equity will give relief in this manner to either party, merely because there has been a mutual and innocent mistake in the quantity.  Or in such case, to justify the relief, is it not necessary, that the other party should have been guilty of fraud ?  I understand Judge Baldwin to assert, that fraud is not necessary in such a case to justify a court of equity in granting such relief.  Throughout this opinion he appears to regard this as settled, though he no where expresses himself with the definiteness, which he might have used.  This whole citation as indeed much of his whole opinion is without point and almost meaningless, unless we regard him as asserting, that a mere mutual innocent mistake, for which neither party is responsible, furnishes a sufficient ground for a court of equity in every case to grant relief, where there is such mistake in the quantity of land sold, by allowing the vendee an abatement from his purchase money, if there be a deficiency in the land, or the vendor additional price, if there be a surplus of land.  This is the principle, which, I understand him to assert, was recognized in *Hill* v. *Buckley,* 17 Ves. 394 in  *Glover* v. *Smith,* 1 Dessaus. 433, and in *Duval* v. *Ross,* 2 Munf. 290, and to have been the sole ground of decision in *Quesnel* v. *Woodlief,* which case, since it has been correctly reported, so that it appears to have been decided on the ground of a mutual and innocent mistake of both parties, is now recognized as good authority, though it was disputed, when it was supposed not to involve in its decision this position.  He further asserts, that this principle must be the basis of the decisions in *Nelson* v. *Mathews, et al.,*

2 H. & M. 164 and *Hull* v. *Cunningham's ex'rs*, 1 Munf. 330.

I am certainly in very great error, if these Virginia decisions without exception do not show the very reverse of what they are cited by Judge Baldwin to establish. It is true, that there is more or less ambiguity in both the decree and opinion of the court pronounced by Judge Lyons in *Quesnel* v. *Woodlief ;* and from the time, when they were pronounced, until now doubt has been felt and often expressed as to the real ground of that decision ; but that doubt never arose from the supposed imperfect report of that case in 2 H. & M. 173. It has more often been expressed before that report, than it has been since, though the publication in that report did not put a stop to the discussion as to what were the true grounds of the decision in that case. Nor did the more full but not more accurate report of that case in 6 Call. 218, in any degree abate this controversy. In truth these publications only disclosed to the profession, that these differences of opinion in regard to that case arose from the ambiguity on the face of the decree, which ambiguity was in no manner lessened by the publication of the opinion in 6 Call. 218; for it there appeared, that precisely the same ambiguity was in this opinion, that had been found in the decrees. All this will fully appear from the decree in that case and the extract from the opinion, which I have already quoted in this opinion.

The question of controversy was from the beginning and is now, whether this decision was based, as Judge Baldwin says, on the ground, that a court of equity will grant relief by way of abatement from the purchase-money, simply because the parties to a sale of land were each mutually mistaken in the number of acres in the tract, which had been sold in gross, or whether such relief could only be granted, where the vendor was guilty of such a misrepresentation of the quantity, as in law amounts to a fraud on the vendee. Judge Baldwin says, that a mutual and innocent mistake, in which the vendor was no more to blame than the vendee, "was the expressed and sole ground of that decision." Three out of the four judges who sat in the case, with the record before them and evidently after an examination of the record (as I infer from president Pendleton's opinion, who did not sit in the case) expressly and emphatically declare, that, as they

understood, this case was not only not decided on this sole ground, but was not decided on that ground at all but upon the ground, that the vendor was guilty of fraud. I have already quoted these words as delivered in the case of *Jolliffe* v. *Hite, &c.*, 1 Call 301. Yet strange to say, this is a case referred to by Judge Baldwin as approved by that case. It was approved, but only after it had been interpreted to mean the reverse of what Judge Baldwin assumed it meant.

In *Pendleton* v. *Stewart*, 5 Call 9, 10, referred to by Judge Baldwin they reiterate in express terms, that this case of *Quesnel* v. *Woodlief* was decided as it was because of the fraud of the vendor. And the court in that case, as I have shown, repudiate, as they did in *Jolliffe* v. *Hite*, 1 Call 301, the idea, that such relief could be granted merely because of a mutual and innocent mistake.

In the case of *Tucker* v. *Cocke*, 2 Rand. 67, also referred to by Judge Baldwin in his opinion Judge Green delivering the unanimous opinion of the court says of this case of *Quesnel* v. *Woodlief*, that if it is interpreted as based on the ground, that a court of equity will give relief by abatement of the purchase-money for a simple mutual and innocent mistake, where a sale of land in gross is made, then it "has been repeatedly overruled," an assertion, which in our review of the Virginia cases I have shown, was fully sustained. But, Judge Baldwin, though this case, when construed as it is by him, has been thus so often repudiated as finally to be treated without common respect but thrown aside by a sweeping declaration, "that it has been repeatedly overruled" says, it has been restored to its standing by the report in 6 Call 218, "and its authority is no longer disputed but recognized." What is his authority for saying this? He says *Beirne* v. *Erskine*, 5 Leigh 64. It is true Judge Tucker does in that case approve of *Quesnel* v. *Woodlief*, when construed, as Judge Baldwin would understand it, but, as we have seen, none of the other judges concurred with him in his opinion, but they all concurred in the opinion delivered by Judge Carr, which we have shown, while not expressly mentioning this case, obviously did not concur with the views of Judge Tucker based on his interpretation of that case. In truth he was one of the

judges, who sat in the case of *Tucker* v. *Cocke,* 2 Rand. 67, and concurred in the opinion of Judge Green, which so emphatically condemned the case of *Quesnel* v. *Woodlief,* if interpreted in the manner Judge Tucker afterwards interpreted it.

But says Judge Baldwin, "the cases of *Nelson* v. *Mathews,* 2 H. & M. 164, and *Hull* v. *Cunningham,* 1 Munf. 330, must have been founded on this principle he had announced." I understand both these cases as well as the case of *Duval* v. *Ross,* 2 Munf. 290, as giving no sort of countenance to these views of Judge Baldwin. The first and last named of the cases were decided expressly on the ground of fraud in the vendor; and the second of them, *Hull* v. *Cunningham,* 1 Munf. 330, was, as we have shown in our review of the case a repudiation of Judge Baldwin's idea, that a mere mutual mistake in the quantity of the land would entitle the vendee to an abatement of the value of such deficiency. No such abatement was allowed in that case. There are other Virginia cases, as will appear from our review of them, which are inconsistent with this view of Judge Baldwin, and none, as I understand them, which sustain his views.

There being then an entire absence of Virginia authority to sustain his views, Judge Baldwin refers to other authorities elsewhere, one *Glover* v. *Smith,* 1 Dessaus. 433; and the other *Hill* v. *Buckley,* 17 Ves. 394–401. In the first of these cases the court rescinded the contract because of such mutual mistake, a relief, which, in such a case, we have shown, could be afforded. So that this decision is no support to Judge Baldwin's views, though it must be admitted, that an *obiter dictum* may be found in this case, which accords with Judge Baldwin's views. We have reviewed the case of *Hill* v. *Buckley,* 17 Ves. 401, and have shown, that the real ground, on which the abatement was allowed the purchaser, was the misrepresentation made by the vendor as to the quantity of the land, which misrepresentation having been made, as though the quantity of the land was known exactly to the vendor, and as of his own knowledge, it deceived the vendee and was in law a fraud on him, though the vendor did not intentionally defraud him. But we have cited a large number of authorities elsewhere, which seem to me clearly and firmly to

establish the doctrine, that while a mutual and innocent mistake, in which one of the parties is no more to blame than the other, may furnish a court of equity a sufficient ground for rescinding a contract, it can never in the absence of legal fraud at least justify a court in allowing an abatement of the purchase-money because of a deficiency in the land or for any other mistake; for if it did, the court, would be making a new contract for the parties and then enforcing it, which it can never have the authority to do.

Judge Baldwin having laid down this untenable position as the foundation of his opinion proceeds to divide, as he says, cases proper for compensation on account of deficiency or excess of quantity into three distinct classes. The first class is a sale by the acre by the express terms of the contract. This he says clearly entitles either the vendor or vendee to compensation for any excess or deficiency in the estimated quantity of the land named in the contract. Then no matter how stated in the contract "the quantity mentioned is manifestly merely matter of description or conjecture or temporary estimate." There is and can be no controversy in such a case and never has been. Judge Baldwin in this is clearly right; but he adds a qualification or variation in this class, which to me is perfectly unintelligible as such modification. On the contrary it seems to me precisely the case, which he properly states as his third class, though it is obvious, that he regards it as something entirely distinct. This modification of his first class he states in these words : " But if the parties relying too much on the estimated quantity go on to adjust the consideration by that criterion, and it turns out the estimate is erroneous, the mistake is one, which must undoubtedly be corrected. In such case the mistake is not in the terms of the contract, but in the result of those terms applied to the subject." Now he describes as his third class: " Where the parties contract for the payment of a gross sum for a tract of land upon an estimate of a given quantity, which influences the price agreed to be paid. Here there is no mistake in the terms of the contract nor in the application of these terms to the subject, but an important element of the contract, which, if correctly understood at the time, would in all probability have prevented the contract from being made or have

varied its terms. That such cases require relief in equity is well established. *Hull* v. *Buckley*, 17 Ves. 394–401; *Glover* v. *Smith*, 1 Des. 433; *Quesnel* v. *Woodlief*, 6 Call 218; 2 H. & M. 173, note; and *Duval* v. *Ross*, 2 Munf. 290; to which may be added *Beirne* v. *Erskine*, 5 Leigh 59, and the authorities cited by Judge Lyons in *Jolliffe* v. *Hite*, 1 Call 310."

I confess my utter inability to comprehend the difference between this third class of Judge Baldwin and that included in his modification of the first class, though it is obvious, that Judge Baldwin regarded them as two entirely distinct and even contrasted cases. They are both contracts for the sale of land in gross, so far as the form of the contract goes, and thus are worded exactly alike. The modification of the first class, he says, is where "the parties relying too much on the estimated quantity go on to adjust the consideration by that criterion and it turns out the estimate is erroneous." In the third class "it is based on an estimate of a given quantity, which influences the price to be paid" and which Judge Baldwin assumes turns out to be erroneous. To my mind there is not a shadow of difference between the two cases; and yet they are evidently regarded by Judge Baldwin as entirely distinct and different. Speaking of his third class of cases Judge Baldwin says, p. 301: "The proper relief in such case is to set aside the contract or to give a just compensation, such as will place the parties in the same relative situation, as they would probably have placed themselves, if the true state of fact had been known, when they made their agreement." The authorities, which Judge Baldwin cites and numerous others, to which I have referred, do show, that in such a case a court of equity may under some circumstances rescind or set aside a contract thus made under mutual mistake, but they fail to show, that in such a case a court of equity "may give a just compensation (either to vendor or vendee), such as will place the parties in the same relative situation, in which they would probably have placed themselves, if the true state of fact, had been known, when they made their agreement." This proposition strikes me *as almost preposterous*. It amounts to saying, that a court of equity may make a new contract for parties against the consent of one or both of them according to its notion of what they would probably have done, had they

not been ignorant, and having thus made a contract the court will proceed to enforce its performance.   The authorities which I have cited both in Virginia and elsewhere, show, that no court of equity can exercise such power.   It would simply be a usurpation.   If either party has defrauded the other, he may be compelled to compensate the party injured, but this is the full extent, to which equity in such a case can go in giving compensation.   This is not only sound in principle but fully sustained by the authorities.

The remaining class of such cases is what Judge Baldwin calls his second class : "Where the agreement is for the sale of land at a stipulated price per acre, but instead of stating these terms in the contract, they express as the consideration the result of a calculation based upon an erroneous estimate of the quantity.   Here," says Judge Baldwin, "the mistake is in the terms of the contract, a gross sum having been adopted under the belief of its being the aggregate of the agreed price per acre.   In such case the right to this relief is clear." Judge Baldwin, to avoid misapprehension, should have said, that no relief could be granted in such a case except by the aggrieved party filing a bill, in which he alleged, that by mistake the real contract of the parties had not been truly expressed in the written contract, and asking, that upon this oral agreement of the parties being fully established, the written contract might be made to correspond with the real contract of the parties and then enforced, which the court would do, if the real agreement were fully established   This would have been a much more accurate statement of the rights of the parties in this class of cases than the loose and general statement of Judge Baldwin, "that the right of relief in such case is clear."

Judge Baldwin after thus classifying the cases enters into a lengthy discussion, pp. 201, 202 and 203, to show, that the words *sales in gross* and *by the acre* have been used loosely, and seems to think, that the phrase "contract of hazard " or " contract not of hazard " could be used more appropriately. But it seems to me, that the use of the phrase " contract of hazard " would be much more liable to be used vaguely and loosely, unless the person using it had much clearer views than Judge Baldwin seems to have.   For where the vendor

by misstating the quantity of land sold, has induced the purchaser to buy it in gross, Judge Baldwin seems to regard it as "a contract not of hazard," when it is obviously "a contract of hazard," made, it is true, by false representations of the vendor, which might render him responsible to the same extent, as if the contract had been a "contract not of hazard." And thus Judge Baldwin confounds by his mode of using these terms the vendor's liability arising from contract and his liability arising from a tort; liabilities which cannot be confounded without resulting in great confusion and frequently in injustice.

On page 303 Judge Baldwin says: "In the absence of all direct evidence the safest general rule, I think, is, that an estimate of quantity by the parties, whether in a contract executed or a contract executory, ought to have been taken *prima facie* to have influenced the price; for quantity is usually an important element of the agreement and can hardly be supposed to have been disregarded by the parties or to have been unmeaningly stated by them in a solemn contract." Applying this principle pp. 303, 304 he says: "In the case before us the quantity is unequivocally and expressly stated in the deed at two hundred and eighty acres without even the addition of the words 'more or less'; and in the articles of agreement it is called a certain parcel of land containing two hundred and eighty acres called Staley Creek place. These terms to my mind furnish strong presumptive evidence against a contract of hazard; and I am aware of no circumstance in the cause, by which that presumption is rebutted." He therefore concluded, that a compensation for the deficiency should be allowed to the vendee.

Judge Baldwin in all this reasoning has lost sight of a distinction, which, we have shown, the books are full of, i. e., that a representation at the time a contract is made, on the face of the contract, when it is in writing, is essentially different from a warranty of the truth of such statement as a matter of contract. The vendor may be under some circumstances equally responsible in either case, if his representation is false. If it constitutes a part of his contract and was intended by the parties as such, then it is a warranty, and he is bound by his contract to make good his representation under all circum-

stances.  If on the other hand it was not a warranty of quantity, and it can not be, unless so intended by the party, then he may or may not be responsible for the misrepresentation contained on the face of his contract.  Judge Baldwin seems to think, that when he has shown, that the vendee would probably be influenced by the statement of the quantity made by the vendor in his contract or deed, he has established, that the representation made by the vendor must be a warranty of the quantity received ; for this is what he means, though he would avoid coming in conflict with the authorities expressly by avoiding the use of the well-known term warranty, and resorting, to the use of the words a "contract not of hazard."

The law, as I understand it, is correctly laid down by Judge Robertson in *Mason* v. *Chappell*, 15 Gratt. 583:  "Any distinct affirmation of quality (and I would add of quantity) made by the vendor at the time of sale not an expression of opinion or belief, but an assurance to the purchaser of the truth of the fact affirmed and an inducement to him to make the purchase, is, if accordingly received and relied on and acted upon by the purchaser, an express warranty.  But no affirmation however strong will constitute a warranty, unless it was so intended."  If it be a warranty, the vendor is under all circumstances responsible, if it turns out false.  But if it be a false representation, he will not be responsible, unless his statement is made on his own knowledge, as in a deed or contract for sale of land it would be if positively stated, and induced the purchaser to buy, or unless the statement not made on personal knowledge was fraudulently made.  It seems to me therefore, as the mere stating of the quantity of the land is not in the form of a warranty, which form it would naturally assume, if so intended, and as it cannot be regarded as a warranty, unless it was so intended, that it would be much safer and wiser to hold, as, I understand, was done in the case of *Keyton* v. *Brawford*, 8 Leigh 34 and *Bierne* v. *Erskine*, 5 Leigh 59, and as has been frequently intimated by different judges before, that the statement of the quantity of land on the face of a contract or deed in describing the land does not amount to anything *prima facie* but a representation, and does not make the sale of itself a sale with warranty or a sale by the acre, but renders the contract so ambiguous, as

to permit the proof of the surrounding circumstances and the conduct of the parties in the execution of the contract in aid of the interpretation of such contract. This is certainly the far safer course in order to effect the ends of justice; for if it be construed as a warranty, as was done by Judge Baldwin, then the vendor is responsible and can not avoid his responsibility by the clearest proof, that the vendee was not influenced to purchase by his representation and knew much more about the land sold than the vendor; for such parol proof could not be received. Whereas if such statement of the exact quantity in a tract of land is regarded as *prima facie* a representation made by the vendor, then parol testimony will be freely received of all the circumstances, under which it was inserted in the contract, and whether the vendee was really injured by the operation; and if he was not, then the vendor would be exempt from responsibility.

Instead of stating the law governing the case of *Blessing's adm'r* v. *Beatty* in the language Judge Baldwin used on page 303, I would have said : " In the absence of all evidence the statement of the quantity of the land by the vendor, whether in a contract executed or executory, ought to render him *prima facie* responsible to the vendee in case of a deficiency, because it is a positive assertion of a fact as within the knowledge of the vendor, which was not true, and *prima facie* in the absence of evidence this fact ought to be assumed to have influenced the price paid by the vendee." And applying this principle to the case of *Blessing's adm'r* v. *Beatty* I should have held with the court in that case, that the vendee was clearly entitled to an abatement for the deficiency, as the vendor in his contract had positively alleged, that there were two hundred and eighty acres in the tract, when there were but two hundred and fifty-three ; and the allegation being made falsely on the personal knowledge of the vendor, as must be presumed, and relied upon by the vendee, as must also be presumed in the absence of all evidence, and this false statement so operating, as to have induced the vendee to agree to pay $2,000.00 for the entire tract, also to be presumed in the absence of evidence, such misstatement would in law be a fraud practiced by the vendor on the vendee and therefore the vendee would be entitled to an abatement.

The whole opinion of Judge Baldwin in my judgment is based on false reasoning and is not in accord with the many Virginia cases, which preceded it. The conclusion however reached in that case was just and in perfect accord with the preceding Virginia cases.

The case of *Crawford et als.* v. *McDaniel*, 1 Rob. 448 was decided by the same court, and the facts were substantially the same as in the case of *Blessing* v. *Beatty*, except that the price of the land was an exact multiple of the number of acres, and the court allowed the vendee an abatement for the purchase-money on the face of the contract, there being no proof in the case except the deficiency in the land. The decision was clearly right, as on the face of the contract and this proof the vendor would be regarded as guilty of a legal fraud; but the court following the views of Judge Baldwin, decided it on the ground of a mutual mistake. Judge Sherrard concurs in this decision basing his opinion on the fact, that the price was a multiple of the number of acres stated in the contract, and therefore it was to be regarded as a sale by the acre. This I submit is in direct conflict with the case of *Beirne* v. *Erskine*, 5 Leigh 59, where just such a contract was held to be *prima facie* a sale in gross but as ambiguous and admitting therefore in aid of its interpretation proof of the conduct of the parties in carrying it into execution; and because of this proof only was the contract in that case interpreted to be a contract by the acre. But in the case of *Crawford et als.* v. *McDaniel*, 2 Rob. 448, it was unimportant, whether it was a contract by the acre or not, inasmuch as there was a deficiency, and the vendor was, as I conceive, responsible therefor because of his presumed fraud in the absence of evidence. These two cases then from 1st Rob. were correctly decided. And I can not regard the unsound reasons assigned for the decisions as sufficient to overthrow the large number of Virginia decisions sustained by authorities elsewhere, which are irreconcilable with the reasons assigned in these two decisions, but which are in perfect accord with the decisions themselves. These are the last decisions by the Court of Appeals of Virginia prior to the formation of this State, and of course the decisions rendered since are not binding on us as authorities.

I will now state the conclusions, which these Virginia de-

cisions and the general principles of law, I think, establish as the law, which prevailed in this State at the time of its formation.

1. If by a written contract a vendor agrees to sell or by a deed conveys a tract of land described as containing a specified number of acres or a specified number of acres more or less for the consideration of a specified price per acre for such land, this is a *contract by the acre;* and if it turns out, that there is a deficiency in the number of acres specified, the vendee will be entitled to a proportionate abatement from the purchase-money; and if it turns out, that there is a surplus of the land, the vendor is entitled to an additional compensation proportionate to such surplus.

2. If by a written contract a vendor agrees to sell or by a deed conveys a certain tract of land, stating its boundaries as containing a specified number of acres more or less, or as containing about a specified number of acres, or as containing by estimation a certain number of acres, or as containing, it is supposed or it is said, a specified number of acres, or any other mode of designating the quantity, which shows, that the exact quantity was unknown, such a contract is *clearly* a sale in gross without warranty of the quantity; and if there be a deficiency in this estimated number of acres, unless there be fraud on the part of the vendor in the statement, that the number of acres was really estimated to be the quantity named, the vendee is not entitled to any abatement from the purchase-money because of such deficiency; nor would the vendor in such case be entitled to any additional compensation, should it turn out, that there was a surplus over the number of acres named.

3. If by a written contract a vendor agrees to sell or by a deed conveys a certain tract of land, stating its boundaries, as containing a specified number of acres, this is *prima facie* a contract in gross without a warranty, that there is in the tract the specified number of acres; but there is ambiguity on the face of this contract as to whether it is or is not a warranty of the specified number of acres; and if the price named in such a contract to be paid by the vendee is an exact multiple of the number of acres specified, then there is also ambiguity as to whether this is a sale in gross or by the acre; and where such

an ambiguity exists on the face of the contract or deed, proof of the circumstances surrounding the case and the situation of the parties and also their conduct in carrying the contract into execution may be admitted in aid of the true construction of the contract or the understanding of the parties; but all parol declarations of the parties either before or at the time of or after the execution of such contract or deed must be excluded in interpreting such contract or deed.

4. Where a contract or deed is a sale in gross of a tract of land, and the number of acres in the tract is stated to be *by estimation* or by *supposition*, or to be between a specified number of acres and another specified number of acres, or in any other manner, so as to show, that the vendor does not profess to know the number of acres in the tract, such statements must be regarded as representations of the quantity of the land made by the vendor not upon his own personal knowledge; and in order to establish a fraud by him, so as to make him responsible for a deficiency in the estimated quantity, it must be shown, that the vendee relied on such representations, was thereby induced to purchase at the price, which he paid or agreed to pay, and that the vendor either did not believe his representation to be true, or had no knowledge or information on the subject.

5. Where a contract or deed is a sale in gross of a tract of land, and the exact number of acres is specified, or it is said to contain a specified number of acres more or less (which last expression means about the specified number of acres), such exact specification of the number of acres or such specification of them as a certain number of acres more or less is to be regarded as a representation made on the personal knowledge of the vendor, and it is unnecessary in order to establish a fraud on him, which will render him responsible for a deficiency in the specified number of acres, or even if they be stated as a certain number more or less, for a deficiency beyond the usual allowance for the ordinary errors in surveying. In order to prove, that he knew the statement he made to be true, it is not necesessary to prove that he did not delieve, that there was in the tract the specified number of acres; for though he did believe, that there was the specified number of acres, he ought not to have stated them positively as so many, or so many acres more or less; and if the vendee placed reliance in this statement

and was thereby induced to purchase the tract at the price, which he paid or agreed to pay for it, the vendor would in law be guilty of a fraud and would be responsible for such deficiency; and in the absence of all proof the presumption would be, that the vendee did rely upon such a statement made on the vendor's own knowledge, and was thereby induced to purchase the land at the price paid or agreed to be paid; but such presumption could be disproved by parol evidence offered by the vendor.

6. Whenever a vendee of land sold in gross seeks an abatement from his purchase-money because of a deficiency in the quantity of the land, as he can only seek such abatement on account of a fraudulent misrepresentation of the quantity by the vendor, it is obvious, that he may bring his suit because of such fraud and asking such abatement in a court of equity; and parol evidence including the oral declarations of parties before, at the time of and after the contract, may as a matter of course be introduced to prove this misrepresentation and to prove, that it was fraudulent and relied upon by the vendee, and that he was thereby induced to make the purchase at the price, which he paid or agreed to pay. And a common character of such evidence is to prove, that prior to the sale there were propositions to sell and buy by the acre, or that since the sale the parties spoke of it as a sale by the acre. This evidence is not received to alter or vary the written contract but to establish, that the vendee in buying fixed the price by the supposed number of acres thus establishing satisfactorily, that he relied on the vendor's statement of the quantity and was by it induced to make the purchase at the price, which he paid; and this he must in some way establish, or he cannot recover, though a misrepresentation of the quantity was made by the vendor.

We will review briefly the Virginia cases since the formation of this State with a view of ascertaining, how far they accord with these propositions, premising that they are entitled to no weight as authority but to only such weight as their reasoning properly entitles them to.

The case of *Jones* v. *Tatum*, 19 Gratt. 720, was a sale of a tract of land containing ninety acres; and it was decided, that this was a sale in gross and not by the acre, and that the

purchaser was entitled to no abatement because of a deficiency of a little more than an acre.  This decision is in full accord with the principles we have laid down.  But Judge Moncure following obviously the views of Judge Baldwin on page 736 says: "The ground, on which alone a purchaser is entitled to relief, is that of mistake ; and he must clearly prove the mistake."  On page 735 he comments on the price not being a multiple of the number of acres.

In *Caldwell* v. *Craig*, 21 Gratt. 132, the decision is in perfect accord with the reasons we have expressed.  But the opinion of Judge Staples is eminently unsatisfactory.  For instance, he says on p. 188 : "Many cases have been before this court involving the doctrine of compensation upon contracts for the sale of real estate.  In many of them parol evidence was received of the true understanding of the parties, whether a sale in gross or by the acre was intended, notwithstanding the existence of written articles evidencing the contract.  In *Jolliffe* v. *Hite*, 1 Call 262 (301), in *Quesnel* v. *Woodlief*, 6 Call 218, in *Fleet* v. *Hawkins*, 6 Munf. 188, and in *Grantland* v. *Wight*, 2 Munf. 179, such evidence was admitted without objection."  He also refers to *Russell* v. *Duncan*, 6 Leigh 9.  These various cases he tries in this respect to reconcile with *Bierne* v. *Erskine*, 5 Leigh, where such parol evidence was rejected ; but his effort is very unsatisfactory, because he was misled by Judge Baldwin's opinion in *Blessing's adm'r* v. *Beatty*, 1 Rob. 287, on which I have commented.  He misapprehended the true ground of these decisions.  Thus with the exception of *Bierne* v. *Erskine*, 5 Leigh 59, we have seen, these Virginia cases were all base on a claim for an abatement of purchase-money because of a deficiency in the land not the result of a mistake but of fraud practiced by the vendor in misstating the quantity of land ; and as a matter of course parol evidence was received to prove and disprove this alleged fraud ; and the understanding of the parties, whether the land was a sale without reference to the quantity or by the acre with direct reference to the quantity, bore directly on the question, whether the vendee relied on the statement of the quantity by the vendor and was thereby induced to purchase, that is, on the question at issue, fraud.  In *Bierne* v. *Erskine* no such question was at issue; the suit was brought by the vendor claiming

compensation not because of any fraud of the vendee, but because, he claimed, the sale was by the acre and not in gross. In such case of course parol declarations of the parties were excluded.

The whole difficulty arose from the false views of Judge Baldwin followed by Judge Staples, that these cases were all alike and all equally based on mistake, when in fact this was not the true basis of any of them, and all of those cited by Judge Staples were essentially based on a different principle from *Bierne* v. *Erskine*, 5 Leigh 59. The very form of the suit, on which this opinion of Judge Staples was pronounced, ought to have suggested to him his error in regarding all these cases as based on a mistake of the parties simply. For it was a suit at common law brought by the vendor and a defence by the vendee, that he had been defrauded in the sale of the land by a fraudulent misrepresentation made by the vendor of the quantity of land in the tract bought. Of course parol testimony showing, that the risk of the quantity of the land was taken upon himself by the vendee, and that he was told by the vendor, that he did not know how many acres were in the tract, and he must take it by the boundary, was proper evidence to disprove a plea, that the defendant was fraudulently induced to purchase by the misrepresentation of the quantity, No doubts could have been entertained by any one on this subject but for the perverted views as to the grounds, on which such relief was granted, first stated distinctly by Judge Baldwin.

The case of *Hoback* v. *Kilgores*, 26 Gratt. 442, is very imperfectly reported, the contract between vendor and vendee not being stated, nor its contents even alluded to by the court. The vendee was relieved in part from the payment of the purchase-money because of a deficiency. Judge Moncure on page 444 states, that "the vendor represented to the vendee, that the quantity of the land was one hundred and twenty-seven and a half acres; and the vendee made the purchase on the faith of that representation. Whereas in truth and in fact there were but eighty-one acres of land in the tract." If this be a correct statement of the case, on the principles, which we have laid down, an abatement should have been made on account of the deficiency, as was done. But the reporter

states a case essentially different, as does the syllabus; and if the reporter is right in his statement of the case, on correct principles no such relief could have been granted the vendee. Be this as it may, the ground, on which Judge Moncure bases his opinion, that relief should be granted, is that stated by Judge Baldwin as the ground of relief in such cases, that is, mutual mistake. He says: " The court is of opinion, that there was a mutual mistake between the vendor and vendee in this case as to the quantity included in the boundaries of the tract sold." He refers to no authority to sustain this opinion.

In the case of *Watkins* v. *Elliott et al.*, 28 Gratt. 380, Judge Moncure says: " If there was fraud on the part of the vendor, there can of course be no doubt of the right of the vendees to relief by abatement. We think there can be as little doubt of their right of relief on the ground of mistake." He then cites what we have quoted from Story's Equity Jurisprudence, which states a case of mutual mistake, where relief by *rescinding the contract* should be granted, and cites *Quesnel* v. *Woodlief*, 6 Call 218, and *Blessing's adm'r* v. *Beatty*, and *Belknap* v. *Sealy*, 14 N Y. 143, to all of which cases I have referred. Judge Moncure like Judge Baldwin loses sight entirely of the distinction, which we have pointed out and illustrated, between relief in such a case by rescinding the contract and relief by allowing an abatement of the purchase-money.

The case of *Watson* v. *Hoy et al.*, 28 Gratt. 698, was a sale by commissioners of a tract of land reciting in the contract of sale, that it contained five hundred and three acres. It was sold for $25,000.00. The proof was, that a map was exhibited to the purchaser showing, that the land to be sold contained that quantity; and on the faith thereof he agreed to pay $25,000.00 for the tract. It was held, that this was not a contract of hazard, and the land having turned out deficient in quantity by thirty-four and one half acres, the purchaser was entitled to an abatement. He was clearly entitled to such abatement on the principles, which we have stated; but as has now become the settled law in Virginia, their decision was based on the false views, as I regard them, of Judge Baldwin.

In *Benson* v. *Humphreys*, decided at the January term 1881 of the Court of Appeals of Virginia reported in the

Law Journal of April, 1881, the court carried these views so far as to hold, that a contract to convey a tract of land describing it as containing fifty three and one half acres more or less for a certain price, which was a multiple of the number of acres, was clearly a contract to sell this land by the acre and not in gross. There turned out to be sixty-one and one fourth acres in the tract; and for this excess the purchaser was required to pay $273.25. This is the legitimate conclusion, to which the erroneous views of Judge Baldwin naturally lead. But it will not be pretended, that any decision rendered prior to *Blessings* v. *Beatty*, 1 Rob. 287, ever gave any countenance to what seems to me a most extraordinary conclusion. The danger, which, it has been said, would result from a usurpation by the courts of the power to make contracts for parties, such, as it is presumed, they would have made, had they been acquainted with all the facts, is, I think, well illustrated by this case. Fortunately the untenable views of Judge Baldwin have not yet been followed by that effect in this State.

. The first case on this subject decided in West Virginia was *Nichols* v. *Cooper*, 2 W. Va. 347. Cooper brought a bill in chancery to compel the specific performance of a contract for the sale of a tract of land   The contract was a verbal one; but when the defendant made the first payment on the land, about a month after the purchase, the vendor gave him a receipt for it, which recited, that the vendee had purchased a tract of two hundred acres of land of the vendor according to certain boundaries set out at $22.00 per acre including a growing crop of wheat. The vendor in his bill alleged, that this writing was the written contract of the parties; that it was a sale by the acre of the tract at $22.00 per acre; and that there was an excess of quantity in the tract of ninety-three acres, which he claimed, the vendee should pay for at $22.00 per acre. The vendee denied, that this was the contract and stated, that the vendor had prepared this paper, but it never had been accepted as the contract; that the contract was verbal and was made a month before, and under it the vendee was at the time of his purchase put in possession; that the tract was supposed to contain two hundred acres at the time of the purchase, of which forty acres were represen-

ted by the vendor to be Ohio bottom-land, and the balance to be hill-land ; and on this representation the defendant agreed to give $22.00 an acre for the tract. He was induced to do so by the solemn representation of the vendor, that the tract contained forty acres of Ohio bottom, which was not true. The answer was sustained by the evidence ; and it was proved, that the Ohio bottom-land was worth $90.00 per acre and the hill-land $5.00 per acre. The court below required a specific execution of the contract, which was not resisted by the vendee ; but the court required the vendee to pay for the excess in the entire tract of ninety-three acres at $22.00 per acre or an increase of $1,046.00 though there were in the tract only about twenty-nine acres of bottom-land, a deficiency in the quantity represented of eleven acres worth $990.00, and an excess in the hill-land over the quantity represented by the vendor of one hundred and four acres worth $520.00.

The Supreme Court of Appeals reversed this decree and required the vendor in the settlement of the amount of purchase-money due to be charged with this $990.00 the deficiency in the bottom-land and to be credited by $520.00 the excess in the hill-land. This decree of the Court of Appeals was, it seems to me, perfectly right. The real contract between the parties was the verbal contract, which was made on the positive assurance of the vendor, that there were forty acres of land in the Ohio bottom. This was a fraudulent representation by the vendor of the quantity. If he was ignorant of the quantity he committed a fraud in representing, that he knew the quantity to be forty acres ; but if the vendee claimed a credit for the deficiency of the bottom-land, before the court would specifically enforce the contract, it properly required him to do equity by giving the vendor a credit for the excess in the hill-land. The decision itself was therefore in perfect accord with the principles settled by the Virginia Court of Appeals prior to the formation of this State, as they have been stated. Judge Brown in his opinion refers to no authority except Judge Baldwin's opinion in *Blessing* v. *Beatty*, 1 Rob. 287, and quotes approvingly that portion of it, in which he says : " The principle, upon which equity gives relief in cases of deficiency or excess in the estimated quantity in the sale of lands, I understand to be, that of mistake,

whether the mutual mistake of the parties or the mistake of one of them occasioned by the fraud or culpable neglect of the other." And this is copied into the syllabus as the first point decided by the court. This I regard as an *obiter dictum* only of Judge Brown, and as it was not a case of mutual mistake, this point ought not to be considered as decided. Judge Maxwell concurred in this decision. Only these two judges sat in the case.

In the case of *Reed* v. *Paterson,* 7 W. Va, 263, the vendees enjoined a sale of a tract of land by a trustee in a deed of trust to secure the purchase-money on the ground of a deficiency in the number of acres in the tract of land. The bill stated, that the land had been bought by a verbal contract; and a deed for it had been made by the vendor, and a deed of trust given by the vendee to secure the purchase-money. The bill then alleged, "that the vendees bought the land believing they were buying one thousand five hundred acres, but by a survey afterwards made it turned out, that instead of there being one thousand five hundred acres as represented, there were only nine hundred and one acres, making a deficit of about six hundred acres." The deed conveying the land filed with the bill as a part thereof after describing the land conveyed added: " And said to contain one thousand five hundred acres more or less." The Court of Appeals held, that this bill on its face showed no ground for an injunction to stay the collection of the whole purchase-money, and that it should have been dismissed on demurrer. Judge Paull in his opinion after stating the contents of the bill as above stated says: "The only ground whatever presented in the bill for invoking the equitable interposition of the court, and staying the progress of the sale is found in the words 'instead of there being one thousand five hundred acres *as represented* there were only nine hundred and one acres.' This is all; it no where speaks of the facts and circumstances, in which the contract originated; it no where charges the defendant with making any representations whatever in regard to the number of acres contained in this tract of land; much less with having made any false or fraudulent representations, or with having used any language of any kind, which would indicate there had been a mutual mistake or misapprehension between the parties in re-

gard to the subject matter of their contract ; nor is there any allegation, that the sale was a sale by the acre, or that the quantity was a material element in the contract.   The words *as represented* above quoted from the bill are not followed by the names of the vendors of the land, or by the names of any other person whatsoever.   The words therefore are only referable to the deed, which conveys the land, and where after describing the land are found the following words 'and said to contain one thousand five hundred acres, be the same more or less' we think this bill being entirely silent in all the particulars indicated, and presenting only the above simple and ambiguous allegation, at least, does not present sufficient equity on its face to justify the high power of a court of equity in restraining a sale for the benefit of parties, to whom no fraud, misrepresentation or mistake are imputed touching the transaction in any direct or positive manner.   There is nothing whatever, which charges or indicates, that the contract as now executed in the deed is in any respect different from what it was, or was designed to be so far as the defendants are concerned.   Story's Eq. Plead. 256."

This shows clearly, that Judge Paull thought, that if there was a mutual mistake or misapprehension touching the subject-matter of the contract, or if in the executing of the contract by the deed in the form, in which it was drawn, there was a mistake, and these allegations had been made in the bill, a court of equity might have had jurisdiction to rectify the contract according to the real understanding of the parties, or it may be to rescind it ; but that without such allegations a court of equity had no authority to make an abatement of the purchase-money because of deficiency in the quantity of land, unless the vendee alleged, that there was fraud or fraudulent misrepresentation on the part of the vendors in reference to the number of acres in the tract.   The idea never seems to have occurred to him, that a simple innocent mutual mistake in the parties as to the quantity gave the vendees a right to this sort of relief.   The vendees in their bill did allege such mistake.   They said, that " they bought the land believing they were buying about one thousand five hundred acres, and it turned out on survey to be only nine hundred and one acres; " but Judge Paull does not for a moment refer

to this allegation of mistake. He evidently thought it of no avail, when the allegation of fraud on the part of the vendors was not also made. This is made perfectly clear by the balance ot his opinion. He says, page 266: "We have carefully examined the evidence with the view of seeing, whether, in the event this cause was remanded with leave for the plaintiffs to file an amended bill, they have adduced sufficient proofs of such grievance or wrong on the part of the defendants, as would entitle them to relief. We briefly state the result: The issue as made simply is, whether the defendants made such representations as to the number of acres in the tract of land, which proved untrue, as induced the plaintiffs to buy to their loss or injury." He here states the real issue, whenever the vendees seek an abatement of the purchase-money because of a deficiency in the land, when the sale is in gross, in language both clear and striking. He then examines the evidence and concludes, that there was no such fraud on the part of the vendors. As supporting his views he refers to to the cases of *wolliffe* v. *Hite*, 1 Call 301; *Keyton's adm'r* v. *Brawford's ex'or*, 5 Leigh 39; *Pendleton* v. *Stewart*, 5 Call 1; and *Fleet* v. *Hawkins*, 6 Munf. 188. He does not refer to the case of *Blessing* v. *Beatty*, 1 Rob. 287. It is obvious that his views are entirely antagonistic to those of Judge Baldwin as expressed in that case. All the other judges concurred with Judge Paull.

In the *Western Mining and Manufacturing Co.* v. *Peytona Cannel Coal Co.*, 8 W. Va. 406. Judge Hoffman at considerable length sets forth his views of the law on the subject, which we are discussing. These views are to be found on pages 437, 438, 439 and 440. They seem in some respects to be not as clear and consistent, as they might be; yet they cannot be read without at once seeing, that he did not concur with the views of Judge Baldwin, expressed in the case of *Blessing* v. *Beatty*, or in the recent Virginia cases, which have adopted and carried out those views. Thus he says, on page 438: "When the purchaser does not get any land, that he did not buy, the court cannot compel him to pay for land, that he did purchase at a fixed price, an additional sum, that he did not agree to pay. It is generally difficult enough for persons to pay the moneys, which they contemplate or contract to pay;

it would be too often disastrous, without an agreement and for no fault of the purchaser to compel him to pay more."

Yet this, which is thus condemned by Judge Hoffman, was actually done in the recent case of *Benson* v. *Humphreys et al.*, decided by the Court of Appeals of Virginia, January 1881, where the vendee, who had agreed to pay a fixed price for a tract of land, without any fault on his part, was compelled to pay an additional sum of $273.25, because it turned out, that the land contained some seven acres more than it was supposed to contain.    On pages 437 and 440 of 8 W. Va., Judge Hoffman expresses his opinion, that in the case of a mutual innocent mistake of the parties as to the number of acres in a tract, a court of equity may somtimes rescind the the contract, unless the parties are content of their own accord to pay each other for the excess or deficiency in the number of acres, as the case may be.   And that in such a case, where neither party is in fault, this is the kind of redress which a court of equity affords.   This is, as we have insisted, a correct view of the law; but it is a view which does not accord with Judge Baldwin's views or with the views of the Court of Appeals of Virginia since the formation of this State.

It only remains now to apply these principles to the facts, as shown by the record in this case.    By the contract in this case it was agreed to convey, and the deed did convey, to the vendee, Rezin Cain, a tract of land, setting forth its boundaries in detail, containing one hundred and forty acres, being the same land conveyed by James Biddle and wife to the late Allen Crislip.   The consideration named in the contract and deed was $2,000.00.   This was clearly a contract for a sale of the tract in gross and not by the acre.   Had the purchase-money been a multiple of the number of acres named, it would have rendered the contract ambiguous, though it would still have been *prima facie* a sale in gross and not by the acre. By this contract and deed on its face the vendor did not warrant, that there were one hundred and forty acres in the tract ; but the exact number of acres in the tract being named, it was thereby rendered ambiguous, as to whether the vendor had or had not warranted the quantity of the land to be one hundred and forty acres, though the *prima facie* construction

of the contract and deed would be, that there was no such warranty. But the ambiguity produced by the exact number of acres in the tract being named justifies the court in resorting to the circumstances, which surrounded the parties, their situation and their conduct in carrying out the written contract to aid in its interpretation; but in ascertaining the meaning of this contract we are carefully to exclude from our consideration all the verbal declarations of the parties, whether made before, at the time of or after the execution of the contract. It cannot be explained, modified or altered as to its meaning by any verbal declarations of the parties; but as it is ambiguous on its face, we can look to the testimony showing the circumstances surrounding the making of the contract, the relative situation of the vendor and vendee, and and their conduct in carrying out the contract; and though *prima facie* there was no warranty by the vendor, that there were one hundred and forty acres in the tract, yet aided by these surrounding circumstances, &c., if they justified it, the court might by their aid interpret this as a contract by the vendor that there were one hundred and forty acres in the tract.

The circumstances and conduct, to which we can resort for aid in the interpretation of this ambiguous contract are as follows: About two years before this land had been bought by Allen Crislip of James Riddle for the sum of $2,000.00; and in the deed made to Crislip the land was described by metes and bounds as "containing one hundred and forty acres." Shortly after this purchase Crislip died, leaving a widow and several infant children. They did not live on this place but on an adjoining farm; and the vendee, Cain, also lived in the neighborhood, and was therefore probably as well acquainted with this Riddle tract, as Mrs. Crislip was. Not long after her husband's death Mrs. Crislip made this written contract with Rezin Cain to sell him this tract of land for the same price her deceased husband gave for it describing it by the same metes and bounds as "containing one hundred and forty acres."

Mrs. Crislip, as guardian of her children, obtained the approval of the court of this sale by a bill filed for the purpose. She had a dower interest in this tract of land. No survey of the land was made at the time of the purchase or before

the making of the deed, nor indeed for many years afterwards, and then it was a private survey made at the vendee's instance, and not made till he was being pressed for the payments on the land, which had become due and were unpaid. These are all the circumstances and facts which we can look at in-aid of the interpretation of the contract and deed as to whether the vendor intended by inserting in the contract and deed that the tract contained one hundred and forty acres, to warrant that there was that quantity, the *prima facie* presumption being, that she did not. These facts seem to me to strengthen this *prima facie* presumption. First, they render it improbable, that the vendee, knowing the tract probably better than the vendor, would ask a warranty. Secondly, as she had personally but little interest in the land, most of it belonging to her infant children, it is improbable, that she did intend to warrant, that there were one hundred and forty acres in this tract, especially as under the circumstances stated it was improbable, that she knew anything of the quantity of the land, except from the deed, which had been executed by Riddle to her husband. In the next place the fact, that the price Cain was to pay her was the exact price, which her husband gave for the land, and the description of it was in all respects copied from the deed to her husband, rendered it to some extent probable, that Cain simply took the tract from the widow just as it was, and just as it had been conveyed to her husband. And the fact, that he executed his bonds and took the deed without asking for a survey, and did not have it surveyed for years, and not till urged to pay the purchase-money, have a strong bearing as showing, that he did not think that he had a warranty, that there were one hundred and forty acres of land in this tract. Had he so construed the contract, it is probable that he would have ascertained sooner than he did, that he had a claim or demand by reason of this warranty. I conclude, therefore, that these circumstances show, that by the contract and deed the vendor did not intend to, and did not, warrant the quantity in the tract to be one hundred and forty acres.

But it does not follow, because the vendor did not warrant the quantity, that the vendee would not be entitled to an abatement for the deficiency in the tract of six and three

fourths acres.   On the contrary, if we were to look only at
the contract and deed and knew nothing of the circumstances,
under which they were executed, the *prima facie* presumption
would be, that the purchaser was entitled to such abatement.
It would be presumed, that the vendor knew the quantity in
the tract of land, which she was selling, and as on the face of
the contract and deed she asserts positively, that the tract con-
tained one hundred and forty acres, this statement would have
to be regarded as made on her own personal knowledge; the
vendee would be presumed not to be acquainted with the
quantity of land in the tract, and would have a right to rely
on the assertion of the vendor that the tract contained one
hundred and forty acres; and as very generally the price paid
for land is largely influenced by what is believed by the
vendee to be the number of acres in the tract, and that the
mere production of the contract and deed would, when it was
shown, that there was a deficiency of six and three fourths
acres in the tract, raise a presumption, that the vendee had
been imposed on to his injury by the misrepresentation of the
quantity made by the vendor on the face of the deed and con-
tract.   And if he had been so deceived to his injury, he was
entitled to an abatement of his purchase-money to cover the
loss he had sustained by reason of the vendor's deception.

The burden of disproving this *prima facie* case in favor of
the vendee is on the vendor; and it would not be met by sim-
ply proving, that she did not intend to deceive but supposed,
that there really were one hundred and forty acres in the
tract; for if she did not know, that there was that quantity,
she ought not to have asserted it positively but should have
said, that it was estimated to contain, or believed to contain
one hundred and forty acres.   If she had said this, she could
not have been held responsible, if she really believed, that
there was this number of acres; for she would have done no
wrong, as she would have stated the whole truth.   But this
*prima facie* case made against the vendor on the face of the
contract and deed is fully rebutted by the facts, which I have
stated, of the circumstances existing, when this contract was
executed: the situation of the parties and their conduct in
carrying the contract into execution.   These facts taken in
connection with the wording of the deed and contract satisfac-

torily show, that the vendee, Cain, had not been misled by any statement of the vendor, that there were one hundred and forty acres in this tract; that he did not rely and act upon this statement and was not thereby induced to agree to pay the $2,000.00 for this tract of land.

But in considering this question of fraud we have a right to look not only at the contract and deed and all the surrounding circumstances but also at the verbal declarations of the parties made before and at the time of the entering into the contract and signing of the deed and also to the verbal declaration of either party made at any time afterwards, if made in opposition to his or her interest. There were but three persons present, when this contract was reduced to writing, the two parties to the contract and the scrivener, who reduced it to writing and no one but the parties were present, when the verbal contract was made. These witnesses however differ much less than witnesses usually do in such cases; and it is not difficult to arrive at what were probably the real facts, which occurred.

The original terms of the sale were agreed upon at the house of the vendor Mrs. Crislip, no one being present except her and the vendee Cain; and we can learn very little from their statements of what took place there, except that the price agreed on was $2,000.00, which was the sum the vendor's husband had agreed to pay for this tract of land about two years before. As nothing is said by either party of any papers being before them at that time, it is probable, that the deed from Riddle to the vendor's husband was not before them ; and all, probably, that was agreed on at that time, was, that the vendee was to pay $2,000.00 for the Riddle farm. It would seem most probable, that neither party knew the number of acres in the farm then, though both of them were about equally well acquainted with the tract. Mrs. Crislip. says, that she did not then know, how many acres were in the tract ; while we may infer, from what Cain says, that according to his recollection the number of acres was named as one hundred and forty ; but he does not pretend to say, that Mrs. Crislip by a statement of the number of acres induced him to agree to pay the $2,000.00. Shortly afterwards Gibbs was called on by the parties to draw the contract between

them. Both the parties were present; and it is evident, that neither of them in stating the contract and its terms to Gibbs mentioned the number of acres in the tract, which would, it seems to me, have certainly been done by Cain, if Mrs. Crislip's statement to him, that the tract contained one hundred and forty acres, had been the inducement to him to buy the land and agree to give $2,000.00 for it. The scribe had before him the deed from Riddle and wife to Allen Crislip, from which he described the tract of land sold. As nothing was said about the quantity of the land, he omitted probably by carelessness to insert in it after copying the boundaries from this deed the words "containing one hundred and forty acres." It was read to the parties; and Cain the vendee objected to it, because the number of acres was left out. The parties got into a little argument about the matter, Cain contending, that he bought the land agreeable to the deed from James Riddle to Allen Crislip containing one hundred and forty acres, and insisting, that the contract should describe the land, as it was in that deed. She agreed, that he should have the land agreeable to that deed. The words "containing one hundred and forty acres" were then inserted copied from this deed from Riddle to Crislip. Cain says, that when it was drawn the second time Gibbs inserted the words "containing one hundred and forty acres more or less," which, he says, he again objected to. It was, he says, changed again by striking out the words "more or less" and then signed. Gibbs says nothing about his having inserted the words "more or less." Cain says, that he refused to take any article of agreement only just in accordance with the Riddle deed. Mrs. Crislip states, that when the contract named one hundred and forty acres following the Riddle deed, it was understood expressly, that if the quantity exceeded the one hundred and forty acres, she was to get but the $2,000.00, and if it fell short, Cain was still to pay $2,000.00; but she is not sustained in this by the scribe Gibbs, whose memory seems not to be very distinct.

Taking all these statements together I infer, that the bargain as made at the house of Mrs. Crislip was, that Cain was to have the land, that Riddle had conveyed to Amos Crislip, for $2,000.00, the same price Crislip gave for it; that nothing

was then said about the quantity of the land, and nothing being said about the quantity, when Gibbs was directed to draw the deed, and he being told that the land, which Riddle had conveyed to Crislip, was the land sold, he carelessly left out the number of acres in copying from this deed, and when it was read, Cain observed that the number of acres was not inserted, and asked, that they be inserted, and Mrs. Crislip admitted, that she sold the land, which had been conveyed by Riddle to Crislip, and the scribe inserted the full description of the land just as it was in that deed.  To my mind it is obvious, when all the facts, which we have stated, are considered in connection with what most probably took place between the parties, when the contract was made, that the conclusion we must draw is, that Cain the vendee was not induced to give $2,000.00 for this tract because of any representation of the quantity made by the vendor Mrs. Crislip.  He knew well, that she did not know the quantity any better than he did, and if he wanted to have the one hundred and forty acres assured to him and was unwilling to buy at $2,000.00, unless it was, he ought to have had the contract changed to a contract by the acre or have had it so written, as to insert in it an express warranty by Mrs. Crislip, that there was at least that quantity of land in the tract.  If he had proposed either of these changes, it seems to me almost certain, that the bargain would have been broken off.  He bought the tract of land in gross and was not deceived as to the quantity by the statement of the vendor.  He did not rely on her statement but bought the farm on his own knowledge of it and gave the $2,000.00 for it, because Allen Crislip had shortly before given that price for it.  On the principles, which we have laid down, he was not entitled to any abatement of the purchase-money because of the deficiency of six and three-fourths acres.

We have found, therefore, no error in the decrees of the court below, and they must be affirmed, and the appellee must recover of the appellant her costs and $30.00 damages; and this cause must be remanded to the circuit court of Roane county to be further proceeded with according to the principles governing courts of equity.

JUDGES JOHNSON AND HAYMOND CONCURRED.

DECREES AFFIRMED.   CAUSE REMANDED.